## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TIMOTHY PRIME, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MANHATTAN ASSOCIATES, INC., EDDIE CAPEL, and DENNIS B. STORY,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Timothy Prime ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Manhattan Associates, Inc. ("Manhattan Associates" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Manhattan Associates' public documents, conference calls, press releases, and stock chart; (c) review and analysis

of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Manhattan Associates securities between October 22, 2024, to January 28, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Manhattan Associates' expected revenue for the fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's ability to forecast guidance despite macroeconomic fluctuations, the growth potential of their professional services offerings, and the ability for their cloud revenue to drive revenue for its professional services.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading

statements and/or concealing material adverse facts concerning the true state of Manhattan Associates' forecasting ability for its professional services; notably, the Company was either not truly equipped to deliver "responsible targets" for growth or, otherwise, Manhattan Associates' services were not equipped to achieve such targets. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Manhattan Associates' securities at artificially inflated prices.

4.      On January 28, 2024, Manhattan Associates published its financial results for the fourth quarter and full fiscal year 2024 and announced reduced revenue guidance for the full fiscal year 2025. The Company attributed its results and lowered guidance on the "shift in professional services work to future periods . . . and to a lesser extent, reduced customization and higher partner utilization."

5.      Investors and analysts reacted immediately to Manhattan Associates' revelation. The price of Manhattan Associates' common stock declined dramatically. From a closing market price of $295.10 per share on January 28, 2025, Manhattan Associates' stock price fell to $222.84 per share on January 29, 2025, a decline of about 24.49% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Manhattan Associates is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Manhattan Associates common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Manhattan Associates is attached hereto.

4

12.    Manhattan Associates, Inc. is a Georgia corporation with its principal executive offices located at 2300 Windy Ridge Parkway, 10th Floor, Atlanta, GA 30339. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MANH."

13.    Defendant Eddie Capel ("Capel") was, at all relevant times, the President, Chief Executive Officer, and Director of Manhattan Associates.

14.    Defendant Dennis B. Story ("Story") was, at all relevant times, the Executive Vice President, Chief Financial Officer, and Treasurer of Manhattan Associates.

15.    Defendants Capel and Story are sometimes referred to herein as the "Individual Defendants." Manhattan Associates together with the Individual Defendants are referred to herein as the "Defendants."

16.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Manhattan Associates' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information

5

available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.   Manhattan Associates is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.   The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Manhattan Associates under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.   Manhattan Associates is a global company that develops, sells, deploys, services, and maintains software solutions for the purpose of assisting in the management of supply chains, inventory, and omnichannel operations for its customers.

20.    The Company offers its "Manhattan Active" applications through the cloud and provides them to customers via its software-as-a-service subscription model (the "Cloud Segment").

21.    Manhattan Associates also offers assistance in the planning and implementation of such solutions thorough its Professional Services Organization (the "Services Segment").

### The Defendants Materially Misled Investors Concerning

### Manhattan Associates' Revenue Outlook for Fiscal Year 2025

#### *October 22, 2024*

22.    On October 22, 2024, Defendants issued a press release announcing 3Q financial results, specifically highlighting:

- Consolidated total revenue was $266.7 million for Q3 2024, compared to $238.4 million for Q3 2023
  - Cloud subscription revenue was $86.5 million for Q3 2024, compared to $65.0 million for Q3 2023.
  - License revenue was $3.8 million for Q3 2024, compared to $3.9 million for Q3 2023.
  - Services revenue was $137.0 million for Q3 2024, compared to $128.0 million for Q3 2023.
- GAAP diluted earnings per share was $1.03 for Q3 2024, compared to $0.79 for Q3 2023.
- GAAP operating income was $75.1 million for Q3 2024, compared to $53.4 million for Q3 2023.

23.    CEO Eddie Capel stated, in relevant part:

Manhattan delivered record third quarter and year-to-date results. Our fundamentals are strong, and we continue to deliver a balanced

financial performance across top-line growth and profitability and industry leading innovation each quarter.

While we remain appropriately cautious on the global economy, we are optimistic on our growing market opportunity and our long-term strategy. ***Our fourth quarter is off to a solid start, and we are providing responsible 2025 parameters.***

24.    During an earnings call the Defendants conducted later the same day, Defendant Capel praised the Company's continued services revenue growth, despite the macroeconomic climate stating, in pertinent part:

> ***Driving the top line outperformance and earnings leverage with solid cloud and services revenue growth across all geographies***, with cloud subscription revenue posting 33% growth in the quarter. ***The Manhattan's business fundamentals are solid, and we remain confident and very optimistic about our business opportunity. While the global macro environment remains challenging, demand for our solutions is robust***, Customer satisfaction is high and as evidenced by our recent release of the Manhattan Active supply chain planning solution, the investments we're making in R&D and our people are creating a clear differentiation, delivering consistent market-leading innovation is creating more opportunities across supply chain, omnichannel retail and at the world's best -- as the world's best brands look to unify and digitally transform.
>
> . . .
>
> Across our industry-leading product portfolio and global pipeline sits at record levels, our win rates remain strong at about 70%. ***And these factors, despite the uncertain macro environment, again, give us confidence that we'll achieve the high end of our 2024 RPO bookings goals and equally important, are well positioned for continued success in 2025, 2026 and of course, beyond that***.
>
> . . .

In Q3, 14% of our new bookings were generated from net new logos, and we continue to have a very healthy mix of conversions, upsells and cross-sells. And we believe this demonstrates the many and varied opportunities we have for sustainable future growth. And as stated earlier, our solution pipeline is at record levels, and new potential customers represent about 35% of that demand. This strong demand is driven by our best-of-breed cloud native solutions that provide continuous access to innovation and helping our customers digitally transform their businesses to drive success.

Our mission-critical solutions help our clients improve customer satisfaction, drive more revenue and improve efficiency. ***And this strong demand for our solutions is also fueling opportunities and growth for our internal services organization and our systems integrator integration partners. In Q3, our global services team completed over 100 go-lives and continue to perform very well for our customers.***

(Emphasis added).

25.    Defendants further touted the strong financial growth of the Services Segment and assured investors the Company was taking into consideration the impact of the "choppy macro environment" in forecasting their guidance. In pertinent part, Defendant Story added:

> ***Our global services teams delivered record revenue totaling $137 million, up 7% as cloud sales continue to fuel services revenue growth for Manhattan***. Adjusted operating profit was $99 million with adjusted operating margin of 37.1%. This is 670 basis points year-over-year, up. ***Our performance was driven by strong cloud and services revenue growth,*** combined with operating leverage as our cloud business continues to scale. As Eddie discussed, ***we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable long-term growth.***
>
> . . .

With that, for the full year 2024, we expect total revenue of $1.039 billion to $1.041 billion, with a $1.04 billion midpoint, which represents 12% growth. For operating margin, we are increasing our midpoint to 34%, this compares favorably from our prior midpoint of 32.1% and 30.4% in the prior year period. As Eddie highlighted, given the demand and size of our opportunity, we continue to invest in our business to fully leverage the new large TAM expansion revenue streams through investments in R&D and sales and marketing.

Our full year earnings per share midpoint is increasing $0.35 to $4.61 and represents 23% growth compared to the prior year. For GAAP earnings per share, our midpoint increases by $0.36 to $3.48 and also represents 23% growth compared to the prior year. ***This implies Q4 total revenue of $253.5 million, which is $3.5 million lower than our prior Q4 midpoint as we now anticipate services revenue of $121.5 million as the choppy macro environment has resulted in several transformational deal pushes, some customers shifting services projects to 2025 and a more pronounced pausing impact from this year's retail peak season***.

We are increasing our cloud target to $89.5 million and maintenance revenue upticks to $33.5 million. Our operating margin target is increasing to 32.5% and is up from our prior 30.5% estimate. The Q4 sequential change in operating margin accounts for retail peak seasonality, which, as a reminder, is when customers idle implementations to focus on their peak busy season.

(Emphasis added).

26.    Defendant Story then turned to presenting the Company's preliminary,

responsible fiscal year 2025 guidance, providing, in relevant part, the following:

Now moving to 2025. We're going to provide some preliminary parameters here. ***We are currently in the very early stages of our 2025 budget cycle, and we'll firm up this outlook on our Q4 call as we get through the U.S. election process and our final market analysis***. With that, we are targeting total revenue of $1.13 billion to $1.14 billion, representing 9% to 10% growth with license and maintenance attrition masking total growth by 5 percentage points. This includes our cloud

revenue target of $415 million, representing 23% year-over-year growth.

For RPO, we are targeting $2.15 billion, which represents 21% growth. In 2025, we are targeting services revenue of $565 million to $575 million. The $570 million midpoint represents 8% growth. On license and maintenance attrition to cloud, we are targeting maintenance revenue to be about $118 million, which represents a 15% decline and for license revenue to be about $5 million, which is well below 1% of total revenue. We anticipate operating margin to be about 33.5%, normalizing for our license and maintenance revenue attrition to cloud, our 2025 operating margin increases roughly 100 bps year-over-year. While we simultaneously increased our investment in our business and hire leading supply chain talent. We expect our 2025 tax rate to be 21% and diluted share count to be approximately 63 million shares, which assumes no buyback activity.

In summary, our preliminary 2025 parameters include total revenue, excluding license and maintenance attrition to increase 14%, cloud revenue to increase 23%, services revenue to increase 8% and an RPO to increase 21% and for an operating margin of 33.5% while increasing our investment in Manhattan leading innovation. All in, solid execution by our global Manhattan team and looking forward to the -- ending the year strong.

(Emphasis added).

27.    Defendant Capel summarized the Defendants' prepared remarks for the earnings call, highlighting their cautious and responsible approach to signaling fiscal year 2025 guidance and their optimism in achieving them:

Well, we're pleased with our Q3 and our year-to-date results. ***While we continue to be appropriately cautious, I think, on the volatile macro conditions. And we did experience a more pronounced impact this quarter, as we said earlier, though, we're still very confident in achieving the high end of our RPO goals for 2024. Longer term, our business fundamentals, win rates and innovation strategies are really solid.***

***And accordingly, we're optimistic about expanding our opportunity and what we've provided what we consider to be, albeit preliminary but responsible targets for 2025***. So we thank everybody for joining the call, and we thank our global team for all the great work that they do for our customers.

(Emphasis added).

28.    A question-and-answer portion followed the Defendants' prepared remarks, during which Defendants fielded multiple questions related to the Company's performance and expectations for the Services Segment in the following pertinent exchanges:

<Q: Terrell Frederick Tillman – Truist Securities – Research Analyst> … Thanks for all the commentary for '25. The one thing on services -- what I'm curious about is because you're talking about hitting at least the high end of your RPO guidance for this year, and it looks pretty constructive in terms of the initial RPO targets for next year.

On the services side, I'm curious, is there something to be said about some of these customers just maybe being more frugal when they sign a contract, maybe they're just using less resources and you're assuming that? Or there's just kind of using maybe a longer duration of rolling it out so it could impact services and/or is there just maybe some incremental conservatism you're baking in because of some of these risk factors like the global macro elections, et cetera?

<A: Eddie Capel> Dennis can talk about any conservatism and so forth, contingency that he may have built into the model. ***But I would tell you that there's kind of 2 components. One is frankly, we are getting more efficient.*** There's no question as we've been -- gone down this journey. Cost of implementing our Manhattan Active Solutions is getting better and better and better. We've seen on a number of fronts. ***Straight efficiency is getting better on the services side. We're seeing far less customization because of the richness of solutions. So that's on our side of the fence.***

And **secondly, as I think you know, we've advanced and enhanced system integrator network.** And the good news is they're doing a healthy amount of the work as well. So we're getting a global reach across systems integrators. So that's a little bit of what's going on in there, strong software, but not quite as strong on the services side, but we see that as largely as a positive.

<Q: Terrell Frederick Tillman> That's helpful. And then I guess maybe just like on the idea, though, just kind of finishing up here, Dennis, in terms of -- there's always an underpromise and overdeliver kind of philosophy here. **Is there some incremental conservatism because of some of these things that you can't really control.** And then the thing that I didn't even plan on asking I'm going to ask you all benefited from some of these customers committing for long durations. Are you still seeing that kind of multiyear, 5-year plus contracting?

<A: Dennis B. Story> Yes. On the multiyear, 5-year contracting, and you hit the nail on the head, **we like to underpromise and overdeliver, Terry. Yes**.

. . .

<Q: Dylan Tyler Becker – William Blair & Company LLC – Research Analyst> You guys called out some of the internal efficiencies on the services side. You also talked about some of the evolution of the partner ecosystem. I would love to just kind of get an update on how you're thinking about offloading to be more of that kind of services work to partners kind of receptivity appetite in growing that ecosystem?

<A: Eddie Capel> Well, first of all, **certainly, our services team have done a fabulous job**. I always have, but continue to get more and more and more efficient. There's no doubt that over the last -- if you kind of look back over the last couple of years, 24 to 30 months or so, frankly, we did a lot of campus recruiting and those guys are really becoming experienced and efficient at what they do now.

Our attrition as being low. So again, we're just sort of infusing experience into our services organization that's creating a great deal of efficiency. On top of that, we're seeing the need for customers to

customize our solution go down. And that is because of the thoughtfulness and the richness of the new solutions that we're introducing in the market. We've always said every time we reengineer one of our solutions from the ground floor up. It's based upon all the product experience that we've gained, WMS, for example, 30 years of experience that we put into Manhattan Active WM, everything you could possibly imagine. And we were able and fortunate enough to be able to start from a clean sheet of paper.

*So less customization is required. That drives services down. And we've been able to attract a larger systems integrator community for sure. And frankly, a number of the bigger global systems integrators that are in the program.* They're all important, don't get me wrong, all of our partners. But when you look at the guys the global REITs, like the Accentures and the caps and the Deloittes and IBMs and so forth. It's not that we're pushing services to them. But if our customers choose to use them either on a regional or a global basis, that's fine by us. And we're just seeing a little bit more of that.

(Emphasis added).

29.    The above statements in Paragraphs 22 to 28 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Manhattan Associates' optimistic reports of growth in its professional services and overall confidence, despite the macroeconomic fluctuations and streamlining of professional services offerings, fell well short of reality; the Company's Service Segment was simply ill equipped to achieve the purportedly "responsible targets" set by Manhattan Associates.

### *The Truth Emerges during Manhattan Associates' Fourth Quarter Earnings Report*

<u>January 28, 2025</u>

30.     On January 28, 2025, Defendants issued a press release announcing fourth quarter and full-year fiscal 2024 financial results. As part of the release, CEO Capel remained optimistic about Manhattan Services' position, stating:

> Manhattan ended the year strong, posting record bookings that exceeded our expectations … In 2024, we surpassed the one billion in total revenue milestone and extended our position as the leading innovator in supply chain and omnichannel retail end-markets.

> We enter 2025 excited about our growing market opportunity and are executing well on our business strategy. While we remain appropriately cautious on the turbulent macro environment, our business momentum is solid, and our team is devoted to our customers' success.

31.     During the same-day earnings call, Defendant Capel highlighted setbacks to the Company's guidance for the Services Segment and blamed this reduced guidance on headwinds caused by customers reducing their planned services work, stating in pertinent part:

> ***Near-term headwinds for our services business surfaced as about 10% of our customers with in-flight implementations reduced their planned services work for the upcoming calendar and fiscal year, and we've adjusted our outlook accordingly.***

> Now ***services continues to be very important to Manhattan. Firstly, because that team ensures our customers' success; and secondly, it keeps us close to our customers. And these tight partnerships help us provide clarity on our customers' needs, which in turn incorporates -- allows us to incorporate that in our future waves of innovation,***

***helping us drive future subscription growt***h. Now in 2025, we'll have a record number of customer implementations, and those customers will continue to spend significantly on Manhattan services, albeit a little less than we had previously planned.

So to summarize, ***this shift in professional services work to future periods, some deal pushes that we highlighted throughout 2024, and to a lesser extent, reduced customization and higher partner utilization, will cause services revenue to trough in the first quarter of 2025***. With new service implementation projects steadily increasing throughout 2025, we anticipate solid sequential services revenue growth in the middle of the year before returning to year-over-year growth in Q4

32.    Defendant Story further elaborated on the reduced guidance for fiscal

year 2025, stating in relevant part:

Additionally, as previously discussed, our bookings performance is impacted by the number and relative value of large deals we close in any quarter, which can potentially cause lumpiness or nonlinear bookings throughout the year. All guidance references made on today's call will be at the midpoint of their respective ranges and remind investors that we provide our preliminary parameters using FX rates at the conclusion of Q3.

For RPO, we are now targeting $2.11 billion to $2.15 billion, with the $2.13 billion midpoint, representing 20% growth. Removing the $33 million FX headwind, our 2025 RPO outlook is $13 million higher than our preliminary parameters. ***For the full year 2025 guidance, we now expect total revenue of $1.06 billion to $1.07 billion. The $70 million difference from our preliminary parameters consists of $20 million of FX headwind, and as Eddie highlighted, a reduction in services revenue.***

This will result in Q1 total revenue of $256 million to $258 million, and we are targeting total revenue of about $266.5 million in Q2, $273 million in Q3 and $269 million in Q4. For 2025 adjusted operating margin, we expect a range of 33% to 33.5%, and an FX in the range is

unchanged from our prior parameters. On a quarterly basis, at the midpoint, adjusted operating margin is expected to be about 31% in Q1, 33.5% in Q2, 34.5% in Q3, and accounting for retail peak seasonality, 34% in Q4.

. . .

So here are some additional details on our 2025 outlook. For full year 2025, we expect cloud revenue of $405 million to $410 million. At the midpoint, this represents 21% growth and ex the FX, the midpoint is unchanged from our earlier parameters. On a quarterly basis, this assumes $93.5 million in Q1, $99.5 million in Q2 and $105 million in Q3 and $109.5 million in Q4.

**_For services, we now expect a range of $494 million to $500 million, and assume steady growth improvement throughout the year as new service projects ramp. On a quarterly basis, this assumes $117 million in Q1, $127.5 million in Q2, $130.5 million in Q3, and accounting for retail peak seasonality, $122 million in Q4._**

(Emphasis added).

33.    During the question-and-answer portion of the call that followed, Defendants were questioned about the poor results in services and year-end RPO mix in the following pertinent exchanges:

<Q: Terrell Frederick Tillman – Truist Securities – Research Analyst> Maybe a bit of a tale of 2 cities, but even towards the end here in your prepared remarks, we all listened with bated breath, and it sounds like software is actually quite resilient, demand-wise. Services, you're seeing some sluggishness.

What I'm curious about in services, and maybe it's too early to tell, but part of this is it's a whole different model with the cloud. And you have 3 plus versions each year, and so there's new stuff coming out. And so I'm just curious where you think we are on cyclicality versus maybe structural dynamics with services going forward?

<A: Eddie Capel> Yes. There's no question that we are becoming much more efficient in implementing our software, that's having some impact. Being the now, I think, unequivocal leader in the space, there are more and more particularly Tier 1 partners that are implementing our software, so that's having an impact as well.

But there is no question, we've seen pressure on budgets. ***As we -- as our customers went into their budgeting cycle, call it, August, September, October of last year, they were more bullish, I think, about how much they wanted to get completed calendar year 2025.***

And we've got, obviously, a whole cadre of fabulous Tier 1 companies that honestly are going to continue to implement our software during 2025 and spend significant services dollars with us, ***just not quite as much as the team -- their teams are anticipating when they originally budgeted in the fall of last year***. So I think they had their budgets pulled back a little bit, and that trickled down to us.

. . .

<Q: Joseph D. Vruwink – Robert W. Baird & Co. Inc. – Senior Research Analyst> Could you maybe provide an update of your year-end RPO mix? I think in the past, you've kind of given a breakout WMS Active Omni TMS. And I'm wondering -- obviously, it sounds like you got some big wins in point-of-sale at year-end. If that product mix begins to shift, does that actually contribute to a shift in kind of services intensity around what needs to happen, and so that also factors in kind of your go-forward "rightsized headcount"?

<A: Eddie Capel> In reverse sequence though, the answer is not really. ***There's not really a big difference across the portfolio in terms of services attach rate. So whether it be planning, point-of-sale, WMS, TMS, OMS, or at least directionally, similar services attach rate.***

In terms of the breakdown of RPO, we don't provide a detailed breakdown there. I would tell you that the preponderance certainly comes from WMS, followed by OMS, followed by TMS and then sort of other. ***But there's no question. We are -- it's slow. It's -- there's nobody more impatient with this than me. But the point-of-sale implementation activity, subscription activity and sales activity***

18

*definitely seems to be picking up. So we're encouraged by that, for sure.*

. . .

<Q: Quinton Amedeo Gabrielli – Piper Sandler & Co.– Research Analyst> And then maybe on the services line, obviously, it's creating some messiness here in 2025. I understand there's some FX that's kind of out of your control, but does this accelerate the company's desire or decision to maybe focus more on leveraging large partners and accelerating kind of your cloud transition first and kind of pushing the services to the side? Or how do you balance that decision of pushing services while also accelerating that cloud growth?

<A: Eddie Capel> So as I said in my prepared remarks, and we've been frankly saying this for a very long time. In 2026, we expect software revenue to exceed services revenue, okay? Obviously, with the growth -- with 20% or so growth on the software line, that makes perfect sense. Now obviously, that tells you what the trajectory looks like in '27, '28 and so on and so forth going forward.

So software is continuing to grow at a faster rate than services. ***Now services is still very important to us, very important to us***. You could put a case together, it's not as important to long-term top line growth as software is, of course, because that's the core of what we do, core of what we build and where our innovation investments go, but ***services are very important for a couple of reasons***.

***One, we feel it's important that we'd be engaged with the client to ensure that they get great success from that software. And second of all, our customers are really an important part of our secret innovation sauce***. So staying very close to them so we understand what market trends are, we can build innovation to be, as I often say, 1/8 of a pace in front of them in the market is very, very important.

***But again, you bring up a good point there. But no. No intentions of moving away from the services busine***ss, but we certainly expect the software revenue to continue to grow much faster with that line crossing in 2026.

. . .

<Q: William A. Jellison – D.A. Davidson  – Analyst> The first relates to professional services, and I wanted to get an update, because in the past, you've spoken to some strong increases in efficiency within that organization, in part related to record low attrition in the services labor force. And I was just curious on where we are with those kinds of trends. And in light of the updated expectations for services in 2025, how are you thinking about hiring in that organization?

<A: Eddie Capel> So first of all, *efficiency continues to grow and efficiency continues to get better. There's no question about that. And we -- our attrition is certainly very low in our professional services organization. So again, that continues to be a driver of efficiency.*

*In terms of hiring, obviously, we've got to balance out supply and demand, to state the very obvious. We've seen a downtick in demand, so we'll keep a very close eye on what that profile looks like. We expect it to start picking up in the back half of the year, but we've got time be able to monitor that situation before we decide specifically what the hiring profile in services for 2025 looks like.*

(Emphasis added).

34.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the October 22, 2024, earnings call. On that call, Defendants continually praised the Services Segment's continued growth, customer demand for the Company's solutions, the ability for cloud revenue to "fuel" revenue growth in the Services Segment, and their overall RPO bookings potential, while continually minimizing risks associated with seasonality, the global macroeconomic environment, and

Manhattan Associates' own streamlining of the professional services offerings on the Services Segment's ability to achieve its projected revenue.

35.    Investors and analysts reacted immediately to Manhattan Associates' revelation. The price of Manhattan Associates' common stock declined dramatically. From a closing market price of $295.10 per share on January 28, 2025, Manhattan Associates' stock price fell to $222.84 per share on January 29, 2025, a decline of about 24.49% in the span of just a single day.

36.    A number of well-known analysts who had been following Manhattan Associates lowered their price targets in response to Manhattan Associates' disclosures. For example, William Blair, while reiterating their market perform rating post drop highlighted that Manhattan Associates ought to have been aware of budgetary scrutiny before the January print, pertinently stating:

> We note that the ongoing budgetary scrutiny is not entirely new and has led to pipeline elongation in the business since the second quarter of 2024, leading to lighter quarterly outperformance relative to the company's historical cadence. Accordingly, when paired with elevated expectations and a premium valuation going into the print … we are not surprised to see shares off more than 20% after hours.

The analyst went on to note that "[i]mportantly, these deals are not being canceled, but the uncertainty around the timing of projects continues to drive volatility in the model."

37.    Similarly, Piper Sandler, while considerably reducing their price target, cautioned that, "[w]hile FX did create an incremental $20M revenue headwind for

the year, Services was the larger driver of the weakness, with 10% of customers reducing planned service work for FY25." The analyst further noted that "[n]egatively, Services in the [fourth] quarter was $119.5M / ~flat Y/Y, missing Street by ~2%. This implied a fairly material stepdown in the RPO attach rate, as large Tier-1 customers slowed services usage."

38.    The fact that these analysts, and others, discussed Manhattan Associates' shortfall and below-expectation projections suggests the public placed significant weight on Manhattan Associates' prior revenue and sales estimates, particularly as they relate to the Services Segment. The frequent, in-depth discussion of Manhattan Associates' fiscal year 2025 guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

39.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Manhattan Associates' common stock and operated as a fraud or deceit on Class Period purchasers of Manhattan Associates' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Manhattan Associates' common stock materially declined, as the prior artificial inflation came out of the price over time.

As a result of their purchases of Manhattan Associates' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

40.     Manhattan Associates' stock price fell in response to the corrective event on January 28, 2025, as alleged *supra*. On January 28, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Manhattan Associates' forecasting processes and growth guidance.

41.     In particular, on January 28, 2025, Manhattan Associates announced significantly below-market growth expectations, reducing their own prior guidance for fiscal year 2025 by $70 million.

### *Presumption of Reliance; Fraud-On-The-Market*

42.     At all relevant times, the market for Manhattan Associates' common stock was an efficient market for the following reasons, among others:

(a)     Manhattan Associates' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Manhattan Associates communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Manhattan Associates was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Manhattan Associates was reflected in and incorporated into the Company's stock price during the Class Period.

43.    As a result of the foregoing, the market for Manhattan Associates' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Manhattan Associates' stock price. Under these circumstances, all purchasers of Manhattan Associates' common stock during the Class Period suffered similar injury through their purchase of Manhattan Associates' common stock at artificially inflated prices, and a presumption of reliance applies.

44.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

46.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading

and the "forward-looking statement" was authorized and/or approved by an executive officer of Manhattan Associates who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Manhattan Associates' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Manhattan Associates' common

stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Manhattan Associates or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2024, there were 60.9 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

50.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Manhattan Associates;

(c)    whether the Individual Defendants caused Manhattan Associates to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Manhattan Associates' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

28

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including

Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Manhattan Associates common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Manhattan Associates' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Manhattan Associates' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

58.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts

were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Manhattan Associates' internal affairs.

60.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Manhattan Associates' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Manhattan Associates' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Manhattan Associates'

common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

61.    During the Class Period, Manhattan Associates' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Manhattan Associates' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Manhattan Associates' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Manhattan Associates' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants

### for Violations of Section 20(a) of the Exchange Act

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Manhattan Associates' misstatements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Manhattan Associates which had become materially false or misleading.

67.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Manhattan Associates disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Manhattan Associates to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Manhattan Associates' common stock.

68.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Manhattan Associates to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.     By reason of the above conduct, the Individual Defendants and/or Manhattan Associates are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

//

//

//

35

Dated: February 25, 2025                    Respectfully submitted,


**LAW OFFICES OF
DAVID A. BAIN, LLC**


*/s/ David A. Bain*
David A. Bain
Georgia Bar No. 032449
1230 Peachtree Street, NE
Suite 1050
Atlanta, GA 30309
Tel.: (404) 724-9990
Fax: (404) 724-9986
Email: dbain@bain-law.com

*Liaison Counsel for Plaintiff*

      -and-

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and 14-point font.

Dated:  February 25, 2025

*/s/ David A. Bain*
David A. Bain
Georgia Bar No. 032449
Law Offices of David A. Bain, LLC
1230 Peachtree Street, NE
Suite 1050
Atlanta, GA 30309
Telephone: (404) 724-9990
Facsimile: (404) 724-9986
dbain@bain-law.com

Counsel for Plaintiff