# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| TIMOTHY PRIME, *et al.*, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MANHATTAN ASSOCIATES, INC., EDDIE CAPEL, and DENNIS B. STORY, <br><br> Defendants. | Case No. 1:25-cv-00992-TRJ <br><br> <u>CLASS ACTION</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

# AMENDED COMPLAINT FOR VIOLATIONS OF
# <u>THE FEDERAL SECURITIES LAWS</u>

## **TABLE OF CONTENTS**

GLOSSARY ......................................................................................... iv

I.    PRELIMINARY STATEMENT ............................................................. 2

II.   JURISDICTION AND VENUE ............................................................ 9

III.  THE PARTIES .................................................................................. 9

      A.    Plaintiffs ............................................................................... 9

      B.    Defendants ......................................................................... 11

IV.   RELEVANT NON-PARTIES ............................................................. 13

      A.    Former Employees of Manhattan ........................................ 13

V.    SUBSTANTIVE ALLEGATIONS ...................................................... 16

      A.    Company Background ......................................................... 16

      B.    Manhattan's Services Business is its "Secret Weapon" ....... 18

      C.    To Remain Competitive, Manhattan Began Offering Cloud-Based
            Software .............................................................................. 25

      D.    The Company Positioned its Cloud Subscriptions as a Driver of
            Services Revenue ............................................................... 29

      E.    Behind the Scenes, the Company's Cloud Products Eroded
            Manhattan's Ability to Generate Services Revenue ........... 33

            1.    The Company's Cloud Products Required Fewer Ongoing
                  Services by Design ................................................... 33

            2.    Failed Cloud Implementations Damaged Customer
                  Relationships and Lowered Services Demand .......... 41

      F.    The Company's Hiring Practices and Lack of Work for its Services
            Employees' Evidenced Manhattan's Declining Services
            Performance .......................................................................... 54

i

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
       OMISSIONS OF MATERIAL FACT ............................................................. 65

       A.    Q2 2024 Earnings Call (July 23, 2024) ............................................. 65

       B.    Q3 2024 Earnings Call and Press Release (October 22, 2024) ........... 72

VII.   DEFENDANTS REVEALED THE TRUTH THROUGH A SERIES OF
       PARTIAL DISCLOSURES ........................................................................ 80

       A.    Q3 2024 (October 22, 2024) ............................................................. 80

       B.    Q4 2024 (January 28, 2025) ............................................................. 83

       C.    Press Release (February 10, 2025) .................................................... 88

VIII.  SCIENTER ALLEGATIONS ...................................................................... 89

       A.    Defendants Knew Services Demand was Declining and They Could
             Not Meet Their Services Revenue Forecasts ...................................... 89

       B.    Defendant Capel's Abrupt Resignation, Shortly After the
             Revelation of Poor Guidance, Raises a Strong Inference of Scienter. 94

       C.    The Company's Services Employees—Some Hired Just Prior to the
             Start of the Class Period—Lacked Work, and Were Eventually
             Terminated ...................................................................................... 95

       D.    Manhattan's Services Business Was the Self-Described "Secret
             Weapon" of the Company .................................................................. 98

IX.    LOSS CAUSATION ................................................................................. 101

X.     PRESUMPTION OF RELIANCE ............................................................. 102

XI.    CLASS ACTION ALLEGATIONS ............................................................ 104

XII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
       AND BESPEAKS CAUTION DOCTRINE ................................................ 107

XIII.  CONTROL PERSON ALLEGATIONS ...................................................... 108

XIV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................ 110

COUNT I  For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Defendants Manhattan, Capel, and Story.................................110

COUNT II  For Violations of Section 20(a) of the Exchange Act and SEC Against Defendants Capel and Story.........................................................113

XV.    PRAYER FOR RELIEF ...........................................................116

XVI.   DEMAND FOR TRIAL BY JURY ...........................................117

# GLOSSARY

| | |
|---|---|
| 2023 Form 10-K | Manhattan's Form 10-K for the fiscal year ended December 31, 2023, filed with the SEC on February 5, 2024. |
| 2024 Form 10-K | Manhattan's Form 10-K for the fiscal year ended December 31, 2024, filed with the SEC on February 7, 2025. |
| APAC | Asia-Pacific. |
| Capel | Defendant Eddie Capel, former President and Chief Executive Officer of Manhattan. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Class | All persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Manhattan during the Class Period, and were damaged thereby. |
| Class Period | July 24, 2024, through February 7, 2025, inclusive. |
| Company or "Manhattan" | Manhattan Associates, Inc. |
| CSO | Customer Services Organization. |
| Defendants | Manhattan and the Individual Defendants. |
| EMEA | Europe, Middle East, and Africa. |
| Exchange Act | Securities Exchange Act of 1934. |
| FY | Fiscal Year. |
| Gantt | Stewart Gantt, Executive Vice President of Global Support and America's Services. |

| Hough | Senior Vice President and Chief People Officer Suzanne Hough. |
|---|---|
| Individual Defendants | Defendant Eddie Capel, former President and CEO of Manhattan, and Defendant Dennis B. Story, Executive Vice President and CFO of Manhattan. |
| MAOM | Manhattan Active Order Management. |
| MASCP | Manhattan Active Supply Chain Planning. |
| MATM | Manhattan Active Transportation Management. |
| MAWM | Manhattan Active Warehouse Management. |
| OMS | Order Management System. |
| PSO | Professional Services Organization. |
| Q1 2024 | First fiscal quarter of 2024, covering the period from January 1, 2024 through March 31, 2024. |
| Q2 2024 | Second fiscal quarter of 2024, covering the period from April 1, 2024 through June 30, 2024. |
| Q3 2024 | Third fiscal quarter of 2024, covering the period from July 1, 2024 through September 30, 2024. |
| Q4 2024 | Fourth fiscal quarter of 2024, covering the period from October 1, 2024 through December 31, 2024. |
| RPO | Remaining Performance Obligations. |
| SaaS | Software as a Service. |
| SEC | Securities and Exchange Commission. |
| Services | Manhattan's offered professional and customer services— which include implementation, support, training, hardware |

| | |
|---|---|
| | integration, and ongoing optimization to help its customers deploy and manage the Company's software. |
| SOX Certifications | Certifications pursuant to the Sarbanes Oxley Act of 2022 which attest to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. |
| Story | Defendant Dennis B. Story, Executive Vice President and CFO of Manhattan. |
| TMS | Transportation Management Solutions. |
| WMS | Warehouse Management Solutions. |

Court appointed Lead Plaintiffs City of Orlando Police Officers' Pension Fund ("Orlando Police"), City of Orlando Firefighters' Pension Fund ("Orlando Firefighters"), and City of Orlando General Employees' Pension Fund ("Orlando General") and, alongside Orlando Police and Orlando Firefighters, "Lead Plaintiffs"), and additional class representative Timothy Prime ("Prime"), by their undersigned counsel ("Lead Counsel"), bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Manhattan Associates, Inc. ("Manhattan" or the "Company") during the period from July 24, 2024 through February 7, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs assert claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act") against: Manhattan; the Company's former President and Chief Executive Officer ("CEO"), Eddie Capel ("Capel"); and the Company's Executive Vice President and Chief Financial Officer ("CFO"), Dennis B. Story ("Story") (collectively, "Defendants," and without Manhattan, the "Individual Defendants").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing investigation of Lead Counsel. This investigation includes review and analysis of, among other

things: (i) public filings made by the Company with the Securities and Exchange Commission ("SEC"); (ii) transcripts of the Company's conference calls with analysts and investors; (iii) the Company's presentations, press releases, and other public statements issued by Defendants; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning the Company and Defendants; (vi) economic analyses of the movement and pricing of the Company's publicly traded common stock; and (vii) interviews of former employees of the Company (referred to as "FE-__"). Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

1.    Manhattan is a global corporation that sells software solutions to manage supply chains, inventory, and omnichannel operations. However, Manhattan does not just sell software—it sells Service. The Company's Professional Services Organization ("PSO") and its Customer Services Organization ("CSO") consist of experts who assist customers in implementing, customizing, and upgrading Manhattan's software products.

2.     These Services are optional. Still, almost all the Company's customers, ranging from small businesses to Fortune 500 companies, elected to use them. Manhattan's Services business played a significant role in driving revenue, contributing over 50% of the Company's total revenue during the Class Period and for years before it.

3.     Manhattan's Services business is its "***secret weapon***," as characterized by Defendant Capel, the Company's President and CEO during the Class Period.[1] According to Capel, Manhattan's Services business "drive[s] ROI and customer satisfaction," is a "key driver[] of [the Company's] steady demand," and a "real key differentiator" for the Company. Analysts also viewed the Company's Services business as a differentiator, with one analyst noting that "[o]ne unique aspect of Manhattan's business mix relative to other enterprise software vendors is the size of its professional service division, representing approximately 50% of total company revenues."

4.     Manhattan historically offered on-premise software. This meant that the Company's Services business would install Manhattan's proprietary software on a customer's own servers. Eventually, however, the Company began to offer cloud-based software to its new and existing customers. Manhattan's cloud-based software is hosted on remote, third-party servers that customers can access through the

---

[1] Unless otherwise noted, all emphasis is added.

internet. The transition from offering on-premise software to offering cloud-based software raised the question of how cloud-based software would impact the Company's Services business.

5.      Defendants had an answer. They told investors that the Company's "***best-of-breed cloud-native platform***" was "***fuel[ing] service revenue growth for Manhattan***." However, despite Defendants' statements that its cloud-based offerings would foster growth of Services revenue, the introduction of the Company's cloud-based software eroded the Company's ability to generate Services revenue and stunted Services growth.

6.      Indeed, Manhattan's cloud-based software did not require the same level of maintenance as its on-premise products did. For example, while on-premise software requires expensive manual upgrades, cloud-based software updates automatically. As such, Services demand declined as customers with cloud-based software did not need help from Manhattan's PSO or CSO as often. Notably, FE-1, a former Engagement Director at Manhattan, reported that the Company "***knew internally by April 2024***" that it was not going to make its full year 2024 Services revenue forecasts "***because the sales pipeline was not there, it was dry***."

7.      Moreover, Manhattan's cloud-based software was often faulty and failed to work as well as its legacy on-premise software. According to FE-2, a former Software Implementation Consultant and member of the Company's PSO,

Manhattan's cloud products "were not ready to be rolled out for customer implementation." Technical issues with the cloud-based software disappointed Manhattan's customers, who often delayed or pulled out from their contracts in response. Consequently, demand for Manhattan's Services decreased.

8.      Numerous former Services employees reported experiencing a lack of work during the Class Period, consistent with a decline in Services demand. For example, FE-3, a member of the Company's PSO, described Manhattan's business as slow throughout his tenure from January 2024 to January 2025, adding that the Company was consistently lacking in projects for him and his colleagues to work on. This lack of work prompted a hiring freeze of new Services employees and eventual rounds of mass layoffs. FE-2 advised that he was a part of a mass layoff in January 2025, and the documentation given for his termination stated, "***not enough work***."

9.      Despite knowing that Manhattan's cloud-based products caused a decline in Services demand, Defendants made materially false and misleading statements to investors emphasizing the consistent growth of the Company's Services business, which artificially inflated Manhattan's share price. For example, during the Company's second quarter 2024 ("Q2 2024") earnings call, Defendant Story told investors that "***cloud sales continue to fuel services revenue growth for Manhattan***," and explained that Manhattan's "***performance was driven by strong***

*cloud and services revenue growth*." Notably, Defendants also reported that Services revenue would increase in Fiscal Year ("FY") 2025.

10.    Analysts believed Defendants' misrepresentations. For example, after the Company's Q2 2024 earnings call, Equisights noted that Manhattan's "global services team is killing it, delivering high-quality implementations that drive customer satisfaction and long-term loyalty," and attributed Services revenue growth as "*primarily driven* by the rise in cloud subscriptions."

11.    Defendants also made materially false and misleading statements about its hiring posture of Services employees. Indeed, after enacting a hiring freeze of Services employees and conducting rounds of layoffs, Defendant Capel still told investors, during the Company's Q2 2024 earnings call, that Manhattan plans "*to continue to hire*" and that those "*hires will be largely in customer-facing roles*." These statements gave the misleading impression that Manhattan's Services demand had increased to such a level to require additional labor resources.

12.    Again, analysts believed Defendants' misrepresentations. For example, after the Q2 2024 earnings call, Rosenblatt issued an analyst report titled "First Look at Q2 – Healthy Growth Continues During Shift to Cloud Offering" and, relying on Defendants' assertions, noted that: "Manhattan plans to hire several hundred employees in 2024 to support its Services growth."

13.    After months of misrepresenting the strength of Manhattan's Services business, the relationship between cloud products and Services demand, and the Company's hiring posture for Services employees, Defendants revealed, through a series of partial disclosures, the truth. First, during the Company's third quarter 2024 ("Q3 2024") earnings call on October 22, 2024 after the close of trading, Defendants revealed that they expected fourth quarter 2024 ("Q4 2024") Services revenue of $121.5 million, a $15.5 million sequential decline from Q3 2024. The Company also lowered its total revenue projection for Q4 2024 by $3.5 million, which represented a $10.8 million sequential decline from Q3 2024. On this news, Manhattan's stock price dropped $20.96 per share, or 7.2 percent, to a close price of $271.36 per share on October 23, 2024. However, Defendants continued misleading investors on October 22, 2024, and Manhattan's stock price remained inflated.

14.    Then, on January 28, 2025, during the Company's Q4 2024 earnings call, Defendants further disclosed that Q4 2024 Services revenue was $119 million, another $2 million below their most recent projections, and a total of $11 million below their projected revenue at the start of the Class Period in Q2 2024. Defendants further revealed that "***near-term headwinds for our services business have surfaced as about 10% of our customers with in-flight implementations reduced their planned services work***" and revised the Company's FY 2025 projections from

$1.13-$1.14 billion down to $1.06-1.07 billion for total revenues and from $565-$575 million down to $494-$500 million for Services revenue.

15.     On this news, Manhattan's stock price dropped $72.26 per share, or 24.5 percent. Analysts reporting on Manhattan were surprised to learn that the Company's Services business was not growing as Defendants had represented. For example, a Piper Sandler analyst report following this announcement noted that "services drags down FY25" was "not the surprise we were hoping for." This report attributed the Company's significant share price drop to an "uncharacteristic" revenue guide cut noting that "Services was the larger driver of the weakness."

16.     Less than two weeks after this announcement, Defendants revealed the full extent of lower Services demand on the Company when, before trading on February 10, 2025, Manhattan filed a Form 8-K with the SEC announcing Defendant Capel's departure as CEO. That day, Manhattan also published a press release disclosing that "Eddie Capel, Manhattan's President and CEO, will retire from his position effective February 12, 2025," just two days later. On this news, the price of Manhattan's stock price dropped another $23.20 per share, or 11.5 percent, to close at $177.70 per share on February 10, 2025.

17.     Lead Plaintiffs bring this action to hold Defendants responsible for their fraud and the resulting significant losses suffered by investors.

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

20.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Manhattan is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

21.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    THE PARTIES

### A.    Plaintiffs

22.    Lead Plaintiff Orlando Police is a single-employer, defined benefit public pension fund based in Orlando, Florida. Orlando Police manages over $800 million in assets for the benefit of its over 1,800 active and retired participants. Orlando Police purchased Manhattan common stock during the Class Period (as set

forth in its certification, ECF No. 28-3) and suffered damages as a result of the violations of the federal securities laws alleged herein.

23.     Lead Plaintiff Orlando Firefighters is a single-employer, defined benefit public pension fund based in Orlando, Florida. Orlando Firefighters oversees approximately $500 million in assets for the benefit of over 1,000 participants and their beneficiaries. Orlando Firefighters purchased Manhattan common stock during the Class Period (as set forth in its certification, ECF No. 28-3) and suffered damages as a result of the violations of the federal securities laws alleged herein.

24.     Lead Plaintiff Orlando General is a single-employer, defined benefit public pension fund based in Orlando, Florida. Orlando General oversees approximately $200 million for the benefit of its nearly 100 participants and their beneficiaries. Orlando General purchased Manhattan common stock during the Class Period (as set forth in its certification, ECF No. 28-3) and suffered damages as a result of the violations of the federal securities laws alleged herein.

25.     Additional class representative and named plaintiff Prime is an individual who purchased Manhattan common stock during the Class Period (as set forth in his certification, ECF No. 27-4) and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

26.     Manhattan is a Georgia corporation with its principal executive offices located at 2300 Windy Ridge Parkway, 10th Floor, Atlanta, GA 30339. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MANH." According to the Company's Form 10-K for the FY ended December 31, 2024 ("2024 Form 10-K"), as of February 3, 2025, Manhattan had outstanding 61,124,051 shares of common stock.

27.     Defendant Capel was, at all relevant times, the President, CEO, and Director of Manhattan and held these positions since 2013. Prior to that, he served as Manhattan's Executive Vice President since 2000. Capel has over 30 years of experience in supply chain strategy and operations. As of February 12, 2025, Capel transitioned out the roles of CEO and President of Manhattan and now serves as the Executive Chairman of the Board. Throughout the Class Period, Capel gave prepared remarks and answered questions at each of the Company's earnings conference calls and signed Manhattan's quarterly and annual financial reports and SOX certifications attached thereto.

28.     Defendant Story was, at all relevant times, the Executive Vice President, CFO, and Treasurer of Manhattan. Story joined Manhattan in March 2006. Prior to this, he served as Senior Vice President of Finance for Fidelity National Information Services, Inc. Throughout the Class Period, Story gave

prepared remarks and answered questions at each of the Company's earnings conference calls and signed Manhattan's quarterly and annual financial reports and SOX certifications attached thereto.

29.    Defendants Capel and Story are sometimes referred to herein as the "Individual Defendants." Manhattan together with the Individual Defendants are referred to herein as the "Defendants."

30.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Manhattan's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. During their tenure, each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

31.    Manhattan is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

32.    The scienter of the Individual Defendants, and other employees and agents of the Company, are similarly imputed to Manhattan under *respondeat superior* and agency principles.

## IV.    RELEVANT NON-PARTIES

### A.    Former Employees of Manhattan

33.    FE-1 was formerly employed by Manhattan as Engagement Director from April 2018 to January 2025, and he[2] worked at the Company's headquarters in Atlanta, Georgia. According to FE-1, his responsibilities as Engagement Director were akin to those of "a super Project Manager," in that once a contract was signed and the roadmap for software implementation team was in place, he was in charge of the project—above the project management—in getting updates from and giving directives to his team, and going to the customer for additional revenue requests if needed. FE-1 advised that in his final reporting structure, he reported to Vice President of Professions Services Kevin Bass, who reported to Executive Vice

---

[2] In order to protect confidentiality, masculine ("he/him") pronouns will be used to describe the former employees of Manhattan throughout this Complaint, irrespective of those former employees' actual gender and/or identity.

President of Global Support and America's Services Stewart Gantt ("Gantt"), who reported to Defendant Capel.[3]

34.    FE-2 was formerly employed by Manhattan at the Company's headquarters in Atlanta, Georgia from January 2024 to January 2025 as a Software Implementation Consultant. According to FE-2, as a Software Implementation Consultant he was part of the Company's PSO. His responsibilities included implementing Manhattan's warehouse management systems for the supermarket chain H-E-B. FE-2 advised that he reported to Senior Project Manager Wesley Hunter, who reported to Director, Professional Services Organization Travis Hébert.[4]

35.    FE-3 was formerly employed by Manhattan from January 2024 to January 2025 as Consultant and he worked at the Company's headquarters in Atlanta, Georgia. According to FE-3, he was a member of Manhattan's PSO of which his responsibilities included implementing the Company's Manhattan Active Solutions[5] for customers, which he described as Manhattan's supply chain platform. FE-3 explained that the Manhattan Active platform consisted of different solutions

---

[3] According to FE-1, Manhattan personnel communicated through Microsoft Teams messenger.

[4] According to FE-2, he communicated with his colleagues through the Company's Microsoft Teams application.

[5] As explained in more detail *infra* Section V.C., Manhattan Active Solutions is the Company's cloud-based platform that hosts its suite of cloud-native products.

including demand forecasting, allocations, customer relationship management, and transportation management as some examples, adding that he worked on the warehouse management solution portion of the platform. FE-3 advised that he reported to a Project Manager, who reported to a Senior Project Manager.[6]

36.    FE-4 was formerly employed by Manhattan from January 2024 through February 2025. He described his duties as configuring Active Warehouse Systems for many different clients.

37.    FE-5 was formerly employed by Manhattan at the Company's headquarters in Atlanta, Georgia, as a Technology Consultant from January 2023 to February 2025. FE-5 advised that he was a member of Technical Services, and his responsibilities included resolving technical issues in a customer's system on the Point of Sale side, which a project was transferred to after PSO finished implementing the software. According to FE-5, he reported to Technology Leader Kannan Rajappa, who reported to Vice President, Technology Services Udai Tennati, who he believes reported to Vice President of Professional Services Divya Rajan.

38.    FE-6 was formerly employed by Manhattan from March 2023 to February 2025 as an Assistant Manager of Talent Acquisition at the Company's

---

[6] According to FE-3, the Company used Salesforce for at least some of its customer relationship management and sales related information, adding that he and his PSO colleagues provided updates on any work they did to their managers via email.

India operations in Bengaluru, India. According to FE-6, his responsibilities as Assistant Manager of Talent Acquisition included scouting and hiring the Company's PSO and CSO talent in India. FE-6 advised that he reported to Head of India Talent Acquisition, Arijit Deb, who reported to Senior Director Human Resources, Sujatha Sata, who reported to Senior Vice President and Chief People Officer Suzanne Hough ("Hough"), who worked at headquarters in Atlanta, Georgia.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

39.    Manhattan is an Atlanta, Georgia based corporation that provides software solutions to manage supply chains, inventory, and omnichannel operations. It was founded in 1990 in Manhattan Beach, California, and incorporated in Georgia in 1998. The Company's customers include retailers, wholesalers, manufacturers, and logistics providers spanning various industries including apparel, food, auto parts, and pharmaceuticals, for example.

40.    The Company's products include supply chain software intended to manage the warehousing, distribution, and transportation of a company's products. For example, the Company offers its Warehouse Management Solutions ("WMS") software for distribution management. The WMS software coordinates the flow of inventory and data across a distribution center. For transportation management, Manhattan offers its Transportation Management Solutions ("TMS") software,

which helps shippers plan and execute day-to-day transportation requirements. For order management, Manhattan provides its Order Management System ("OMS") that helps retailers fulfill orders by showing inventory and managing order fulfillment.

41. The Company reports its revenues across five categories: (1) software licenses, which are permissions for a customer to use Manhattan's software as it exists at the time of purchase; (2) cloud subscriptions, which include Software as a Service ("SaaS") and hosting revenues; (3) maintenance revenue, which consists of revenues from software upgrades; (4) hardware revenue, that represents revenues from hardware products developed and manufactured by third parties; and (5) Services revenue, which is derived from fees generated through professional and customer relations Services, "including solutions planning and implementation, related consulting, customer training, and reimbursements from customers for out-of-pocket expenses."

42. In the years leading up to the Class Period, and during the Class Period itself, Services accounted for a majority of the Company's total revenue, as demonstrated in the chart below:

| Year | Total Revenue | Services Revenue | Services Revenue as a % of Total Revenue |
|------|---------------|------------------|------------------------------------------|
| **2020** | $586.4 million | $303.6 million | 52% |

| 2021 | $663.6 million | $334.8 million | 50% |
| 2022 | $767.1 million | $394.1 million | 51% |
| 2023 | $928.7 million | $487.8 million | 53% |
| 2024 | $1,042.4 million | $525.5 million | 51% |

43.     Manhattan also reports its Remaining Performance Obligations ("RPOs") as a key metric. According to the Company, the RPO metrics "represents contracted revenue that has not yet been recognized, which includes deferred revenue and non-cancelable amounts that we expect to invoice and recognize as revenue in future periods." Moreover, the Company has disclosed that: "[a]s of December 31, 2024, approximately $1.8 billion of revenue is expected to be recognized from remaining performance obligations. Over 98% of our remaining performance obligations represent cloud native subscriptions with a non-cancelable term greater than one year (including cloud-deferred revenue as well as amounts we will invoice and recognize as revenue from our performance of cloud Services in future periods)."

**B.     Manhattan's Services Business is its "Secret Weapon"**

44.     In a highly competitive and complex industry, Manhattan has attempted to differentiate itself through its Services capabilities. Indeed, Defendant Capel described the Company's Services business as its "secret weapon."

18

45.    Manhattan's Services business consists of professional consultants and experts who assist customers with the implementation of the Company's software products, the conversion and transfer of the customer's data onto the new systems, ongoing training and education, and regular system upgrades. The Company touted its professional Services as a system that: "enable[s] customers to implement our software rapidly, ensure[s] the customer's success with our solutions, strengthen[s] our customer relationships, and add to our industry-specific knowledge base for use in future implementations and product innovations."

46.    According to the Company, its Services revenue "consists of fees generated from implementation, training, and application managed services, including reimbursements of out-of-pocket expenses in connection with our implementation Services."

47.    Specifically, Manhattan's Services segment consists of two organizations that have distinct roles: the PSO and the CSO. First, the Company's PSO is responsible for the implementation of the core software product, which includes "system planning, design, configuration, testing, and other software implementation support," and subsequent customization to align its products with each customer's specific business requirements. The PSO offers technical support and training to Manhattan's customers and ensures the smooth adoption of the software product until the "go-live," or the shift from testing a product to its actual

real-world operation. According to the Company, its PSO "delivers deep supply chain and enterprise commerce domain expertise to [its] customers through industry-specific 'best-practices' protocols and processes developed through the collective knowledge [] gained from 30 years of implementing [its] supply chain solutions worldwide."

48.    After a customer's "go-live," the CSO steps in. According to the Company, "[f]ollowing implementation, customers who have purchased perpetual licenses may purchase application managed services to support and maintain our software." Indeed, the CSO works on post-implementation support and ongoing optimization of Manhattan's software solutions. According to the Company, its CSO team performs regular system health monitoring of its software products and helps in implementing new functionality for its products.

49.    FE-2, a former Software Implementation Consultant employed by Manhattan from January 2024 to January 2025, explained that in a purchased subscription, customers are expecting the additional Services of: (1) customization of the software, (2) modifications, (3) on-site testing, (4) go-live, and (5) CSO service after the go-live.

50.    Services are offered in one of two ways: (1) under time and materials contracts, where customers are billed by the hour, and the Company recognizes resulting revenue over time as the Services are performed; or (2) on a fixed-fee basis,

where payments are due on specific dates or milestones, and revenue is recognized over time based on the proportion of the work performed. Notably, fees generated from work performed by both the PSO and the CSO contribute to the Company's Services revenue.

51.    Manhattan repeatedly emphasized that its Services offerings are optional, but that the majority of its customers utilize that option to maximize the Manhattan projects. For example, in its Form 10-Q for the quarterly period ended June 30, 2024, filed on July 26, 2024, the Company disclosed that: "[a]lthough our professional services are optional, the majority of our customers use at least some portion of these services for their planning, implementation, or related needs." That customers voluntarily elect to use these Services speaks to their value to the customers, and consequently, to the Company.

52.    Defendant Capel further explained that Manhattan's Services business is a key driver of the Company's total revenues, as Defendants consistently depicted the Services segment as one that drives demand. For example, during the Baird Global Consumer, Technology & Services Conference, held on June 6, 2023, an analyst asked Defendant Capel if he considered the Company's Services business "dependable." In response, Capel affirmed that Manhattan's Services business was "important to us," expanding that: "[i]t's a large part of our revenue, but it's important for, we believe, to drive ROI and customer satisfaction and even more

strategically for us to be able to be very close to our customers and understand what product roadmap and footprint needs will look like going forward."

53.    Moreover, on October 24, 2023, during Manhattan's Q3 2023 earnings call, Defendant Capel emphasized that the Company's "ability to deliver industry-leading solutions and service to our customers are key drivers for our steady demand."

54.    On January 28, 2025, Defendant Capel continued to stress the critical nature of the Company's Services:

> Now **Services continues to be very important to Manhattan**. Firstly, because that team ensures our customers' success; and secondly, it keeps us close to our customers. And these tight partnerships help us provide clarity on our customers' needs, which in turn incorporates – allows us to incorporate that in our future waves of innovation, helping us drive future subscription growth.

55.    Defendant Capel also emphasized the strategic importance of Manhattan's Services during Manhattan's Fireside Chat on February 12, 2025, and in response to an analyst question about the importance of Services, Defendant Capel stated that:

> **Services is very, very important** to us. Of course, it's still top line revenue for us and so on, but it's strategically important, right? Because it's – we feel like it's very, very important that we'll be involved in the final part of the software implementation to ensure our customers get full value from our software products, number one.
>
> And then sort of somewhat selfishly for us, it means that we're shoulder to shoulder with our customers each and every day. So as we think about our next innovation cycles, ***we are connected at the hip with our***

*customers. We know exactly what to build. We know where the market is going. So services continues to be strategically important to us.*

56.    Defendants also touted its Services business model as one that differentiates the Company from its competitors. Indeed, on March 4, 2024, during the Raymond James Institutional Investor Conference, Defendant Capel emphasized that: "the real key differentiator for us having our services guys side by side with the customers is we know exactly what's going on in the marketplace. So, we've been very fortunate over the years to – we've never build [sic] new products that haven't gone anywhere. We tend to build products that the market needs and that's one of the key ways that we get that intelligence."

57.    Even further, on April 23, 2024, during Manhattan's first quarter 2024 ("Q1 2024") earnings call, Defendant Capel described the Company's Services business as its "***secret weapon***[]" due to its ability to offer "the perspective of being shoulder-to-shoulder with our customers, understanding what market trends look like, understanding what their specific needs look like, and informing our product roadmap as we go forward."

58.    FE-2 advised that the idea that Services revenue was key to the Company is "100% true," as that is what he was told internally as well.

59.     Investors and analysts viewed the Company's Services business model as a key value driver. For example, a Baird analyst report dated February 2, 2024 stated that:

> ***One unique aspect of Manhattan's business mix relative to other enterprise software vendors is the size of its professional service division***, representing approximately 50% of total company revenues. While services are optional, a majority of Manhattan customers utilize the expertise of Manhattan associates in the planning and implementation of new software licenses, cloud subscriptions, or system upgrades. The virtues of an expert service network are readily apparent when sophisticated enterprise customers pursue warehouse management implementations/upgrades, typically requiring heavy customization ahead of initial installation, complex onboarding of customer data and integration with other IT systems, and extensive training/education for personnel that will subsequently manage the system.

60.     The market understood that Manhattan did not just sell software products. The Company sold customization, deep expertise, and hands-on support—*i.e.*, Services—as part of its overall business strategy, ensuring that Manhattan would continue to yield revenues following the initial implementation of the Company's software. Indeed, an Equisights analyst report dated November 10, 2024 epitomized this business model by noting Manhattan's "'land and expand' strategy, where initial deployments of one solution open avenues for the introduction of additional services."

### C.    To Remain Competitive, Manhattan Began Offering Cloud-Based Software

61.    Manhattan historically offered its software products *on-premise*, meaning that the Company's customers hosted the software on their own servers. However, within the past few years, the Company transitioned its core business model from offering its products *on-premise* to offering cloud-based products. This meant that the software was instead hosted on third-party servers, such as the Google Cloud Platform. Prior to and during the Class Period, Manhattan offered Services for both its *on-premise* and cloud-based software products.

62.    Over the past decade, the use of cloud-based software in supply chain planning has exploded. Cloud adoptions became mainstream as top supply chain management software suppliers like SAP and Oracle began generating billions in cloud subscription revenues. Notably, these companies were Manhattan's main competitors.

63.    Manhattan needed to start offering cloud-based products not only to remain competitive, but to ensure the Company's survival. Indeed, during the June 6, 2023 Baird Global Consumer, Technology & Services Conference, and in response to an analyst question regarding the Company's cloud products and competition, Defendant Capel stated that, "[t]he number one driver for moving to the cloud" was that the Company would be "no different from any other company." Capel went on to emphasize that the need for "more flexibility, more agility, and

greater access to new innovation" led to the Company's cloud offerings. Moreover, in a Manhattan press release titled "Manhattan Associates Launches Supply Chain Commerce Solutions on Google Cloud Marketplace," Capel stressed that: "[i]n today's dynamic market, cloud-driven flexibility isn't just an advantage – it's essential for business success."

64.    As such, beginning in May 2017, the Company introduced the Manhattan Active Solutions Platform, which is a cloud-based platform that serves as a foundation for Manhattan's suite of cloud-native products. According to the Company, Manhattan's Active Platform Solutions are "cloud-native products designed to provide 'always-current' version-less product access." These cloud-based products are distinct from its historic *on-premises* software.

65.    The Manhattan Active applications are available as subscription-based software. According to the Company, "[u]nder our Manhattan Active Solutions cloud subscription offering, customers pay a periodic fee for the right to use our software within a cloud environment that we provide and manage over a specified period of time." Indeed, the Company sells Manhattan Active in multi-year cloud subscription arrangements, which typically last for a period of five years or more.

66.    FE-3, who was formerly employed by Manhattan as a Consultant, and whose responsibilities included implementing the Company's Manhattan Active products for customers, explained that the Manhattan Active platform consisted of

different solutions including demand forecasting, allocations, customer relation management, and transportation management as some examples, adding that he worked on the warehouse management solution portion of the platform.

67.    The specific products offered within the Manhattan Active Platform suite include Manhattan Active Warehouse Management ("MAWM"), Manhattan Active Transportation Management ("MATM"), Manhattan Active Order Management ("MAOM"), Manhattan Active Omni, Manhattan Active Supply Chain Planning ("MASCP"), and Manhattan Active Labor Management. MAWM is the cloud-based version of the Company's WMS, which customers use to manage their distribution centers.

68.    FE-2, a former Software Implementation Consultant who was also responsible for implementing Manhattan's MAWM, explained that MAWM was one of Manhattan's most popular selling software licenses and that Manhattan had started off as a warehouse management software company. He described Manhattan's MAWM business segment as its most important segment that contained the most used products by clients (as compared to other segments such as MATM), estimating that it accounted for "well over 50%" of the Company's revenues, and was the largest department at Manhattan. He added that MAWM is still one of the Company's main revenue generators.

69.    One of the key products included in the Manhattan Active suite is the MAWM software, which was first released in May 2020. The Company offers MAWM to its new and upgrading customers. MAWM runs on the Google Cloud Platform, and the Company offers this product exclusively through subscriptions. In its 2024 Form 10-K, Manhattan touted that MAWM:

> includes state of the art fulfillment optimization technology, a consumer grade mobile app experience for the associate, and embedded gamification capabilities to improve associate engagement and performance. Manhattan Active WM is fully configurable and technically extensible, meaning customers can build their own componentry to work alongside our base application. Manhattan Active WM also embeds labor management and slotting optimization capabilities. Manhattan's WMS customers benefit from its embedded warehouse execution system that coordinates the interaction between automation, robotics and labor for maximum efficiency. Manhattan's WMS also enables the efficient utilization of a single distribution center for direct-to-consumer, retail replenishment and high-volume wholesale fulfilment. Our WMS provides the customer the most productive operation that can scale to meet the highest demands during peak season while operating effectively and profitably throughout the course of the year.

70.    After the release of MAWM, Manhattan continued to roll out new cloud-based products as part of the Manhattan Active suite even during the Class Period. For example, the Company's newest cloud-based product is its MASCP software, which Manhattan officially released in October 2024. According to the Company, the MASCP unifies demand forecasting, replenishment, and allocation on the same cloud-native platform. During the Company's Q3 2024 Earnings Call on October 22, 2024, Defendant Capel highlighted that MASCP "runs continuously,

constantly fine-tuning order quantities, even on orders that are already processing in their distribution center." Capel also trumpeted this product as "really transformative because it allows real-time demand data from throughout the day to continuously shape the final order quantities right up until those orders are ready to be shipped."

71.    During the Company's Q3 2024 earnings call, Defendant Capel emphasized how the MASCP significantly enhanced the performance of the Company's other products. For example, Capel noted how the Company's "WMS and TMS users are fascinated by our vision of combining these solutions" with the MASCP in order to "improve their ability to execute in the field."

72.    Ultimately, as noted by Defendant Capel during the Q3 2024 earnings call, the Company's "supply chain agility is simply unachievable without the industry's leading cloud native platform that we call the Manhattan Active Platform."

### D.    The Company Positioned its Cloud Subscriptions as a Driver of Services Revenue

73.    In addition to generating cloud subscription revenue, Manhattan positioned its cloud-based products as a strategic means to drive the Company's important Services revenues. In its Form 10-K for the FY ended December 31, 2023 ("2023 Form 10-K"), the Company noted that: "[a]s with our cloud subscriptions, customers often continue to purchase our professional services beyond their initial implementation to roll out additional locations, implement additional features and

functionality, and implement additional products, as well as for general support." The 2023 Form 10-K also disclosed that the Company's "future revenue is dependent on continuing sales from cloud subscriptions, which in turn drive sales of professional services. [The Company] is dependent on our new customers as well as our large installed customer base to purchase additional cloud subscriptions and professional services from us."

74. Moreover, in both its Form 10-Q for the quarterly period ended June 30, 2024, filed on July 26, 2024, and its Form 10-Q for the quarterly period ended September 30, 2024, filed on October 25, 2024 (*i.e.*, during the Class Period), the Company continued to emphasize that "Services revenue growth is contingent upon cloud sales and customer upgrade cycles." As acknowledged in Manhattan's SEC filings, the Company's revenue growth depended on the success of its cloud subscriptions which, in turn, would drive increased utilization of its Services.

75. Over the years, an increasing share of Manhattan's Services revenues has come from its cloud-based products—rising from 55% of Service revenues in 2022 to 70% in 2023 and reaching 75% in 2024.

76. Analysts widely accepted that Manhattan's cloud adoption was a key driver of the Company's Services growth. Indeed, a Morningstar analyst report dated February 1, 2024, recognized that: "[t]he firm continues to find success in migrating its customers to the cloud, which in turn also increases services revenues."

77.    Moreover, an Equisights analyst report dated May 2, 2024 noted that the Company's cloud subscriptions drove an increase in Services revenues during Q1 2024:

> The 14% growth in services revenue, totaling $132 million in the first quarter, highlights Manhattan Associates' successful diversification and expansion in its service offerings. ***This growth is directly linked to the robust performance and expansion of their cloud solutions***, ***as these technologies require complementary services such as implementation, training, and ongoing support***. The record number of over 100 customer go-lives in this quarter alone reflects the effective execution and delivery capabilities of Manhattan's professional services team. ***Such a high level of activity not only boosts immediate revenue but also solidifies client relationships*** by ensuring successful adoption and maximization of the software's capabilities. ***Manhattan Associates is actively investing in their services sector by scaling their operations to support the anticipated increase in demand following their product innovations and cloud services expansion.*** This strategy is evidenced by their plans to meet a significant 2024 hiring goal, aiming to onboard several hundred new associates to support growth areas. This expansion in workforce is aligned with their strategic focus on enhancing customer success and broadening their market reach, further enabling them to tap into new industries and regions which could benefit from their integrated supply chain solutions. This proactive approach in building a robust service framework supports sustainable growth by enhancing client engagement and ensuring successful solution deployments across varied industry verticals.

78.    Additionally, an Equisights analyst report, dated August 6, 2024, emphasized that: "***Services revenue saw a significant increase*** of $12.2 million, with contributions from the Americas ($9.7 million), EMEA ($1.0 million), and APAC ($1.5 million) segments. ***This increase was primarily driven by the rise in***

***cloud subscriptions***, with approximately 75% of professional services revenue related to cloud subscriptions in Q2 2024, up from 68% in Q2 2023."

79.     During the Class Period (i.e., July 24, 2024 through February 7, 2025), Defendants promoted both Manhattan's cloud-based products and related Services—claiming that cloud subscriptions and Services revenues would grow in tandem. For example, during the Company's Q2 2024 earnings call on July 23, 2024, which occurred after the market closed, Defendant Capel emphasized the Company's "best-of-breed cloud-native platform" as one that "***fuel[s] opportunities for growth of [its] internal services organization***." Defendants repeatedly emphasized that "***cloud sales continue[d] to fuel service revenues growth for Manhattan***" throughout the Class Period.

80.     Based off the sales of cloud-based products and the touted "***fuel***" it provided to Services, during Manhattan's Q2 2024 earnings call on July 23, 2024, Defendant Story messaged that the Company would achieve full year 2024 Services revenues of "$535 million to $539 million, with the $537 million midpoint representing 10% growth." Story further explained that: "[o]n a quarterly basis, we are targeting Q3 services revenue of $136 million, and accounting for retail peak seasonality, $130 million in Q4."

81.     However, while the Company championed the strength of its Services segment, Defendants failed to disclose that, contrary to Defendants' statements and

assurances to the market, the introduction of its cloud-based products actually diminished customer demand for Services and were on track to cause a decline of the Company's most important revenue driver: Services revenues.

### E. Behind the Scenes, the Company's Cloud Products Eroded Manhattan's Ability to Generate Services Revenue

82. While promising investors that cloud products would drive Services revenue, Defendants failed to disclose that the opposite was in fact occurring, and the introduction of cloud products eroded the Company's ability to generate Services revenues in more than one way. *First*, Defendants and others at the Company knew that Manhattan's cloud-based products would require far less Services support than the Company's on-premise products, and that this differing level of demand did and would continue to lead to less Services revenue than was expected by the market. *Second*, the Company offered deficient cloud products that caused project delays, damaged client relationships, and consequently lowered Services demand.

### 1. The Company's Cloud Products Required Fewer Ongoing Services by Design

83. Manhattan experienced declining demand for its Services both prior to and during the Class Period because its cloud products required fewer ongoing Services. Indeed, as reported by a key former Project manager, FE-1, the Company's cloud products did not require Services updates in the same way that its on-premises products did, consequently leading to less Services revenues.

84.    FE-1 was formerly employed by Manhattan as Engagement Director from April 2018 to January 2025, and he worked at the Company's headquarters in Atlanta, Georgia. According to FE-1, his responsibilities as Engagement Director were akin to "a super Project Manager," in that once a contract was signed and the roadmap for software implementation team was in place, he was in charge of the project—above the Project Manager—in getting updates from and giving directives to his team, and going to the customer for additional revenue requests if needed. FE-1 advised that in his final reporting structure he reported to Vice President of Professional Services Kevin Bass, who reported to Executive Vice President of Global Support and America's Services Gantt, who reported to CEO Defendant Capel.

85.    According to FE-1, the Company has traditionally made the majority of its revenue from regularly updated versions of the software which was required by the onsite servers. He explained that every 5 to 10 years or so, Manhattan's customers paid millions of dollars to have their onsite software upgraded to new versions, and the upgrades were the business model for onsite servers.

86.    This changed in 2017, according to FE-1, when the Company introduced its cloud-based software, and with various management solutions like MAWM and the others that rolled out between 2018 to 2021. FE-1 explained that when the cloud-based version went live in 2017, existing customers started

converting from onsite to cloud-based systems. FE-1 noted that the Company would generate Services revenue by helping its existing customers transition to cloud.

87.    However, FE-1 explained that the cloud-based software is SaaS (Software as a Service) and did not require upgrades the same way that onsite servers did and the Company would generate minimal Services revenue from cloud-based software. With the cloud-based software, Manhattan's business model changed from offering on-premise software upgrades (as part of Services) to offering Services in the form of adding new features and maintenance. According to FE-1, once the online software was fully implemented, customers did not feel the need for enough new features and maintenance for the Company to meet its Services revenue forecast. FE-1 added that the switch to cloud-based software meant a "major downgrade" from millions of dollars' worth of Services for updates for the onsite servers/software, to thousands of dollars' worth of Services for cloud-based modifications and new features. He described the situation as a "bubble that was ready to burst" and one that he "saw coming from a mile away."

88.    FE-1 explained that Services were expected to decrease when transitioning to cloud, adding that it was in **the Company's sales pitch that transitioning to cloud would be the "last upgrade you would ever do."**

89.    Moreover, according to FE-1, the SaaS Services offered by Manhattan "became commoditized." He explained that once the transition or implementation of

SaaS for a customer was complete, third-party consultants, including former Manhattan employees, who "knew how to activate and/or design features" could be, and were, hired by customers to activate features at lower rates than Manhattan charged.

90.     FE-1 recalled that it was around mid-to-late 2023 when it was clear that existing customers had stopped transitioning from onsite to cloud-based MAOM. By early 2024 it became clear that there were not going to be enough transitions left or new projects to meet the FY 2024 MAOM service revenue forecast. FE-1 added that it became clear around June 2024 that the MAWM and MATM fiscal year numbers were in trouble of not being made, and that it was in the second half of 2024 when it was clear they were not going to be made with the number of conversions left to do and a lack of new customers. He suggested that the problems with the MAWM and MATM revenue forecasts were manifested later than MAOM because those two systems began their conversations later and had more customers to convert.

91.     FE-1 noted that the Services sales pipeline had "gone dry" by early 2024 as a result of switching from onsite servers to cloud-based software. Specifically, FE-1 noted that the sales pipeline for MAOM, which was the segment he worked in, had "gone dry" by the end of Q1 2024 as a result of switching from onsite servers to cloud-based software. According to FE-1, it was clear by June 1, 2024, that MAWM and MATM "were both in trouble" of not meeting their FY 2024

forecasts. He described MAWM and MATM as responsible for a majority of the Company's revenues, with MAWM alone responsible for around 50% of revenues. Thus, according to FE-1, the Company "*knew internally by April 2024*" that MAOM was not going to make its full year 2024 Services revenue forecast by the end of FY 2024, which he advised was the same as a calendar year. FE-1 recalled that "*everyone at the Director level and above*" saw at the end of Q1 2024 that MAOM was not going achieve Q2 2024 Services revenue forecast, or FY 2024 Services revenue forecasts, "*because the sales pipeline was not there, it was dry*." He recalled that it was around July 2024 when it became clear that MAWM and MATM were not going to make their FY2024 Service revenue forecasts as well. He added that the forecasts were not going to be made because it was seen that the sales were not in the pipeline for the rest of 2024 to make that year's forecasts.

92.    Moreover, FE-1 noted that he found it "very hard to believe" that Defendants' 2025 Service revenue projections were "sincere," noting that it felt "dishonest." FE-1 went on to say that Services revenue numbers were declining and there was no rationale for why Services would get a boost in revenue in 2025. He recalled that Services related to all software—*i.e.*, MAOM, MAWM, MATM—was on the same downward trajectory and there was nothing that was expected to raise Services numbers, noting that there was nothing in the pipeline that would have helped boost revenue.

93.     According to FE-1, "high level executives" were aware that the various FY Service revenue forecasts were not going to be met because of the updates they received that were generated by Salesforce. FE-1 reported that each month the Engagement Directors updated their forecasts in Manhattan's Salesforce system. Those monthly updates consisted of that month's actual numbers, the next month's projection, and the following quarter's projection. He advised that this was then repeated at the end of each month. Excel spreadsheets containing the forecasts were generated from Salesforce and circulated "all over the place" (internally at the company) monthly by email. These spreadsheets contained of all service revenue projections for all projects across PSO, CSO and each management system— MAOM, MAWM, MATM and planning & allocation—and FE-1 added that "*everyone could see we were not going to make the 2024 service revenue forecast*."

94.     Defendants themselves knew that Manhattan's Services business was in decline. According to FE-1, PowerPoint presentations on each Engagement Director's service revenue forecasts were also generated from Salesforce on a monthly basis by their respective Vice President, Professional Services, which was Kevin Bass in FE-1's case for MAOM. He described Bass as reviewing the presentation on FE-1 forecast with him and "drilling down" on it to fully understand the basis for FE-1's forecast. Bass in turn forwarded the presentation and spreadsheet to Executive Vice President, Global Support and America's Services Gantt—who

FE-1 advised was in charge of all services groups—who "rolled it up" and presented the accumulated forecasts to Defendant Capel and Defendant Story. FE-1 noted it was "the Company's documented rules" that Gantt would review that information with the C-suite on a monthly basis. FE-1 also recalled Bass once telling him that the presentations were needed for Gantt to present to the C-suite.

95.    FE-1 also recalled high level executives directing him and the other directors to proactively ask customers for new or early orders, which FE-1 never recalled having been done before in his tenure. He stated that this directive was given in a meeting to Directors, including FE-1, first in May 2024 and again in September 2024. Specifically, FE-1 recalled he and his Engagement Director colleagues each being directed in May 2024 to get around $50,000 in new orders for 2024, and were then directed again in September 2024 to get a larger amount of $100,000 each in new orders, with both requests made to help meet the Q4 and 2024 fiscal year Services revenue targets. FE-1 noted that the second time he was directed to increase sales, he was given a higher number to meet, signaling to him that the Company was significantly behind on its Services goals.

96.    FE-1 stated that it was harder to convince customers to buy more Services the second time around in September 2024, because they had already "beat the bush" asking for them to take on more services around May 2024. He reported that customers did not comply with the Company's request for additional and

unnecessary orders in September and the fourth quarter, or at least not enough to meet 2024's guidance. He felt it was an unethical request to make and made him uncomfortable enough to decide to start looking for new employment.

97.    FE-1 recalled that a senior level executive led these meetings where he was directed to ask customers for new or early orders. He also recalled that Defendant Capel attended at least one of these meetings, and possibly Defendant Story as well. He suggested that there may be an internal recording of Capel speaking at these meeting(s) he attended. FE-1 described "the tenor" of the meetings as bonuses were not going to be great that year unless the extra Services revenue was brought in.

98.    FE-1 described Defendant Capel as "a very hands-on CEO" and heavily engaged in the performance of the Company. As one example, FE-1 advised that Capel met with Engagement Directors every other week in what was internally referred to as "Key Account Reviews." According to FE-1, not every Engagement Director met with Defendant Capel each time but rather the Engagement Director(s) whose turn it was to speak was chosen ahead of time and scheduled by Senior Engagement Director – Professional Services, George Bozocea, who FE-1 described as being "like the gatekeeper" for these reviews.

99.    FE-1 explained that the key accounts to be reviewed were decided upon by Stewart Gantt and Defendant Capel, adding that it usually involved larger

accounts or they could be accounts that were facing substantial delays. FE-1 explained that these reviews were focused on how certain projects were progressing. FE-1 recalled that Capel routinely offered to call key people at the account if the Engagement Director or Gantt felt it would be helpful in any way.

100.    FE-1 advised that he presented to Defendant Capel around twice a year in these Key Account Reviews, which he suggested was around the number of times that each Engagement Director presented to Capel. FE-1 recalled that Defendant Story was present for around 90% of the reviews that he was involved in. He further described Capel as heavily engaged and getting "into the weeds" during these reviews, including giving feedback on how to address certain IT issues with customers, as an example, and offering to talk with a key figure at an account like the CIO, as another example. FE-1 described Capel's feedback as trying to "smooth waters" where there were delays.

101.    Based on FE-1's allegations, it is clear that Manhattan's switch from on-premise software to cloud-based software caused the decline of the Company's Services business. Moreover, Defendants Capel and Story knew that demand for Manhattan's Services decreased.

### 2. Failed Cloud Implementations Damaged Customer Relationships and Lowered Services Demand

102.    In addition to an—undisclosed—fundamental change in the Company's business model, Services revenues also suffered from the fact that

Manhattan's cloud-based software was faulty and riddled with technical issues that prevented Services from being delivered, even if requested by customers. Indeed, rather than offering a supposed "best-of-breed" cloud software, the Company rolled out a defective product that often did not work as well as the Company's legacy *on-premise* software. As explained by multiple former employees, Manhattan's cloud products suffered from systemic flaws, and the Company's customers were often left frustrated and disappointed. This led to a further decline in Services revenues given declining customer relationships and the corresponding reputational harm.

103.    FE-2 was formerly employed by Manhattan at the Company's headquarters in Atlanta, Georgia from January 2024 to January 2025 as a Software Implementation Consultant. According to FE-2, as a Software Implementation Consultant, he was part of the Company's PSO. FE-2 reported that Manhattan's cloud products "were not ready to be rolled out for customer implementation."

104.    FE-2 explained the process and timeline for the implementation of Manhattan's cloud-based software products—and related Services—explaining that there were six general phases. *First*, the Company offers a "core" base model of the cloud-based software. *Second*, following the offering of the "core" base model, Manhattan's customers have the option to engage in Services. According to FE-2, customers can enter the "Customization" phase, which usually takes approximately 8 to 12 months, in which the core cloud-based software is customized to a specific

client's needs. According to FE-2, "every single warehouse and every single company is completely different, so customization is needed," and thus, most customers choose to customize. FE-2 explained that the revenues from Customization (and any steps thereafter) are rolled into Manhattan's Services revenues.

105.   *Third*, following the "Customization" phase, there is a "Virtual" testing phase, where a virtual environment is set up matching the test location's warehouse and modifications to the software. *Fourth*, following the "Virtual" testing phase, there is an "On-Site" testing phase, which takes anywhere from two weeks to two months. In this step, after the cloud-based product is modified remotely over time to meet the needs of the test warehouse location, the Software Implementation Consultant (FE-2, in this case) would go on site to the client's warehouse location and test the cloud-based software. *Fifth*, following testing, the product would "Go-Live" for the client. *Sixth*, and finally, the client has the option to engage with the CSO, which takes over from the PSO, and which according to FE-2, consists of "technically minded" people providing continuing Services to the client related to the cloud-based software.

106.   FE-2's responsibilities as a Software Implementation Consultant included implementing Manhattan's MAWM for the supermarket chain H-E-B. He stated that H-E-B had been a longtime customer of the Company and had been very

happy and satisfied with Manhattan's onsite servers and warehouse management software. FE-2 was tasked with implementing MAWM at H-E-B's distribution location in Weslaco, Texas. This was the test location before it was to be rolled out and implemented at the supermarket chain's approximately four other Texas distribution centers once MAWM had proven to be working correctly at Weslaco. He recalled that H-E-B had signed their contract for cloud-based Services around 6 to 12 months before the implementation began, and the contract still had a few years on it.

107.    According to FE-2, MAWM was "not ready to be rolled out for customer implementation" and faced "technical issues," and that this fact was widely known internally. He further explained that the cloud-based software needed "a few more years" of development and was likely rushed to market for profit. According to FE-2, "all of us in PSO" believed that the software should have had a couple more years before it was released publicly, as that is what led to the Services revenue issues. According to FE-2, he also spoke with members of Manhattan's R&D team in India who told him they felt that the cloud-based software was rolled out too early.

108.    FE-2 reported that when MAWM was initially implemented in Weslaco, it became readily apparent that the cloud-based version was not duplicative in functionality of the onsite software version, meaning that it had not been created to do everything that the onsite server software could do for H-E-B's needs. This

included, FE-2 added, the cloud-based version "lacking" some of the "core features" of the onsite server version that H-E-B had been using. FE-2 added that multiple product requests were placed for features that existed in the onsite server version.

109.    FE-2 recalled an example of problems with H-E-B's MAWM, advising this was one of many. Specifically, in warehousing, customers create license plate numbers for pallets of items to be scanned into their system and put in storage to later be distributed to their supermarkets. FE-2 explained, however, that customers often need to cancel the scan for various reasons and that while the onsite server-based version of the Manhattan MAWM that H-E-B had allowed for this, the cloud-based version did not. FE-2 further recalled that 18 hours was the estimate built into the contract for resolving the "cancel disposition," but that he wound up spending around 160 on it, adding that it was still not truly fixed by the time his tenure ended. FE-2 described the budget for the H-E-B project as being "exceeded by magnitudes."

110.    FE-2 advised that Manhattan's technical team in India had written the code for the cloud-based Manhattan Active solutions. According to FE-2, this team also provided the patches or corrections as they worked with the PSO consultants, including FE-2, when implementing the software for a customer. FE-2 explained that when he and/or H-E-B discovered a new problem with the WMS cloud-based software, the workflow was that he created a ticket detailing the problem which he would then email to the tech team in India.

111. Given the time difference between the U.S. and India, he would not receive a response with a proposed solution from the India-based technical team until the following day. He advised that the solution from the technical team in India, however, was not always correct or did not solve the problem. This would then require more time to resolve as FE-2 and the technical team would have to go back-and-forth over a period of time, which took longer given the time difference. FE-2 further recalled spending "2-1/2 months of work that was non-billable" with the Manhattan tech team in India on developing a patch or "band-aid," which he described as a work-around the best they could come up with, did not completely work or meet the customer's needs, and that H-E-B was not happy about it.

112. FE-2 recalled that H-E-B was extremely disappointed and upset with the cloud-based service throughout his tenure because of the unexpected additional time and expenses required to create "workarounds" for what was not working in MAWM.

113. FE-2 reported that the full implementation and go-live for the Weslaco location was originally scheduled to be completed May 2024, but in light of problems with the software it was then pushed back to October 2024, then to May 2025, and then pushed back again to sometime in 2026 by the time his tenure ended in January 2025.

114.   According to FE-2, his experience with H-E-B was not the only negative one at the Company given his conversations with colleagues and acknowledgement from more senior level personnel. FE-2 advised that he and other PSO implementation consultants working on MAWM often confided in one another that many of their customers were experiencing similar problems with MAWM. He added that the MAWM issues were experienced by the entire MAWM team regardless of what type of customer—supermarket or otherwise—as far as he was aware.

115.   According to FE-2, senior level executives were updated on problems with implementation after rollouts because the Project Managers and Engagement Directors held separate meetings with their supervisors who in turn met with their supervisors. He also recalled having private conversations with Director, Professional Services Organization Travis Hébert, who FE-2 advised was another Engagement Director at the time, where Hébert acknowledged the problems with the core software. FE-2 also advised that Hébert reported to and attended meetings with the Vice President level. He further recalled Hébert attending meetings led by FE-2's supervisor, Senior Project Manager Wesley Hunter, where complaints of "timelines taking too long" were discussed.

116.   FE-2 recalled that in a meeting in approximately September of 2024, when the Director of Professional Services Organization, Travis Hébert, stated that

"the core MAWM was experiencing a code quality issue," and acknowledged that there were "problems with the coding" in the core MAWM software that had been created by the tech team in India, and that the Company was working on fixing it. FE-2 advised that also present at this meeting was the MAWM implementation team including him, Lead Consultants, Senior Project Manager Wesley Hunter, and someone from technical Services in India.

117.   FE-2 recalled this meeting was held regarding problems that customers were having in customizing their cloud-based MAWM software. He also recalled one example of the core issue leading to "user interface customization being executed poorly" was how barcodes scanning used by H-E-B and other warehousing customers did not consistently work. He also recalled H-E-B being so annoyed with the delays that one of their senior executives, possibly the CIO of H-E-B, attended one of these meetings on MS Teams.

118.   FE-2 noted that his knowledge of systemic-wide MAWM problems came from his side conversations with colleagues and the acknowledgement from Hébert. FE-2 recalled that Hébert had other meetings with Vice Presidents that he reported to, suggesting to FE-2 that Hébert most likely discussed the coding issues with those more senior level personnel.

119.   Additionally, FE-5 also reported that he heard from colleagues that WMS was experiencing problems with their codes and implementation.

120.   Crucially, the Company's inability to deliver functional cloud products to its clients caused declining Services revenues. Multiple former employees working within the Company's Services segment reported that they spent most of their time trying to find "workarounds" for the fundamental issues the cloud products suffered from. Notably, because these problems stemmed from baseline features the product was expected to deliver, the Services employees could not bill for this remediation work and the Company had to "eat the costs." These issues damaged the Company's relationship with its customers and often led to them delaying, deferring, or cancelling their contracts.

121.   Indeed, FE-2 reported that Services revenues were projected to decline because much of the service work being done by Manhattan for its cloud-based software was for non-billable purposes, which was an incurring expense or as FE-2 described it, "eating into profits." FE-2 advised that the Company's goal was for 80% of the service work to be "billable," that is 80% of the service work that was done needed to be able to be billed to customers. FE-2 recalled that 40% of his service time was non-billable because he was working with the tech department in India on fixing and patching issues with MAWM. He described it as Manhattan having "to eat costs" on an estimated "50% of billables."

122.   FE-2 suggested that while there was some buffer of unexpected additional service costs built into a contract, that it was not enough to pay for the

amount of time spent by Service personnel on fixing or patching the number of problems with the MAWM software. He added that, as a result, the Company absorbed those additional costs which reduced its profit margin on projects because they did not want to ask the customer for more money and risk looking bad to the customer.

123.    FE-2 further explained that the Company expected the customer to be billed for no more than eight hours a day, adding that work beyond eight hours was not billed to the customer or project / contract. However, FE-2 often worked well beyond eight hours per day trying to resolve issues with features and that the additional time was not considered billable, adding that the Project Manager consistently reminded consultants to not bill more than eight hours day. FE-2 also noted that there was an "unwritten companywide policy" that you cannot bill more than 40 hours a week.

124.    FE-2 added that his project that he worked on for H-E-B was one of the worst in terms of eating costs on billables because of the high number of problems experienced due to the higher complexity that came along with the higher number of customizations requested by H-E-B. FE-2 described H-E-B as one of the largest supermarket chains in Texas, adding that it had a lot of visibility within Manhattan Associates because they were experiencing so many issues with implementation.

125.    FE-2 also advised that the Canadian supermarket chain, Loblaws, was another one of Manhattan's largest companies, bigger than H-E-B, and was experiencing even more difficulties. FE-2 advised that he was aware of problems with the Loblaws implementation because of his conversations with colleagues working on it. He added that it was an internal joke at Manhattan that someone was being punished if they were moved to the Loblaws account, given all the problems it was experiencing.

126.    According to FE-2, the effect of the cloud-based software issues was that there was a: (1) net loss in revenues from a financial perspective; (2) customers were wary about moving forward with the go-live schedule; (3) there were delays in the go-live; (4) the business relationships created by upper management were not working anymore due to quality issues and the quality decline, leading to reputational decline; and (5) some of Manhattan's clients pulled out due to lack of performance. FE-2 added that Manhattan's clients who had committed to working with Manhattan had decided to pull out because of the cloud-based software issues, noting that clients would pull out before the go live of MAWM. Moreover, he added that as a result of the problems in transitioning to the cloud-based management system(s) experienced by customers for the systems they already had, that they did not want to add additional management systems, such as – for example – a current MAWM customer deciding to not add MATM.

127.    FE-2 emphasized that because of the issues with Manhattan's cloud products, customers were wary about moving forward with go lives. According to FE-2, a couple of Manhattan's clients had pulled out of their deals. FE-2 detailed that customer sentiment had been a lot lower during his tenure and the Company was not getting as many deals or contracts. He further explained that many of Manhattan's clients are large Fortune 500 companies, and he has witnessed and seen clients leave the Manhattan ecosystem completely due to the technical issues and go to a third-party competitor.

128.    FE-2 also reported that Manhattan's customers were looking for outside consultants to replace or supplement the Company's CSO department after software went live. He became aware of this because a Manhattan MAWM customer sent him a direct message after he was terminated asking him to work as a consultant on the MAWM software, and he was aware that other former MAWM colleagues were approached by other Manhattan customers, too.

129.    According to FE-2, one of the key selling points by Manhattan was modification and customization of the software. He suggested that if customers had known the number of issues involved in customization they would not have signed the contracts. He further suggested that if customers were leaving Manhattan, it was because of technical issues experienced in the implementation and customization.

130.    FE-4 similarly reported working on non-billable work for Manhattan's customers. FE-4 was formerly employed by Manhattan as a PSO Consultant from January 2024 through February 2025. He described his duties as configuring the Company's Active Warehouse Systems for many different clients.

131.    FE-4 described how he was staffed on a variety of projects for different clients. He expressed that he was frustrated because he was continuously assigned to "non-billed work" on behalf of different clients. He explained that, when clients enter contracts with Manhattan, those contracts include a certain amount budgeted for consulting fees. He elaborated that he was persistently staffed on cases where he was not permitted to bill the clients for the work he was doing, because the work was outside the allocated budgets for consulting Services for those clients. He added that the work still needed to be done, however, even though he could not bill for it. These assignments, he continued, harmed his performance metrics, because consulting employees' performance was measured in part on the amount of revenue they generated through billable work.

132.    FE-4 reported that in his view, the Company was not clear with its clients regarding realistic budgets and/or how many hours needed to be billed to configure its systems properly. He commented that he did not understand why the Company could not have predicted this issue, or why management did not properly analyze client budgets and contracts, so that necessary work could be billed

appropriately. He characterized it as the Company "overpromising and under-delivering" on the work that needed to be done.

133.   Similarly, FE-1 recalled that there were many non-billable hours spent on projects. He advised that any project that had more than 200 non-billable hours in a month had to be explained to him in Non-billable Reviews between him and the software consultants working on his projects, which he in turn reported to Gantt. FE-1 recalled some projects having in extreme cases as much as 1,000 to 3,000 non-billable hours in a given month. FE-1 noted that non-billable hours "cost the Company a lot of money."

### F.    The Company's Hiring Practices and Lack of Work for its Services Employees' Evidenced Manhattan's Declining Services Performance

134.   In the quarter immediately preceding the Class Period, Manhattan hired around 100 new employees. As reported by FE-3, Manhattan onboarded him, along with a group of around 90 people, in January 2024. Defendants also spoke publicly about their decision to hire new employees. During Manhattan's Q1 2024 earnings call, Defendant Capel stated that "[w]e welcomed about 100, almost exactly, 100 new associates to the family in Q1 [*i.e.*, the period from January to March 2024] and on track with our hiring plans for 2024" and emphasized that the Company's "hiring plan is on track for several hundred hires this year."

135.    Moreover, during Manhattan's Q2 2024 earnings call, Defendant Capel emphasized that: "*we've hired just over 100 new team members year-to-date and plan on continuing our hiring posture for the remainder of the year*." Later in that call, an analyst asked Capel for more details on the Company's Services hiring posture, and Defendant Capel reaffirmed that the Company plans to expand its Services team. Specifically, the analyst asked, "on services, I think there's a commentary about kind of retaining your hiring posture. Maybe just kind of to double-click on what exactly you meant there in terms of does that imply kind of hiring for replacement or maybe expanding by, let's say, another 100 heads in the kind of back half? Yeah, just any color would be helpful." Capel responded, "*we plan to continue to hire*. . . we do definitely plan to expand our team in the second half of the year, for sure. *And those hires will be largely in customer-facing and services roles.*"

136.    The next day, on July 24, 2024, a Rosenblatt analyst report noted that the Company's "plans to hire several hundred new employees in 2024" was to "support its Services growth."

137.    By hiring 100 new employees as early as January 2024 in Q1 2024 and promising to hire hundreds more throughout 2024, Manhattan signaled to investors that Services demand had increased to such a significant degree that the Company required additional labor resources. However, as reported by FE-1, the Company

"***knew internally by April [2024]***" that they were not going to make its full year 2024 Service revenue forecast by the end of that fiscal year "because the sales pipeline was not there, it was dry." As such, Defendant Capel's continuing Class Period promises—beginning on July 23, 2024, months after April 2024 and after the Company had internal knowledge of Services revenue decline—to hire hundreds of additional Services employees painted a misleading picture of the health of the Company's Services department.

138.   In reality, Manhattan's Services employees did not have substantive work to do because of: (1) the fact that cloud products inherently required less Services; and (2) delayed and cancelled contracts resulting from the disappointing underperformance of the Company's cloud-based software. This lack of work led to a hiring freeze of new Services employees and eventual rounds of layoffs just months after touting the onboarding of new hires. According to FE-3, Manhattan conducted layoffs throughout 2024. Additionally, in a January 28, 2025 press release, Manhattan disclosed that, "[i]n January 2025, the Company eliminated about 100 positions to align our Services capacity with customer demand..." In its 2024 Form 10-K, the Company clarified that this layoff of approximately 100 employees happened on January 14, 2025. The Company also conducted an additional mass layoff in February 2025, as reported by FE-5.

139.   Former employees corroborate the lack of work for Services employees and their subsequent terminations. For example, FE-6 detailed a hiring freeze of Services employees during the Class Period. FE-6 was formerly employed by Manhattan from March 2023 to February 2025 as Assistant Manager of Talent Acquisition at the Company's India operations in Bengaluru, India. According to FE-6, his responsibilities in this role included scouting and hiring the Company's PSO and CSO talent in India. FE-6 estimated there were around 2,000 people working at the Bengaluru location, and 60–70% of those were PSO and CSO personnel.

140.   FE-6 reported to Head of India Talent Acquisition, Arijit Deb, who reported to Senior Director Human Resources, Sujatha Sata, who reported to Senior Vice President and Chief People Officer Suzanne Hough, who worked at headquarters in Atlanta, Georgia. According to FE-6, Manhattan's global headquarters directed its India operations to change their hiring focus a number of times in the second half of 2024. FE-6 recalled that it was in July 2024 (the same time when Defendant Capel was telling the market that Services demand was high enough to justify new hires) when Senior Director of Human Resources directed the Bengaluru location's talent acquisition team to halt all searches for new PSO and CSO employees in India and "to move everything" to hiring Research & Development employees. FE-6 described this as a "hiring freeze."

141.  FE-6 advised that this directive and all such directives to Senior Director of Human Resources came from Senior Vice President and Chief People Officer Hough. FE-6 recalled that the explanation given by the Senior Director of Human Resources Sujatha Sata on this change was that now that Manhattan's line of business was pivoting to cloud-based service instead of onsite, that not as many of those personnel were needed. FE-6 also recalled internal conversations at her location related to how the Company expected third-party consultants to handle much of the services for the cloud-based version because Manhattan knew those outside vendors would or could do it at a lower cost than Manhattan could, noting that Manhattan was very expensive compared to third party vendors.

142.  FE-6 reported that Hough visited the Company's Bengaluru, India location every August or September. FE-6 recalled that it was during Hough's annual visit in September 2024 when she (Hough) reconfirmed in-person the July 2024 directive to redirect hiring to R&D, and to also possibly expect additional changes to the Company's hiring practices in the near future. FE-6 recalled that it was then in October or November 2024 when Sujatha Sata directed the Bengaluru location to halt all hiring, including R&D. FE-6 added that this directive came from Hough.

143.  Not only did Manhattan stop hiring new Services personnel, but the Company also carried out multiple rounds of mass layoffs of Services employees

throughout 2024 and in January and February 2025. Indeed, multiple former employees reported experiencing a lack of work caused by declining Services demand, which led to their eventual dismissals.

144.   For example, FE-3 reported experiencing a lack of Services work. FE-3 was formerly employed by Manhattan from January 2024 to January 2025 as a Consultant and he worked at the Company's headquarters in Atlanta, Georgia. FE-3 was a member of the Company's PSO, whose responsibilities included implementing the Company's Manhattan Active solutions for customers.

145.   FE-3 explained that his responsibilities as Consultant on the PSO included implementing the warehouse management software—as part of the Company's Manhattan Active planning solution—for customers. He explained that he worked on the warehousing system while other PSO colleagues worked on other aspects of the Manhattan Active platform. He added that once PSO teams finished implementing their respective software or solutions and the customer's Manhattan Active platform was up and running, the Company's CSO then worked with clients on any issues or questions they had while working with the system.

146.   FE-3 described Manhattan's business as seemingly slow throughout his tenure, adding that the Company was consistently lacking in projects for him and his colleagues to work on. FE-3 also recalled project managers, senior project managers, and other "leaders" often telling him and his colleagues throughout his tenure that

they were trying to find projects for them to work on. FE-3 described that, during tenure, he and his PSO colleagues often did not have work to do, and any work they were assigned came in spurts, lasting short periods of time and abruptly ending. FE-3 advised that his responsibilities were supposed to include him going onsite to customers' locations to install and implement the warehousing solution of the Manhattan Active platform, but that he only went to a customer's location once. FE-3 also recalled "severe delays" in scheduled projects.

147. FE-3 then recalled that an indicator of Manhattan's slow business throughout his tenure was the rounds of layoffs that occurred at different times throughout 2024, including what he described as the biggest one that took place in late Spring or early Summer 2024.

148. FE-1 also detailed a slowdown in Services work during the Class Period. FE-1 noted that at Manhattan, when certain groups were slower than others, services employees would be transferred to another group that is busier. FE-1 said, however, that it was not a good indication to him when the software consultants in MAOM were going to be transferred in Spring 2024 to other service groups like MAWM and MATM because there was not enough work in MAOM. FE-1 found it concerning when MAWM and MATM did not take the MAOM software consultants because those segments did not have enough work either. He also recalled speaking

with salespeople on the MAWM side who said that their sales were slow, and that their pipeline was not strong.

149.   FE-1 recalled that Services employees had work in January 2024 but when those projects finished in 2024 there was not a next project for them. FE-1 noted that when you have excess people sitting around who are not busy, a company is not going to hit its revenue goals.

150.   Moreover, FE-2 similarly described his tenure as often waiting to be given tasks to work on, that there was not enough work for him, and that the majority of work he did do was working with Manhattan's tech team in India on fixing customers' MAWM problems. He also described Manhattan's hiring cycles and terminations as "strange."

151.   FE-2 then advised that while he had been planning to leave the Company voluntarily, that Manhattan terminated his employment around January 2025, around a week before the Company gave its revised 2025 guidance to shareholders. According to FE-2, he was part of a mass layoff, most of them in Services including many of the people he was onboarded with in January 2024. He recalled a previous round of layoffs occurring sometime in Fall of 2024. He advised that the documentation given for his termination stated, "***not enough work***."

152.   Additionally, FE-5 reported a lack of work that stemmed from the Company's failure to secure new contracts during his tenure at the Company. FE-5

was formerly employed by Manhattan at its headquarters in Atlanta, Georgia, as Technology Consultant from January 2023 to February 2025. FE-5 advised he was a member of Technical Services, and his responsibilities included resolving technical issues in a customer's system on the Point-of-Sale side, which a project was transferred to after PSO finished implementing the software.

153.  According to FE-5, he had steady work throughout most of his tenure. However, FE-5 reported that there were indications to him that the Company's growth in new contracts was not trending well near the end of his tenure.

154.  Indeed, FE-5 reported that around September or October 2024 his supervisor, Technology Leader Kannan Rajappa, told him that when the long-term project he was working on was completed, he would be transferred to one of the other departments due to the lack of work in his current department. FE-5 recalled when his project ended in October 2024 that he did not have any projects available to work on. FE-5 advised that he was part of a group of mass layoffs in February 2025.

155.  FE-4 similarly advised that he had been one of a "huge number" of people laid off by the Company in February 2025. FE-4 commented that the work situation was very unstable, since he was constantly assigned to new projects. He described it as "like starting a new job every few months." FE-4 noted that, after the Company's stock dropped, Manhattan cut approximately 25% of its consulting

workforce, and since he had been assigned almost exclusively non-billable work, he was in the group which was let go.

156.   Moreover, multiple people have shared their insights on Manhattan's layoffs on www.thelayoff.com. This website offers a discussion board where users can comment on layoffs, job cuts, and other work-force reduction topics for specific companies. There, users can share information on layoffs occurring across a broad range of companies, including Fortune 500 companies such as Apple and Google. On the www.thelayoff.com website, multiple individuals corroborated the accounts of the FEs described above and explained that the mass layoffs and firings by Manhattan at the start of 2025 *were a result of*: (1) lower Services revenues and improper forecasting for 2024; and (2) that the cloud-based software products were "riddled" with technical issues.

157.   For example, on www.thelayoff.com, a user started a thread regarding Manhattan's layoffs and reported that the Company laid off "another 100+" employees in January. In response to this, a user commented on January 19, 2025 that this "was a strategic decision [from] the upper management to be prepared for this year. *They are having lower revenue on implementation and support* [i.e.,

Services]. Hence, the decision was made to reduce employee count to save money and invest in other portfolios."[7]

158.    Moreover, a second thread was created on www.thelayoff.com to discuss Manhattan's layoffs. This thread was created on February 7, 2025 and was titled "Anyone else find it funny that none of the bloated [Resource Management] team is getting let go?" This user goes on to comment that: "[a]pparently these layoffs were all a result of a forecasting error made sometime in 2024 which caused them to overhire in the last few hiring cycles."[8] Notably, this user's account corroborates significantly with FE-1's account above that by April 2024, the Company knew it would not reach its projected 2024 Services revenues. Nonetheless, the Company continued to tout positive Services growth and demand thereafter anyways.

159.    Another user commented on this thread on February 5, 2025, stating that, "[h]onestly, it was bound to happen. They have been overhiring for that last 2+ years like crazy with very poor management/organization from leadership in general. ***Clients are becoming keen that the software suite is riddled with bugs and***

---

[7] Anonymous, Comment to *Another 100+ layoff*, THELAYOFF (Jan. 19, 2025), https://www.thelayoff.com/t/1jhpa68d3 (last accessed on July 21, 2025).

[8] Anonymous, Comment to *Anyone else find it funny that none of the bloated RM team is getting let go?*, THELAYOFF (Feb. 7, 2025), https://www.thelayoff.com/t/1jkgw43t0? (last accessed on July 21, 2025).

*constantly fails during basic functions/process flows* . . . *Clients are realizing they're paying premium prices for a subpar product*."[9]

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

160.    During the Class Period, Defendants Manhattan, Capel, and Story made materially false and misleading statements and omissions about the health of Manhattan's Services business, and that the Company's cloud-based products were "fueling" such growth in Services revenue. However, unbeknownst to the market, the opposite was true, and Defendants failed to disclose that: (1) Manhattan's cloud based products, by design, required less Services; (2) Manhattan's cloud products were often faulty, and failed to function as well as its *on-premise* products, which caused delayed and cancelled contracts that ultimately reduced Services demand; and (3) Manhattan's Services employees suffered from a lack of work due to the Company's inability to secure new contracts and declining Services demand.

### A.    Q2 2024 Earnings Call (July 23, 2024)

161.    On July 23, 2024, after the market closed, Manhattan held a conference call to update investors on the Company's financial results for Q2 2024. During this call, Defendant Capel represented that demand for the Company's products contributed to Services growth. Specifically, Capel stated:

---

[9] Anonymous, Comment to *Another 100+ layoff*, THELAYOFF (Feb. 5, 2025), https://www.thelayoff.com/t/1jhpa68d3 (last accessed on July 21, 2025).

Our best-of-breed cloud-native platform and solutions provide continuous access to innovation and are a key component of our customer success. These mission critical solutions help our clients strengthen their relationships with their end customers, drive more revenue and improve efficiency. These powerful benefits are translating into a record solutions pipeline for us with new potential customers representing about 35% of the demand. As ***solid product demand is also fueling opportunities for growth of our internal services organization***, as well as the growing roster of Manhattan Value Partners.

162. Defendant Capel's above statement was false and misleading when made because rather than "experiencing opportunities for growth," Manhattan's Services business was declining because: (1) Manhattan's cloud-based products inherently required less Services (*supra* Section V.E.1.); and (2) the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services (*supra* Section V.E.2.). Indeed, evidencing this decline in Services demand was the fact that Manhattan's Services employees had little to no projects to work on throughout the Class Period (*supra* Section V.F.)—another fact that contradicted Defendants Capel's statement about "growth" of its Services organization.

163. During this same earnings call, Defendant Story went on to claim that the Company's "global services teams delivered record revenue totaling $137 million, up 10%" and that "***this was in line with our expectations as cloud sales continue to fuel services revenue growth for Manhattan***." Story then explained that

Manhattan's "***performance was driven by strong cloud and services revenue growth combined with operating leverage as our cloud business continues to scale***." Finally, Story boasted that: "[i]mportantly, as Eddie [Capel] discussed, we are ***very optimistic on our business opportunity and continue to invest in innovation to drive sustainable long-term growth***."

164.   Defendant Story's statements were false and misleading when made because cloud sales were not fueling Services revenue growth. Instead, Manhattan's cloud products eroded the Company's ability to generate Service revenues because: (1) by design, the Company's cloud products required less Services (*supra* Section V.E.1.); and (2) failed cloud implementations caused customers to delay or cancel their contracts, which in turn reduced demand for the Company's Services (*supra* Section V.E.2.). Indeed, as Manhattan continued to sell its cloud products to its customers, the amount of work required by the Company's Services employees significantly diminished, evidencing a pervasive decline in Services demand (*supra* Section V.F.).

165.   Later, during the question-and-answer portion of the earnings call, an analyst asked Defendant Story for more color on subscription and Services performance:

> Q (Analyst): If I'm looking at the gross margins for subscription, maintenance and services, that was much higher than we had modeled up north of 300 basis points year-over-year. Anything [sic] call out that that's driving that? Thanks, guys.

A (Defendant Story): No, *just a positive mix between services and cloud in the gross margins*.

Q (Analyst): Okay. So just more on the mix of the revenue components?

A (Defendant Story): Yeah.

166.    Defendant Story's statement highlighting a "positive mix between services and cloud" that contributed to higher gross margins was false and misleading because Defendant Story failed to disclose that cloud sales were actively diminishing Services revenues because: (1) cloud products required less Services (*supra* Section V.E.1.); and (2) failed cloud implementations had a downstream effect of delayed or cancelled contracts and declining Services demand (*supra* Section V.E.2.).

167.    Moreover, Defendant Capel discussed the Company's expansion during Manhattan's Q2 2024 earnings call:

> Now, like the last few quarters, our global services team completed over 100 go-lives in Q2 and *continue to perform very well for our customers*. And while we remain appropriately cautious on the global economy, we continue to invest to drive growth from our numerous opportunities. This includes monetizing strategic investments in industry-leading innovation, further enablement of our customer success, and the expansion of our addressable market. From a hiring perspective, *we've hired just over 100 new team members year-to-date and plan on continuing our hiring posture for the remainder of the year*.

168.    Defendant Capel's statement was false and misleading when made because, rather than "perform[ing] very well," Manhattan's Services team was not performing well at all. Indeed, multiple former Services employees reported that, as

a result of declining Services demand, they had little to no work to do during the Class Period. Moreover, at this point, Manhattan was not planning to "continue [its] hiring posture," but, as reported by FE-6, had instead enacted a hiring freeze of Services employees in July 2024. At this point, Manhattan had also begun laying off its Services employees, as reported by FE-3 who noted rounds of layoffs that occurred at different times throughout 2024, including what he described as the biggest one that took place in late Spring or early Summer 2024 (*supra* ¶ 147).

169.   An analyst then questioned Defendant Capel about the Company's hiring posture:

> Q (Analyst): And then on services, I think there's a commentary about kind of retaining your hiring posture. Maybe just kind of to double-click on what exactly you meant there in terms of does that imply kind of hiring for replacement or maybe expanding by, let's say, another 100 heads in the kind of back half? Yeah, just any color would be helpful.

> A (Defendant Capel): Yeah, **we plan to continue to hire**. Now, the good news is that our attrition rate is – for this year is lower that we had forecasted. So that helps in all kinds of different ways, not at least – not least of which on efficiency, margin, customer satisfaction and so forth, but lower attrition does mean, potentially a little bit less hiring. **But we do definitely plan to expand our team in the second half of the year, for sure. And those hires will be largely in customer-facing and services roles**.

170.   Defendant Capel's response touting the Company's plans to continue to hire and expand its Services team was false and misleading. Indeed, at this point, Manhattan had already enacted a hiring freeze of Services employees, as reported

by FE-6, and had begun laying off Services employees, as reported by FE-3 (*supra* ¶¶ 140, 147).

171.   Analysts believed Defendants' misrepresentations, as evidenced by their reactions to the Defendants' statements. For example, on July 24, 2024, Rosenblatt issued positive commentary on Manhattan's Q2 2024 results and false and misleading assertions therein, issuing an analyst report titled "First Look at Q2 – Healthy Growth Continues During Shift to Cloud Offering" and relying on Defendants' assertions that: "Manhattan plans to hire several hundred employees in 2024 to support its Services growth."

172.   Similarly, on July 29, 2024, CFRA maintained a "Buy" rating in its analyst report and anticipated "revenue to increase 12.5% in 2024 and 11.5% in 2025" based upon Defendants' Q2 2024 statements. According to CFRA: "[w]e maintain our Buy rating on shares of MANH on new cloud growth opportunities ahead as the company steps up the pace of release of new cloud-based solutions that would likely build expansion interest from existing customers." CFRA lifted its price target from $252/share to $269/share (while trading at $258/share), based in part on the fact that Professional Services "rose 9.8% to $136.8M" for the quarter.

173.   Furthermore, on August 6, 2024, Equisights Research published an analyst report commenting on Manhattan's Q2 2024 statements, finding that: "Manhattan Associates continues to smash expectations with its stellar Q2 2024

results, driven by a balanced demand for software and a successful migration of customers to the cloud. With confidence riding high, the company has upped its full-year revenue guidance for 2024. We believe the shares are fairly valued." As to Services revenue, Equisights found that Manhattan's "***global services team is killing it, delivering high-quality implementations that drive customer satisfaction and long-term loyalty***," with Services revenue "rising 10% to $137 million" for the quarter. Notably, and based off Defendants' false and misleading assurances in Q2 2024, Equisights attributed the "significant increase" in Services revenue growth as "***primarily driven*** by the rise in cloud subscriptions. . ."

174. By mid-September 2024, the market was concerned with what Manhattan's 2025 full year revenue guidance would be. Indeed, Loop Capital published a September 15, 2024 analyst report with a Buy rating for Manhattan stock, at a price target of $284/share (when trading at $264/share), and finding that: "[w]e think the larger question on investors' minds this quarter [*i.e.*, Q3 2024] will be what the company's preliminary 2025 outlook looks like. . . . All in all, we expect MANH's momentum to continue into 2025 and beyond as the firm pulls away as the leader in the WMS space. . . . Driving this is the opportunity in the warehouse market created by the shift to the cloud and continued high win rates from a favorable (and improving) competitive environment. This should drive a multi-year run of mid-to-high teens revenue growth and expanding margins."

**B.    Q3 2024 Earnings Call and Press Release (October 22, 2024)**

175.    On October 22, 2024, after the market closed, Manhattan held its Q3

2024 earnings call. During this call, Defendant Capel stated:

> For the quarter, total revenue increased 12% to $267 million, and
> adjusted earnings per share increased 29% to $1.35. Both of these
> metrics were above our expectations. ***Driving the top-line
> outperformance and earnings leverage with solid cloud and services
> revenue growth across all geographies***, with cloud subscription
> revenue posting 33% growth in the quarter.

176.    Defendant Capel continued touting the strength of Manhattan's

business model, emphasizing the "robust" demand for Manhattan's solutions and

high customer satisfaction:

> ***The Manhattan's business fundamentals are solid, and we remain
> confident and very optimistic about our business opportunity***. While
> the global macro environment remains challenging, ***demand for our
> solutions is robust, customer satisfaction is high and is evidenced by
> our recent release of the Manhattan Active Supply Chain Planning
> Solution, the investments we're making in R&D and our people are
> creating a clear differentiation***. Delivering consistent market leading
> innovation is creating more opportunities across supply chain,
> omnichannel retail and at the world's best – as the world's best brands
> look to unify and digitally transform.

177.    Defendant Capel also spoke on a granular level about the Company's

quarterly success, explaining such success instilled confidence in Manhattan's

ability not only to reach the "high end" of its targets, but also to achieve "sustainable

future growth":

> RPO, remaining performance obligation, increased 27% to roughly
> $1.7 billion. And as we've often cautioned, large, complex deals can be
> lumpy on a quarter-over-quarter basis. And whilst we haven't seen

much of that lumpiness over the past three or four years, this quarter and, to a lesser extent, last quarter, we have seen some. And our third quarter RPO growth was impacted by some large digital transformational projects pushing out.

*That said, our fourth quarter is off to a great start, and demand is solid and attributes that give us confidence that we will actually achieve at the high end of our 2024 RPO bookings guidance of $1.8 billion*. Across our industry leading product portfolio and global pipeline sits at record levels, our win rates remain strong at about 70%. And these factors, despite the uncertain macroenvironment, again, give us confidence that we'll achieve the high end of our 2024 RPO bookings goals, and equally important, are well positioned for continued success in 2025, 2026, and of course, beyond that.

. . .

In Q3, 14% of our new bookings were generated from net new logos, and we continue to have a very healthy mix of conversions, upsells and cross-sells. *And we believe this demonstrates the many and varied opportunities we have for sustainable future growth. And as stated earlier, our solution pipeline is at record levels and new potential customers represent about 35% of that demand. This strong demand is driven by our best-of-breed cloud native solutions that provide continuous access to innovation and are helping our customers digitally transform their businesses to drive success. Our mission critical solutions help our clients improve customer satisfaction, drive more revenue, and improve efficiency.*

178. Finally, Defendant Capel boasted to investors both that the strong demand Manhattan was experiencing produced growth opportunities and that the services team was performing "very well" for customers. He explained:

And *this strong demand for our solutions is also fueling opportunities in growth for our internal services organization and our systems integration partners*. In Q3, our global services team completed over 100 go-lives and *continue to perform very well for our customers*.

179.   Defendant Capel's statements in paragraphs 175-78 were false and misleading when made because: (1) Manhattan's cloud-based products inherently required less Services (*supra* Section V.E.1.); and (2) the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services (*supra* Section V.E.2.). Evidencing this decline in Services demand was the fact that Manhattan's Services employees had little to no projects to work on throughout the Class Period (*supra* Section V.F.).

180.   Later during that same call, Defendant Story touted that:

Importantly, Manhattan continues to benefit from ***a record pipeline that includes solid demand from both new and existing customers, and strong win rates are giving us confidence in achieving the high end of our 2024 RPO bookings outlook and the ability to provide strong 2025 outlook parameters.***

Our global services teams delivered record revenue totaling $137 million, up 7%, ***as cloud sales continue to fuel services revenue growth for Manhattan***. Adjusted operating profit was $99 million, with adjusted operating margin of 37.1%. This is 670 basis points year-over-year up. Our performance was driven by strong cloud and services revenue growth combined with operating leverage, as our cloud business continues to scale. As Eddie discussed, ***we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable, long-term growth.***

181.   Defendant Story's statements about the Company's "record pipeline" and cloud's ability to "fuel" services revenue growth were false and misleading when made because: (1) by design, Manhattan's cloud-based required less Services

and diminished the Company's ability to generate Services revenue in connection with these products (*supra* Section V.E.1.); and (2) the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services (*supra* Section V.E.2.). Indeed, evidencing this decline in Services demand was the fact that Manhattan's Services employees had little to no projects to work on throughout the Class Period (*supra* Section V.F.).

182.   Defendant Story then continued to provide Manhattan's 2025 outlook:

Now moving to 2025, we're going to provide some preliminary parameters here. We are currently in the very early stages of our 2025 budget cycle, and we'll firm up this outlook on our Q4 call as we get through the US election process and our final market analysis. With that, ***we are targeting total revenue of $1.13 billion to $1.14 billion, representing 9% to 10% growth***, with license and maintenance attrition masking total growth by 5 percentage points. This includes our cloud revenue target of $415 million, representing 23% year-over-year growth.

For RPO, we are targeting $2.15 billion, which represents 21% growth. ***In 2025, we are targeting services revenue of $565 million to $575 million***. The $570 million midpoint represents 8% growth.

In summary, our preliminary 2025 parameters include total revenue, excluding license and maintenance attrition, to increase 14%, cloud revenue to increase 23%, ***services revenue to increase 8%***, and RPO to increase 21%, and for an operating margin of 33.5%, while increasing our investment in Manhattan leading innovation. ***All-in solid execution by our global Manhattan team and looking forward to the – ending the year strong.***

183.   Defendant Story's statements emphasizing the Company's Services revenue guidance for 2025 were false and misleading when made because he failed

to disclose that (1) Manhattan's cloud-based products would continue to pull revenue opportunities away from the Company's Services business given that cloud software inherently required less Services (*supra* Section V.E.1.); and (2) the Company's failed cloud implementations caused customers to delay and cancel their contracts, which materially affected the Company's ability to continue to generate Services revenue (*supra* Section V.E.2.).

184.    Then, during the question-and-answer part of this earnings call, an analyst asked Defendant Story:

> Q (Analyst): . . . on the margin upside, I think it was pretty impressive. Last quarter, I think you called out mix being a tailwind here. Is that also a story in this quarter? And it sounds like scaling was also a benefit, but just how would you frame kind of the upside that you saw in the quarter and in the guide?
>
> A (Story): Absolutely. From a mix standpoint, ***it's a fantastic execution by the business, record cloud and services. Yeah, just great performance there.***

185.    Defendant Story's statement in response to the analyst's question was false and misleading when made because rather than exhibiting "great performance," Manhattan's Services business was significantly diminished by the facts that (1) Manhattan's cloud-based products required less Services (*supra* Section V.E.1.); and (2) the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services (*supra* Section V.E.2.). Evidencing

this decline in Services demand was the fact that Manhattan's Services employees had little to no projects to work on throughout the Class Period (*supra* Section V.F.).

186. Also on October 22, 2024, after the market closed and after its Q3 2024 earnings call, the Company issued a press release titled "Manhattan Associates Reports Record Revenue and Earnings – RPO Bookings Increase 27% over Prior Year on Strong Demand." This press release quoted Defendant Capel as stating that: "*[o]ur fourth quarter is off to a solid start, and we are providing responsible 2025 parameters*."

187. Defendant Capel's statement was false and misleading when made because, as reported by FE-1, Defendants knew by April 2024 that they would not meet their full year Services revenue guidance. As such, it was misleading to tout that the Company's fourth quarter was "off to a solid start" and not disclose this fact. Moreover, the Company's public 2025 Services parameters were not "responsible" as they did not account for the fact that Manhattan's cloud products had significantly hindered the Company's ability to generate Services revenue.

188. Analysts believed the misrepresentations made by Defendants in Q3 2024, as demonstrated by their reports. For example, following Manhattan's Q3 2024 results on October 22, 2024, analysts continued to view favorably the status of the Company's Services business, given Defendants' false and misleading assurances during Q3 2024 Earnings. Indeed, on October 22, 2024, following

Defendants' statements, Baird Equity Research published an analyst report finding that "[o]verall, we maintain on positive fundamental view on Manhattan and the potential for upward estimate revisions in FY25," and quoted Defendants' false and misleading statements, finding that "Management noted . . . that 4Q24 'is off to great start.'"

189.    Loop Capital similarly quoted Defendants in their October 22, 2024 analyst report, finding that Manhattan noted that "Q4 is off to a 'good start' from scheduled Q4 deal closings," and finding that based upon Defendants' statements, "our confidence remains high."

190.    Similarly, William Blair found in their October 22, 2024 analyst report that throughout Q3 2024 Earnings, "management highlighted the strong momentum it is seeing across customer cohorts, product suites, and geographic regions. . . . Further, the company continues to see record pipeline activity from both new and existing customers, which we believe illustrates the growing willingness from stakeholders across the ecosystem to modernize operations and consolidate on the company's comprehensive end-to-end platform to unlock deeper connected insights across key business workflows [*i.e.*, transition to cloud]."  The William Blair report concluded that: "Overall, given the mission-critical nature of the company's solutions and its ongoing platform investment, we believe Manhattan is

favorably positioned to continue capitalizing on recent demand momentum and support a durable growth runway for the business."

191. William Blair commented positively on Defendants' FY 2025 guidance, given for the first time in Q3 2024 Earnings: "Management provided its preliminary outlook for 2025, encompassing total revenue ranging from $1.13 billion to $1.14 billion, representing roughly 10% growth." William Blair further wrote that: "[w]e believe the company's ongoing platform investments continue to bring transformative capabilities to the Manhattan platform and fuel the strong demand the company is experiencing as well as drive ongoing cross-sell opportunities within its existing base as customers." In other words, William Blair believed that given the ongoing focus on cloud-based products and platforms, the Company would have "cross-sell" opportunities to implement its core Services products on such cloud-based products.

192. Analysts continued to believe the false and misleading narrative that Defendants touted during the Class Period, *i.e.*, that Services revenue would continue to increase given the implementation and migration from *on-premises* software to cloud-based products. As reflected on October 23, 2024, Morningstar Equity published an analyst report following Defendants' Q3 2024 false and misleading statements, finding that: "[d]espite continued deal slippage, management remains comfortable with the pipeline. The company continues to find

success in migrating its customers to the cloud, *which in turn also increases services revenue and ultimately results in operative leverage as its cloud business scales*."

## VII.    DEFENDANTS REVEALED THE TRUTH THROUGH A SERIES OF PARTIAL DISCLOSURES

193.    After spending months misrepresenting the strength of the Manhattan's Services business, Defendants finally revealed, through a series of partial correctives, that the Services business was not as robust as Defendants had led investors to believe. Instead, Defendants failed to disclose that Manhattan was grappling with a significant decline in demand for its Services segment not only because the cloud-based products required markedly less services support, but also because of technical issues and systemic flaws in those cloud-based products.

### A.    Q3 2024 (October 22, 2024)

194.    The truth began to emerge on October 22, 2024, after the close of trading, when Manhattan held its Q3 2024 earnings call. During that call, Defendant Story disclosed an expected significant decline of its Services and total revenues:

> Our full year earnings per share midpoint is increasing $0.35 to $4.61 and represents 23% growth compared to the prior year. For GAAP earnings per share, our midpoint increases by $0.36 to $3.48and also represents 23% growth compared to the prior year. ***This implies Q4 total revenue of $253.5 million, which is $3.5 million lower than our prior Q4 midpoint, as we now anticipate services revenue of $121.5 million***, as the choppy macro environment has resulted in several transformational deal pushes, some customers shifting services projects to 2025, and a  more pronounced pausing impact from this year's retail

peak season. We are increasing our cloud target to $89.5 million and maintenance revenue upticks to $33.5 million. Our operating margin target is increasing to 32.5% and is up from our prior 30.5% estimate. The Q4 sequential change in operating margin accounts for retail peak seasonality, which as a reminder, is when customers idle implementations to focus on their peak busy season.

195.   The Company's projected Q4 2024 Services revenue of $121.5 million represented a considerable decline from its Q3 2024 Services revenues of $137 million. This projected Services revenue decline also caused projected total revenues to fall to $253.5 million, representing a $3.5 million drop from the Company's Q4 prior total revenues projection. This also represented a $10.8 million decrease from the Company's Q3 2024 total revenues of $267 million.

196.   On this news, Manhattan stock price dropped $20.96 per share, 7.2 percent, to a close price of $271.36 per share on October 23, 2024. However, because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as discussed Section VI, Manhattan's stock price remained artificially inflated throughout the remainder of the Class Period. Indeed, despite knowing that the Company's Services business faced a significant decline in demand, Defendant Capel still exclaimed that Manhattan's "fourth quarter is off to a great start" and Defendant Story affirmed to investors that the Company was targeting: (1) full year 2025 Services revenues of $565 million to $575 million, representing a year over year increase of 8%; and (2) full year 2025 total revenues of $1.13 billion to $1.14 billion, representing 9% to 10% year over

year growth—all based off Manhattan's cloud-based products "*fueling opportunities in growth for our internal services organization*." In other words, notwithstanding the partial disclosure of the truth on October 23, 2024, the market was left with a false impression about the state of affairs of the Company's business given Defendants' false and misleading statements and assurances on the same day (s*upra* ¶¶ 175-87).

197.    Analysts reporting on Manhattan noted "lumpiness" in Q3 2024 that extended to the Company's outlook for Q4 2024 but ultimately felt that the Company's 2025 guidance sufficiently alleviated any revenue concerns. For example, a Baird Equity Research analyst report dated October 22, noted that "3Q24 experienced more pronounced deal lumpiness" which resulted in "narrowing in FY24 revenue guidance on reduced Services outlook into 4Q24." However, the analyst report further stated that: "we expect downside is contained by more upbeat forward commentary on the call."

198.    Similarly, a Loop Capital analyst report dated October 22, 2024 attributed the Company's stock decline to the fact that: "the quarter's revenue upside and the 4Q guide came in below what many investors have come to expect." This analyst report then goes on to note that while "4Q24 total revenue ticks down $3.5M lower than the prior outlook as customers push Services projects into 2025," the

Company's "preliminary 2025 view was sound" and Loop Capital's "confidence remains high."

199.   Moreover, an October 23, 2024 Morningstar Equity analyst report noted that "revenue guidance was slightly shy" but emphasized that "[t]he company continues to find success in migrating its customers to the cloud, which in turn also increases services revenue."

200.   In its Q3 2024 earnings call, the Company also projected that full year guidance for 2025 total revenues would be between $1.13 and $1.14 billion, with Services revenue leading the charge with a $565 to $575 million range.

**B.    Q4 2024 (January 28, 2025)**

201.   However, just one quarter later, Defendants further revealed the extent of declining Services demand and how that impacted Manhattan. Indeed, on January 28, 2025, after the close of trading, Manhattan published a press release titled "Manhattan Associates Reports Record Fourth Quarter and Full Year Results." In this press release, the Company disclosed that: "[i]n January 2025, the Company eliminated about 100 positions to align our Services capacity with customer demand which has been impacted by short-term macro-economic uncertainty. We expect to record pre-tax restructuring expense in the first quarter of 2025."

202.   Shortly after Manhattan published this press release, the Company hosted an earnings call to discuss its fourth quarter and full-year 2024 results and its

2025 guidance. During this call, Defendant Story revealed that the Company missed its Q4 2024 Services revenue guidance by over $2 million. Specifically, he stated that: "*[s]ervice revenue of $119 million . . . was $2 million below our prior expectations as budgetary constraints were more pronounced for several customers*." Specifically, Services revenue was down $119.5 million for Q4 2024 sequentially from $137 million for Q3 2024—a more than 12% decline. Further, the $119.5 million for Q4 2024 represented a miss on guidance given on Q3 2024 (of $121.5 million).

203.   During this same call, Defendant Capel further revealed weakening demand by reducing the Company's 2025 Services guidance and blaming this reduced guidance on headwinds caused by customers reducing their planned Services work, stating in pertinent part:

> *Near-term headwinds for our services business have surfaced as about 10% of our customers with in-flight implementations reduced their planned services work for the upcoming calendar and fiscal year, and we've adjusted our outlook accordingly.*

> *Now services continues to be very important to Manhattan. Firstly, because that team ensures our customers' success; and secondly, it keeps us close to our customers. And these tight partnerships help us provide clarity on our customers' needs, which in turn incorporates - - allows us to incorporate that in our future waves of innovation, helping us drive future subscription growth.* Now in 2025, we'll have a record number of customer implementations, and those customers will continue to spend significantly on Manhattan services, albeit a little less than we had previously planned.

So to summarize, ***this shift in professional services work to future periods, some deal pushes that we highlighted throughout 2024, and to a lesser extent, reduced customization and higher partner utilization, will cause services revenue to trough in the first quarter of 2025.*** With new service implementation projects steadily increasing throughout 2025, we anticipate solid sequential services revenue growth in the middle of the year before returning to year-over-year growth in Q4.

204.    Defendant Story elaborated on Manhattan's reduced full-year 2025 guidance, stating in relevant part:

> ***For the full year 2025 guidance, we now expect total revenue of $1.06 billion to $1.07 billion. The $70 million difference from our preliminary parameters consists of $20 million of FX headwind, and as Eddie highlighted, a reduction in services revenue.***
>
> This will result in Q1 total revenue of $256 million to $258 million, and we are targeting total revenue of about $266.5 million in Q2, $273 million in Q3 and $269 million in Q4. For 2025 adjusted operating margin, we expect a range of 33% to 33.5%, and an FX in the range is unchanged from our prior parameters. On a quarterly basis, at the midpoint, adjusted operating margin is expected to be about 31% in Q1, 33.5% in Q2, 34.5% in Q3, and accounting for retail peak seasonality, 34% in Q4.
>
> . . .
>
> So here are some additional details on our 2025 outlook. For full year 2025, we expect cloud revenue of $405 million to $410 million. At the midpoint, this represents 21% growth and ex the FX, the midpoint is unchanged from our earlier parameters. On a quarterly basis, this assumes $93.5 million in Q1, $99.5 million in Q2 and $105 million in Q3 and $109.5 million in Q4.
>
> ***For services, we now expect a range of $494 million to $500 million, and assume steady growth improvement throughout the year as new service projects ramp. On a quarterly basis, this assumes $117 million in Q1, $127.5 million in Q2, $130.5 million in Q3, and accounting for retail peak seasonality, $122 million in Q4.***

205.    Indeed, the revision in 2025 total revenues and Services revenue guidance (down from $1.13-$1.14 billion to $1.06-$1.07 billion for total revenues; and down from $565-$575 million to $494-$500 million for Services revenues)— from just one quarter to the next (Q3 to Q4)— reflects a material and significant ***6% and 13% decline*** as measured by the midpoints of those ranges, respectively.

206.    During the question-and-answer portion of the class, Defendants were questioned about the poor results in Services:

> Q (Analyst): . . .Services, you're seeing some sluggishness -- What I'm curious about in services, and maybe it's too early to tell, but part of this is it's a whole different model with the cloud. And you have three-plus versions each year, and so there's new stuff coming out. And so I'm just curious where you think we are on cyclicality versus maybe structural dynamics with services going forward?

> . . .

> A (Defendant Capel) Yes. There's no question that we are becoming much more efficient, implementing our software, that's having some impact. Being the now, I think unequivocal leader in the space, there were more and more particularly Tier 1 partners that are implementing our software. So that's having an impact as well. But ***there is no question, we've seen pressure on budgets. As our customers went into their budgeting cycle, call it, August, September, October of last year, they were more bullish, I think, about how much they wanted to get completed calendar year 2025***.

> And we've got, obviously, a whole cadre of fabulous Tier 1 companies that honestly are going to continue to implement our software during 2025 and spend significant services dollars with us, just not quite as much as the team - their teams are anticipating when they originally budgeted in the fall of last year. ***So I think they had their budgets pulled back a little bit, and that trickled down to us***.

207.   On this news, Manhattan's stock price dropped an astounding $72.26 per share, or 24.5 percent, to close at $222.84 per share on January 29, 2025. However, at this point, Defendants had still failed to disclose the full extent and impact of declining Services demand on the Company, and the price of Manhattan's stock remained artificially inflated.

208.   Market analysts reporting on Manhattan expressed surprise and concern about the extent of the Services drag on the Company. For example, a Piper Sandler analyst report dated January 28, 2025 noted that "services drags down FY25" was "not the surprise we were hoping for." Specifically, this report stated that Manhattan's "[s]hares are trading down >20% after hours (despite a Q4 constant currency RPO print above expectations) due to an uncharacteristic FY25 RPO & revenue guide cut. While FX did create an incremental $20M revenue headwind for the year, Services was the larger driver of the weakness, with 10% of customers reducing planned service work for FY25." This report goes on to note that: "[n]egatively, Services in the quarter was $119.5M / ~flat Y/Y, missing Street by ~2%. This implied a fairly material stepdown in the RPO attach rate, as large Tier-1 customers slowed services usage."

209.   Moreover, a Truist Securities analyst report dated January 28, 2025 noted that "services challenges drive weak outlook," specifically stating that: "[i]ssues impacting 2025 outlook & causing 25% AH decline include FX headwinds

& meaningful services rev guide cut..." This report further emphasizes that: "Professional services growth was flat at 0.3% y/y (against 19% y/y growth comp) and totaled $119.5 million, below both our model at $121.5 million and management expectations by $2 million due to pronounced budgetary constraints among several customers. Management called out near term headwinds that have surfaced for its professional services business as ~10% of customers with in-flight implementations have reduced their planned services work for the upcoming year."

### C.    Press Release (February 10, 2025)

210.   Finally, less than two weeks later, the impact of the lowered Services revenues and guidance were revealed fully when, before the beginning of trading on February 10, 2025, Manhattan published filed Form 8-K with the SEC announcing Defendant Capel's departure as CEO. On that same day, Manhattan also issued a press release titled "Manhattan Associates Announces CEO Succession – Eddie Capel Retires as President & CEO; Succeeded by Eric Clark." This press release disclosed that "Eddie Capel, Manhattan's President and CEO, will retire from his position effective February 12, 2025," just two days later. On this news, the price of Manhattan's stock price dropped another $23.20 per share, or 11.5 percent, to close at $177.70 per share on February 10, 2025.

211.   Before this, Manhattan never mentioned the possibility of Defendant Capel's retirement. This sudden disclosure shocked analysts, who questioned the

proximity of Capel's resignation to the revelation of the Company's negative Services performance. For example, a Baird Equity Research analyst report dated February 10, 2025, stated "[w]e were not expecting an imminent retirement" and explained that "the optics of a CEO transition after a negative update" was "causing pressure on Manhattan trading."

## VIII. SCIENTER ALLEGATIONS

212.   At all relevant times, Defendants acted with scienter. The facts alleged herein support that the Individual Defendants either had actual knowledge of the truthful facts that they omitted to disclose and which contradicted their false or misleading statements, or acted with reckless disregard for the truth or falsity of those statements and omissions. Manhattan has the scienter of its management-level employees, including each of Individual Defendants.

213.   Numerous allegations set forth above and below give rise to the strong inference that Defendants intentionally or recklessly misled investors to believe that its cloud products would "fuel" Services revenue and its Services business was positioned for continued success and growth.

### A.    Defendants Knew Services Demand was Declining and They Could Not Meet Their Services Revenue Forecasts

214.   While making statements lauding the growth of Manhattan's Services segment, Defendants knew—or were severely reckless in not knowing—that Services faced a decline in demand and a "dry" sales pipeline, and the Company

consequently could not meet its Services forecasts. As reported by FE-1, the Company "**knew internally by April 2024**" that MAOM was not going to make its FY 2024 Services revenue forecast by the end of FY 2024. FE-1 recalled that "**everyone at the Director level and above**" saw at the end of Q1 2024 that MAOM was not going achieve Q2 2024 Services revenue forecast, or FY 2024 Services revenue forecasts, "**because the sales pipeline was not there, it was dry**." He recalled that it was around July 2024 when it became clear that MAWM and MATM were not going to make their FY2024 service revenue forecasts as well. He added that the forecasts were not going to be made because it was seen that the sales were not in the pipeline for the rest of 2024 to make that year's forecasts. Notably, Defendants knew that the Company would not make its full year 2024 Services revenue forecast **before the Class Period** and yet continued to give investors the misleading impression that its Services segment was experiencing meaningful growth.

215. Additionally, Defendants knew their 2025 Service revenue projections were false and misleading because there was nothing in the Services pipeline to justify these projections. Indeed, FE-1 stated that he found it "very hard to believe" that Defendants' 2025 Service revenue projections were "sincere," noting that it felt "dishonest." FE-1 explained that Service revenue numbers were declining and there was no rationale for why Services would get a boost in revenue in 2025. He recalled that Services related to all software – i.e., MAOM, MAWM, MATM – was on the

same downward trajectory and there was nothing that was expected to raise Services numbers, noting that there was nothing in the pipeline that would have helped boost revenue.

216.    Defendants' internal awareness of the decline of its Services business stemmed directly from the Company's practice of tracking its Services sales pipeline. According to FE-1, "high level executives" were aware that the various FY service revenue forecasts were not going to be met because of the updates they received that were generated by Salesforce. FE-1 noted that each month the Engagement Directors updated their forecasts in Manhattan's Salesforce[10] system. Those monthly updates consisted of that month's actual numbers, the next month's projection, and the following quarter's projection. This was then repeated at the end of each month. Excel spreadsheets containing the forecasts were generated from Salesforce and circulated "all over the place" (internally at the company) monthly by email and consisting of all Services revenue projections for all projects across PSO, CSO and each management system—MAOM, MAWM, and MATM, and planning & allocation. Because of this, FE-1 emphasized that "**everyone director**

---

[10] Salesforce is customer relationship management platform that manages sales data. FE-3 further confirmed that the Company used Salesforce for its customer relationship management and sales related information, adding that he and his PSO colleagues provided updates on any work they did to their managers via email.

***level and above could see we were not going to make the 2024 service revenue
forecast***."

217.    Indeed, according to FE-1, PowerPoint presentations on each
Engagement Director's service revenue forecasts were generated from Salesforce on
a monthly basis by their respective Vice President, Professional Services, which was
Kevin Bass in FE-1's case for MAOM. He described Bass as reviewing the
presentation on FE-1 forecast with him and "drilling down" on it to fully understand
the basis for FE-1 forecast. Bass in turn forwarded the presentation and spreadsheet
to Executive Vice President, Global Support and America's Services Gantt—who
FE-1 advised was in charge of all services groups—who "rolled it up" and presented
the accumulated forecasts to Defendant Capel and Defendant Story. FE-1 added that
he was aware they occurred because it was "the Company's documented rules" that
Gantt would review that information with the C-suite on a monthly basis. He also
recalled Bass once telling him that the presentations were needed for Gantt to present
to the C-suite.

218.    FE-1 described Defendant Capel as "a very hands-on CEO" and heavily
engaged in the performance of the Company. As one example, FE-1 advised that
Capel met with Engagement Directors every other week in what was internally
referred to as "Key Account Reviews." According to FE-1, not every Engagement
Director met with Capel each time but rather the Engagement Director(s) whose turn

it was to speak was chosen ahead of time and scheduled by Senior Engagement Director – Professional Services, George Bozocea, who FE-1 described as being "like the gatekeeper" for these reviews.

219.    FE-1 explained that the key accounts to be reviewed were decided upon by Gantt and Defendant Capel, adding that it usually involved larger accounts or they could be accounts that were facing substantial delays. FE-1 explained that these reviews were focused on how certain projects were progressing. FE-1 recalled that Capel routinely offered to call key people at the account if the Engagement Director or Gantt felt it would be helpful in any way.

220.    FE-1 advised that he presented to Capel around twice a year in these Key Account Reviews, which he suggested was around the number of times that each Engagement Director presented to Defendant Capel. FE-1 recalled that Defendant Story was present for around 90% of the reviews that FE-1 was involved in. He further described Capel as heavily engaged and getting "into the weeds" during these reviews, including giving feedback on how to address certain IT issues with customers, as an example, and offering to talk with a key figure at an account like the CIO, as another example. FE-1 described Capel's feedback as trying to "smooth waters" where there were delays.

221.    Additionally, FE-3 reported that Defendants were actively engaged in Manhattan's performance and outlook. According to FE-3, Defendants Capel and

Story reported on the Company's performance and outlook during companywide quarterly video conference calls that were held on Microsoft Teams. He recalled that a monthly email with Company news and updates was also sent out from the Company.

222. Given that Defendants were actively involved in the Company's operations and regularly received updates on the performance and outlook of the Company's Services segment – and the fact that, according to FE-1, by April 2024, "*everyone director level and above could see we were not going to make the 2024 service revenue forecast*," Defendants were either aware—or were severely reckless in not knowing—that Services demand was declining, and their statements suggesting otherwise were false and misleading.

## B. Defendant Capel's Abrupt Resignation, Shortly After the Revelation of Poor Guidance, Raises a Strong Inference of Scienter

223. On January 28, 2025, Defendants revealed what they had known all along—demand for Manhattan's Services was declining. Specifically, Manhattan disclosed that the Company missed its Q4 2024 Services revenue and that it was lowering its forecasted FY 2025 Services revenue.

224. Less than two weeks later, on February 10, 2025, the Company issued a press release announcing Defendant Capel's resignation as CEO. Not only this, but the Company also announced that Capel's resignation would be effective on

February 12, 2025, *just two days later*. Manhattan did not offer an explanation for Capel's resignation. Moreover, before this, Manhattan had never so much as hinted that Capel had planned to retire.

225. The proximity of Defendant Capel's retirement to Manhattan's disclosure that the Company did not meet its Q4 2024 Services guidance and reduced its FY 2025 Services Guidance, which caused its stock to drop stock price dropped $72.26 per share, or 24.5 percent, strongly supports an inference of scienter.

## C. The Company's Services Employees—Some Hired Just Prior to the Start of the Class Period—Lacked Work, and Were Eventually Terminated

226. As explained *supra* Section V.F., due to Manhattan's inability to secure new contracts during the Class Period, Services employees were left without work to do. The lack of Services projects affecting Manhattan's work force further demonstrates that Defendants knew—or were severely reckless in not knowing—that their statements emphasizing the growth of Manhattan's Services business were false and misleading.

227. Multiple reports from former employees confirmed that Manhattan's Services employees lacked work due to declining demand and as a result the Company enacted a Services employee hiring freeze and eventually conducted mass layoffs. Indeed, FE-6, a former Assistant Manager of Talent Acquisition at Manhattan's Bengaluru, India location, reported that the Senior Director of Human

Resources directed him to halt all searches for new Services employees in July 2024. FE-5 further corroborated that during the end of his tenure, Manhattan's PSO had a hiring freeze due to lack of contracts. Moreover, FE-3, who was a member of the Company's PSO during his tenure from January 2024 to January 2025, described Manhattan's business as seemingly slow throughout his tenure, adding that the Company was consistently lacking in projects for him and his colleagues to work on.

228.   FE-3 further noted that project managers, senior project managers, and other "leaders" often told him and his colleagues throughout his tenure that they were trying to find projects for them to work on. FE-3 described that, during tenure, he and his PSO colleagues often did not have work to do, and any work they were assigned came in spurts, lasting short periods of time and abruptly ending. FE-3 was supposed to go onsite to customers' locations to install and implement the warehousing solution of the Manhattan Active platform. However, he only went to a customer's location once during his tenure. FE-3 also recalled "severe delays" in scheduled projects.

229.   FE-3 then recalled that an indicator of Manhattan's slow business throughout his tenure was the rounds of layoffs that occurred at different times throughout 2024, including what he described as the biggest one that took place in late Spring or early Summer 2024.

230.   FE-2 also described his tenure as often waiting to be given tasks to work on, that there was not enough work for him, and that the majority of work he did do was working with Manhattan's tech team in India on fixing customers' MAWM problems.

231.   FE-2 then advised that he was part of a mass layoff of people, most of them in Services, including many of the people he was onboarded with in January 2024. He recalled a previous round of layoffs occurring sometime in Fall of 2024. He advised that the documentation given for his termination stated, "***not enough work***."

232.   Additionally, FE-5, a Technology Consultant from January 2023 to February 2025 who was a member of Manhattan's Technical Services, FE-5 reported that Technology Leader Kannan Rajappa told him that when the long-term project he was working on was completed, he would be transferred to one of the other departments due to the lack of work in his current department.

233.   FE-4 similarly advised that he had been one of a "huge number" of people laid off by the Company in February 2025. FE-4 commented that the work situation was very unstable, since he was constantly assigned to new projects. He described it as "like starting a new job every few months." FE-4 noted that, after the Company's stock dropped, Manhattan cut approximately 25% of its consulting

workforce, and since he had been assigned almost exclusively non-billable work, he was in the group which was let go.

234.   The fact that Services employees had little work to do during the Class Period, and that the Company eventually laid off hundreds of them, evidenced Defendants' awareness that Services demand was declining, supporting a strong inference of scienter.

**D.   Manhattan's Services Business Was the Self-Described "Secret Weapon" of the Company**

235.   Manhattan has repeatedly emphasized that its Services segment is critical to the Company's success. Indeed, Services has historically been the Company's largest revenue driver, consistently generating over 50% of Manhattan's total revenue. FE-2 also confirmed that Services was important, noting that the idea that Services revenues were key to the Company is "100% true," as that is what he was told internally as well. Given the importance of Services to Manhattan, it would be absurd to suggest that Defendants Capel and Story were unaware that Services demand was actively declining.

236.   Defendants often publicly trumpeted the importance of the Company's Services business. For example, during the Baird Global Consumer, Technology & Services Conference, held on June 6, 2023, an analyst asked Defendant Capel if he considered the Company's services business "dependable." In response, Capel affirmed that Manhattan Associates' services business was "***important to us***,"

expanding that: "*[i]t's a large part of our revenue, but it's important for, we believe, to drive ROI and customer satisfaction and even more strategically for us to be able to be very close to our customers and understand what product roadmap and footprint needs will look like going forward*."

237.   Moreover, on October 24, 2023, during Manhattan Associates' Q3 2023 earnings call, Defendant Capel emphasized that the Company's "*ability to deliver industry-leading solutions and service to our customers are key drivers for our steady demand.*"

238.   Defendants also represented that Manhattan's Services business differentiates the Company from its competitors. On March 4, 2024, during the Raymond James Institutional Investor Conference, Defendant Capel emphasized that: "*the real key differentiator for us having our services guys side by side with the customers* is we know exactly what's going on in the marketplace. So, we've been very fortunate over the years to – we've never build [sic] new products that haven't gone anywhere. We tend to build products that the market needs and that's one of the key ways that we get that intelligence."

239.   On April 23, 2024, during Manhattan Associates' Q1 2024 earnings call, Defendant Capel described the Company's services business as its "*secret weapon*[]" due to its ability to offer "the perspective of being shoulder-to-shoulder

with our customers, understanding what market trends look like, understanding what their specific needs look like, and informing our product roadmap as we go forward."

240.   Even after revealing that Manhattan's Services business was in decline, on January 28, 2025, Defendant Capel continued to stress the critical nature of the Company's Services:

> Now **services continues to be very important to Manhattan**. Firstly, because that team ensures our customers' success; and secondly, it keeps us close to our customers. And these tight partnerships help us provide clarity on our customers' needs, which in turn incorporates – allows us to incorporate that in our future waves of innovation, helping us drive future subscription growth.

241.   Defendant Capel emphasized the strategic importance of Manhattan's Services until the very end, even on his last day as President and CEO of Manhattan. Specifically, during Manhattan's Fireside Chat on February 12, 2025, and in response to an analyst question about the importance of Services, Defendant Capel stated that:

> **Services is very, very important** to us. Of course, it's still top line revenue for us and so on, but it's strategically important, right? Because it's – we feel like it's very, very important that we'll be involved in the final part of the software implementation to ensure our customers get full value from our software products, number one.

> And then sort of somewhat selfishly for us, it means that we're shoulder to shoulder with our customers each and every day. So as we think about our next innovation cycles, **we are connected at the hip with our customers. We know exactly what to build. We know where the market is going. So services continues to be strategically important to us**.

242. Manhattan's Services business was integral to the Company's operations. Not only did it drive a majority of the Company's revenue, but also, according to Defendant Capel, it differentiated Manhattan from its competitors and drove demand for its products. The critical nature of Manhattan's Services business strongly supports an inference that Defendants knew—or were severely reckless in not knowing—that the Company's Services business was in decline.

## IX.    LOSS CAUSATION

243. During the Class Period, as detailed herein, Manhattan and the Individual Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Manhattan's common stock and operated as a fraud or deceit on Class Period purchasers of Manhattan common stock by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Manhattan's common stock declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Manhattan's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages under federal securities laws.

## X.    PRESUMPTION OF RELIANCE

244.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Lead Plaintiffs and other members of the Class purchased Manhattan common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

245.    At all relevant times, the market for Manhattan common stock was efficient for the following reasons, among others:

246.    As a regulated issuer, Manhattan filed periodic public reports with the SEC;

247.    Manhattan regularly communicated with public investors via established market communications mechanisms, including through regular disseminations of press releases on the major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

248.    Manhattan was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

249.    Manhattan stock was actively traded in an efficient market, the NASDAQ, under the ticker symbol "MANH."

250.    As a result of the foregoing, the market for Manhattan's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Manhattan's common stock prices. Under these circumstances, all purchasers of Manhattan's common stock during the Class Period suffered similar injury through their purchase of Manhattan's common stock at artificially inflated prices, and a presumption of reliance applies.

251.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XI.    CLASS ACTION ALLEGATIONS

252.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Manhattan during the period from July 24, 2024 to February 7, 2025, both dates inclusive, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Manhattan during the Class Period and their immediate family members and any trust established by or for such excluded person; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Manhattan's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, subsidiaries, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

253.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Manhattan's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in

the proposed Class. During the Class Period, an average of over 450,000 shares were publicly traded daily on the NASDAQ, with over 61 million shares outstanding during the Class Period. Record owners and other members of the Class may be identified from records maintained by Manhattan or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

254. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

255. Lead Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class and securities litigation.

256. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, earnings, demand for its products, and specifically, whether

Defendants' statements and omissions misrepresented the strength of its Services business;

(c)    whether, and to what extent, the market price of Manhattan common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    whether Defendants acted with the requisite level of scienter;

(e)    whether Defendants Capel and Story were controlling persons of Manhattan;

(f)    whether Defendants engaged in a scheme and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with the purchase and sale of Manhattan common stock; and

(g)    whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

257.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## XII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

258.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pled in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

259.    Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting the Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

260.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each

of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XIII. CONTROL PERSON ALLEGATIONS

261.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, including its business, operations, earnings, revenue, and demand for its products. The Individual Defendants participated in the drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

262.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements issued by or on behalf of Manhattan during the Class Period. These Individual Defendants were provided copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance

or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed herein.

263.   The Individual Defendants, because of their positions of control and authority as senior executive officers, directors, and/or senior management had access to adverse undisclosed information about Manhattan's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

264.   As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Manhattan's operations and business, and to correct any previously-issued statements that were or had become materially misleading or untrue, so that the market price of Manhattan common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

265.   The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and deceit on all persons and

entities who purchased or otherwise acquired Manhattan common stock during the Class Period, by disseminating materially false and misleading statements and omitting material adverse facts. The scheme deceived the investing public regarding Manhattan's business, operations, and management, and the intrinsic value of Manhattan's common stock, and caused Lead Plaintiffs and members of the Class to purchase Manhattan common stock at artificially inflated prices.

266.   In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Manhattan, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XIV.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Defendants Manhattan, Capel, and Story**

267.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268.   This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and the Class, against the Defendants.

269.   During the Class Period, Defendant Manhattan and Defendants Capel and Story made, disseminated or approved the materially false or misleading

statements alleged herein, all of which were about Manhattan and its common stock, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

270.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Manhattan common stock at artificially inflated prices.

271.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Manhattan common stock.

272.   Defendant Manhattan and Defendants Capel and Story violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material

facts necessary to make the false or misleading statements specified above not misleading.

273.   During the Class Period, Defendant Manhattan and Defendants Capel and Story individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made the above statements and omissions intentionally or with severe recklessness.

274.   Defendant Manhattan is liable for all materially false or misleading statements made during the Class Period, as alleged above.

275.   Defendants Capel and Story are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

276.   As alleged above, Defendants Manhattan, Capel, and Story acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of Manhattan common stock, were either known to Defendants Manhattan, Capel, or Story, or were so obvious that the Defendants should have been aware of them.

277. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Manhattan, establish a strong inference that Defendants Manhattan, Capel, and Story acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

278. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Manhattan common stock and were harmed when the truth about Manhattan negatively impacted the price of that common stock. Lead Plaintiffs and the Class would not have purchased Manhattan common stock at the prices they paid, or at all, had they been aware of the truth about Manhattan.

279. As a direct and proximate result of Defendant Manhattan's, Capel's, and Story's wrongful conduct, Lead Plaintiffs and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act and SEC Against Defendants Capel and Story

280. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

281.   This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and the Class, against Defendants Capel and Story (the "Control Person Defendants").

282.   As set forth above, each of the Control Person Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Control Person Defendants acted as controlling persons of Manhattan within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Control Person Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading, as well as the fraudulent course of conduct and scheme alleged herein. The Control Person Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

283.   In particular, the Control Person Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to

control public statements about Manhattan and the actions of Manhattan and its employees. The Control Person Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Manhattan during the Class Period. Moreover, each of the Control Person Defendants were directly involved in or orchestrated the undisclosed fraudulent scheme alleged herein. As a result of the foregoing, the Control Person Defendants each were controlling persons of Manhattan within the meaning of Section 20(a) of the Exchange Act.

284.    As alleged above, Manhattan violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions, and undisclosed fraudulent scheme, as alleged in this Complaint. By virtue of their positions as controlling persons of Manhattan and as a result of their own aforementioned conduct, the Control Person Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Manhattan common stock. Moreover, as alleged above, during the respective times that the Control Person Defendants served as officers or high-level executives of Manhattan or spoke directly to Manhattan investors during analyst

conference calls, each of the Control Person Defendants culpably participated in the material misstatements and omissions made by Manhattan, as set forth above.

285.   As a direct and proximate result of the wrongful conduct by the Control Person Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Manhattan common stock during the Class Period.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Keller Sucharow LLP as Class Counsel pursuant to Rule 23(g);

(b)    Awarding Lead Plaintiffs and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Exchange Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XVI.  DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 22, 2025                    Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*

Lauren A. Ormsbee (*pro hac vice*)
David Saldamando (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel.: (212) 905-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

-and-

*/s/ Jonathan R. Chally*

Jonathan R. Chally
Georgia Bar No. 141392
COUNCILL, GUNNEMANN & CHALLY, LLC
75 14th Street, NE
Suite 2475
Atlanta, GA 30309

117

Tel.: (404) 407-5250
jchally@cgc-law.com

*Liaison Counsel for the Class*

   -and-

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Additional Named Plaintiff*
*Timothy Prime and Additional Counsel*
*for the Class*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and 14-point font.

Dated: July 22, 2025

/s/ Lauren A. Ormsbee
Lauren A. Ormsbee