IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TIMOTHY PRIME, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MANHATTAN ASSOCIATES, INC., *et al.*,<br><br>Defendants. | CIVIL ACTION NO.<br>1:25-cv-00992-TRJ |

**ORDER**

On September 22, 2025, Defendants Manhattan Associates, Inc., Eddie Capel, and Dennis B. Story filed a motion to dismiss Plaintiffs' amended complaint. (Doc. 43). Upon review and consideration, and with the benefit of oral argument, Defendants' motion is **DENIED**.

**BACKGROUND**

This securities class action is brought on behalf of Plaintiffs and all persons and entities that purchased or acquired the publicly traded common stock of Defendant Manhattan Associates, Inc. ("Manhattan" or the "Company") from July 24, 2024 through February 7, 2025 (the "Class Period"). Plaintiffs consist of the City of Orlando Police Officers' Pension Fund ("Orlando Police"), the City of Orlando Firefighters' Pension Fund ("Orlando Firefighters"), the City of Orlando General Employees' Pension Fund ("Orlando General"), and class representative Timothy Prime. Defendants include Manhattan and individuals Eddie Capel, Manhattan's former President and Chief Executive Officer ("CEO"), and Dennis B. Story,

Manhattan's Executive Vice President and Chief Financial Officer ("CFO").

### A. The Company

Manhattan is a global corporation that sells software solutions to manage supply chains, inventory, and omnichannel operations. (Doc. 41 at ¶ 1). Manhattan also offers services related to implementing, customizing, and upgrading their software products. (*Id.*) The Company's Professional Services Organization ("PSO") and its Customer Services Organization ("CSO") consist of experts who assist customers in implementing, customizing, and upgrading the software products. (*Id.* at ¶¶ 2, 45, 47). The PSO is responsible for implementing the core software product and ensuring that the adoption of the software runs smoothly until the "go-live," or the shift from the product's testing to its actual real-world operation. (*Id.* at ¶ 47). The CSO takes over after a customer's "go-live," working on post-implementation support and optimizing the software. (*Id.* at ¶ 48).

While these services are optional, almost all of Manhattan's customers elect to use them. (*Id.* at ¶¶ 2, 51). Services are offered either under time and materials contracts, where customers are billed by the hour, or on a fixed-fee basis, where payments are due on a specific date or milestone. (*Id.* at ¶ 50). Manhattan's service business generated over 50% of the company's total revenue during the Class Period. (*Id.* at ¶¶ 2, 42). On March 4, 2024, Capel emphasized that "the real key differentiator for [the Company] having [its] services guys side by side with the customers is [the Company] know[s] exactly what's going on in the marketplace," and the Company had never built new products that have not "gone anywhere." (*Id.* at ¶ 56). On April

23, 2024, during Manhattan's first quarter of 2024 ("Q1 2024") earnings call, Capel characterized the service business as Manhattan's "secret weapon," stating that it is a "key driver[ ] of [the Company's] steady demand," "drive[s] ROI and customer satisfaction," and is a "real key differentiator" for the Company. (*Id.* at ¶¶ 3, 44, 57). Analysts agreed Manhattan's service business is a differentiator and "unique." (*Id.* at ¶¶ 3, 59–60).

**B. The Transition to Cloud-Based Services**

Although Manhattan historically would install its software onto a customer's servers itself, in 2017, Manhattan transitioned to the Manhattan Active Solutions Platform, a cloud-based software through remote, third-party servers accessible to customers via the internet. (*Id.* at ¶¶ 4, 61, 64). Defendants told investors that the Company's "best-of-breed cloud-native platform" was "fuel[ing] service revenue growth for Manhattan." (*Id.* at ¶ 5). Capel stressed that "[i]n today's dynamic market, cloud-driven flexibility isn't just an advantage—it's essential for business success." (*Id.* at ¶ 63). In reality, however, the cloud-based software "eroded the Company's ability to generate [s]ervices revenue and stunted [s]ervices growth." (*Id.* at ¶ 5). Because the cloud-based software did not require as much maintenance as the on-premises products did, the demand for services declined because customers did not need help as often. (*Id.* at ¶ 6).

A former Manhattan Engagement Director ("FE-1") reported that the Company, and everyone at the director level and above, "knew internally by April 2024" that it was not going to make its full year 2024 services revenue forecasts

"because the sales pipeline was not there, it was dry." (*Id.* at ¶¶ 6, 84, 91, 214). FE-1 explained that, because the cloud-based software did not require upgrades the same way that onsite servers did, customers did not feel the need for new features or maintenance, causing a "major downgrade" in services revenue. (*Id.* at ¶ 87). According to FE-1, the Company's sales pitch even stated that the cloud upgrade would be the "last upgrade you would ever do." (*Id.* at ¶ 88).

FE-1 claimed that "high level executives" were aware of the likelihood of not meeting revenue forecasts because the executives received monthly updates generated by Salesforce, a platform that managed customer relationships and sales data. (*Id.* at ¶¶ 93, 216 n.10). FE-1, as a director, would receive service revenue forecast presentations, and those presentations were then shown to Capel and Story, as required by the Company's documented rules. (*Id.* at ¶ 217). Capel met with the Company's Engagement Directors every other week for "key account reviews," and Story was in approximately 90% of the reviews that FE-1 participated in. (*Id.* at ¶¶ 100, 218, 220). Because of this, FE-1 stated that he found it "very hard to believe" that the 2025 service revenue projections were "sincere," noting that it felt "dishonest." (*Id.* at ¶ 215). These same high-level executives directed FE-1 and other directors to proactively ask customers for new or early orders, which had never been done before. (*Id.* at ¶ 95).

A former Software Implementation Consultant and member of the Company's PSO from January 2024 to January 2025 ("FE-2") stated that Manhattan's cloud products "were not ready to be rolled out for customer implementation" and this fact

was widely known internally. (*Id.* at ¶¶ 7, 49, 103, 107). FE-2 reported that senior level executives were updated on implementation problems. (*Id.* at ¶¶ 115–19). Numerous former services employees, including FE-2 and a former Assistant Manager of Talent Acquisition at the Company's India operations ("FE-6"), reported that a lack of work during the Class Period led to a hiring freeze and mass layoffs. (*Id.* at ¶¶ 8, 38, 139, 231). A former Consultant on the PSO ("FE-3") reported that the Company's business was slow and consistently lacked projects for him throughout January 2024 to January 2025. (*Id.* at ¶¶ 144–46, 228).

Another former PSO Consultant ("FE-4") advised that the work situation was unstable and noted that, after the Company's stock dropped, Manhattan cut approximately 25% of its consulting workforce, including himself in February 2025. (*Id.* at ¶¶ 130, 233). Another former Consultant ("FE-5") reported the same, claiming the lack of work was due to the Company's failure to secure new contracts. (*Id.* at ¶ 152). Services revenue also suffered because the cloud-based software was often faulty and disappointed customers, causing many to break their contracts and a decrease in demand. (*Id.* at ¶¶ 7, 102).

**C. Second Quarter of 2024 ("Q2 2024") Earnings Call**

Despite the decline in services demand, Defendants made statements to investors emphasizing the growth of the Company's service business, which allegedly artificially inflated Manhattan's share price. (*Id.* at ¶ 9). Defendants failed to disclose that (1) the cloud-based products required less services, (2) the cloud-based products were often faulty, leading to delayed and canceled contracts and a reduced demand

for services, and (3) services employees suffered from a lack of work. (*Id.* at ¶ 160). During Q2 2024, Story told investors that "cloud sales continue to fuel services revenue growth for Manhattan" and that Manhattan's "performance was driven by strong cloud and services revenue growth." (*Id.* at ¶ 9). Defendants also reported that services revenue would increase in Fiscal Year 2025. (*Id.*) Analysts believed these statements, with Equisights noting that Manhattan's "global services team is killing it, delivering high-quality implementations that drive customer satisfaction and long-term loyalty" and attributing the revenue growth as "primarily driven by the rise in cloud subscriptions." (*Id.* at ¶ 10). Defendants made additional statements indicating that the Company's hiring of services employees was positive. (*Id.* at ¶ 11).

On July 23, 2024, Capel told investors during the Company's Q2 2024 earnings call that Manhattan plans "to continue to hire" and those "hires will be largely in customer-facing roles." (*Id.* at ¶¶ 11, 79, 169). He also emphasized that the Company's "best-of-breed cloud-native platform . . . fuel[s] opportunities for growth of [its] internal services organization," predicting 2024 services revenues of over $535 million. (*Id.* at ¶¶ 79, 80, 161). He boasted that the Company was "very optimistic on our business opportunity," and the Company continues "to invest in innovation to drive sustainable long-term growth." (*Id.* at ¶ 163). Again, analysts believed these statements. (*Id.* at ¶ 12). After the Q2 2024 earnings call, Rosenblatt[1] issued an

[1] The amended complaint refers repeatedly to "Rosenblatt" in the context of analyst reports issued in response to Manhattan's quarterly earnings calls. Though the amended complaint contains no facts explicitly defining what or whom "Rosenblatt" is or does—the Court infers from publicly available information that Plaintiffs are referring to Rosenblatt Securities, a market research firm.

analyst report titled "First Look at Q2—Healthy Growth Continues During Shift to Cloud Offering" and noted that "Manhattan plans to hire several hundred employees in 2024 to support its [s]ervices growth." (*Id.* at ¶¶ 12, 171).

**D. Third Quarter of 2024 ("Q3 2024") Earnings Call**

On October 22, 2024, Manhattan held its Q3 2024 earnings call. (*Id.* at ¶ 175). During the call, Capel stated: "The Manhattan's business fundamentals are solid, and we remain confident and very optimistic about our business opportunity . . . . [D]emand for our solutions is robust, customer satisfaction is high and is evidenced by our recent release of the [cloud software]." (*Id.* at ¶ 176). Story also touted Manhattan's "record pipeline that includes solid demand from both new and existing customers[.]" (*Id.* at ¶ 180).

During the Q3 2024 earnings call, Defendants also revealed that they expected a fourth quarter of 2024 ("Q4 2024") services revenue of $121.5 million, a $15.5 million sequential decline from Q3 2024. (*Id.* at ¶¶ 13, 194–95). The Company also lowered its total revenue projection for Q4 2024 by $3.5 million, a $10.8 million sequential decline from Q3 2024. (*Id.* at ¶¶ 13, 195) After this announcement, Manhattan's stock price dropped $20.96 per share, or 7.2%, to a close price of $271.36 per share on October 23, 2024. (*Id.* at ¶¶ 13, 196). During the call, Capel emphasized that the Company's "supply chain agility is simply unachievable without the industry's leading cloud native platform[.]" (*Id.* at ¶ 72).

**E. Fourth Quarter of 2024 ("Q4 2024") Statements**

On January 28, 2025, Manhattan published a press release titled "Manhattan

Associates Reports Record Fourth Quarter and Full Year Results," disclosing that "[i]n January 2025, the Company eliminated about 100 positions to align our [s]ervices capacity with customer demand which has been impacted by short-term macro-economic uncertainty." (*Id.* at ¶ 201). The same day, during the Company's Q4 2024 earnings call, Defendants disclosed that Q4 2024 services revenue was $119 million, another $2 million below their projections and $11 million below the projected revenue at the start of the Class Period in Q2 2024. (*Id.* at ¶¶ 14, 202). Defendants revealed that "near-term headwinds for our services business have surfaced as about 10% of our customers with in-flight implementations reduced their planned services work" and revised Manhattan's 2025 projections from $1.13–$1.14 billion to $1.06–1.07 billion for total revenue and from $565–$575 million to $494–$500 million for services revenue. (*Id.* at ¶¶ 14, 203). Regardless, Capel stressed that "[s]ervices continues to be very important to Manhattan," emphasizing that the partnerships help to "drive future subscription growth." (*Id.* at ¶ 54). After this announcement, Manhattan's stock price dropped $72.26 per share, or 24.5%. (*Id.* at ¶¶ 15, 207). Analyst Piper Sandler observed "services drags down FY25," which was "not the surprise we were hoping for," and services "was the larger driver of the weakness." (*Id.* at ¶¶ 15, 208).

On February 10, 2025, Manhattan filed a Form 8-K with the United States Securities and Exchange Commission ("SEC"), announcing Capel's departure as CEO. (*Id.* at ¶¶ 16, 210). Manhattan also published a press release disclosing Capel's departure effective February 12, 2025. (*Id.*) After this announcement, Manhattan's

stock price dropped another $23.20 per share, or 11.5%, to close at $177.70 per share. (*Id.*) Also on February 12, 2025, during Manhattan's "fireside chat," Capel still emphasized that "[s]ervices is very, very important to [the Company]." (*Id.* at ¶ 55).

### F. This Lawsuit

On February 25, 2025, Timothy Prime initiated this action against Defendants for violations of federal securities laws. (Doc. 1). On May 2, 2025, the Court consolidated this action with a related lawsuit. (Doc. 17). On July 22, 2025, the consolidated Plaintiffs filed an amended complaint, seeking damages for the losses suffered by investors because of Defendants' misrepresentations throughout the Class Period. (Doc. 41). Plaintiffs allege Defendants' conduct violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10(b)-5(b), and separately, Section 20(a) of the Securities Exchange Act of 1934. (*Id.* at ¶¶ 267–85). On September 22, 2025, Defendants moved to dismiss the amended complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995. (Doc. 43).

## LEGAL STANDARD

A complaint should be dismissed only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); FED. R. CIV. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, a claim will survive a motion to dismiss if the factual allegations in the pleading are "enough

to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, at the motion to dismiss stage, "all well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citation omitted). Courts are not required, however, to accept as true legal conclusions "couched" as factual allegations. *Twombly*, 550 U.S. at 555 (citation omitted).

Securities fraud claims must also satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In satisfying Rule 9(b), the complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro*, 544 F.3d at 1237 (citation modified). The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.* (the "PSLRA") also imposes a heightened pleading standard. *Id.* at 1238. A plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is

formed." 15 U.S.C. § 78u-4(b)(1). And to allege scienter under the PSLRA, a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each act or omission alleged to be a violation. *Id.* at § 78u-4(b)(2)(A).

## DISCUSSION

### A. Section 10(b) of the Securities Exchange Act and Rule 10b-5

Under Section 10(b) of the Securities Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary" for the public's protection. 15 U.S.C. § 78j(b). And, under the SEC's Rule 10b-5, it is unlawful:

> (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: "(1) a material misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Buqueras v. Sharecare, Inc.*, No. 1:24-cv-02769-LMM, 2025 WL 3183000, at *3 (N.D. Ga. Sep. 25, 2025) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1216 (N.D. Ga. 2019).

Plaintiffs allege 13 statements were false or misleading. (*See* Docs. 45-2, 43-18, 43-19). The first five statements were made during the July 23, 2024 Q2 2024 earnings call, and the remaining eight were made during the October 22, 2024 Q3 2024 earnings call:

- Capel's statement that: "Our best-of-breed cloud-native platform and solutions provide continuous access to innovation and are a key component of our customer success. These mission critical solutions help our clients strengthen their relationships with their end customers, drive more revenue and improve efficiency. These powerful benefits are translating into a record solutions pipeline for us with new potential customers representing about 35% of the demand. As ***solid product demand is also fueling opportunities for growth of our internal services organization***, as well as the growing roster of Manhattan Value Partners." (Doc. 41 at ¶ 161).

- Story's statement that: The Company's "global services teams delivered record revenue totaling $137 million, up 10%" and that "***this was in line with our expectations as cloud sales continue to fuel services revenue growth for Manhattan***." Story then explained that Manhattan's "***performance was driven by strong cloud and services revenue growth combined with operating leverage as our cloud business continues to scale.*** [I]mportantly, as Eddie [Capel] discussed, we are ***very optimistic on our business opportunity and continue to invest in innovation to drive sustainable long-term growth***." (*Id.* at ¶ 163).

- In response to a question about what specifically was driving the growth in basis points for gross margins for subscription, maintenance, and services, Story responded, "No,[2] ***just a positive mix between services and cloud in the gross margins***." The analyst questioned if this is "just more on the mix of revenue components," to which Story responded "Yeah." (*Id.* at ¶ 165).

---

[2] The parties dispute whether the word "No" was actually said based on differing transcripts. (Doc. 45-2 at 3 n.2; Doc. 43-18 at 4 n.2). The Court may consider these transcripts and other documents to which the complaint refers, documents filed with the SEC, and documents subject to judicial notice. *See Bryant v Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (a court may consider, at the motion to dismiss stage, an attached document that is central to the plaintiff's claims and undisputed).

- Capel's statement that: "Now, like the last few quarters, our global services team completed over 100 go-lives in Q2 and ***continue to perform very well for our customers***. And while we remain appropriately cautious on the global economy, we continue to invest to drive growth from our numerous opportunities. This includes monetizing strategic investments in industry-leading innovation, further enablement of our customer success, and the expansion of our addressable market. From a hiring perspective, ***we've hired just over 100 new team members year-to-date and plan on continuing our hiring posture for the remainder of the year***." (*Id.* at ¶ 167).

- Capel's statement that: "Yeah, ***we plan to continue to hire***. Now, the good news is that our attrition rate is – for this year is lower that we had forecasted. So that helps in all kinds of different ways, not at least – not least of which on efficiency, margin, customer satisfaction and so forth, but lower attrition does mean, potentially a little bit less hiring. ***But we do definitely plan to expand our team in the second half of the year, for sure. And those hires will be largely in customer-facing and services roles.***" (*Id.* at ¶ 169).

- Capel's statement that: "For the quarter, total revenue increased 12% to $267 million, and adjusted earnings per share increased 29% to $1.35. Both of these metrics were above our expectations. ***Driving the top-line outperformance and earnings leverage with solid cloud and services revenue growth across all geographies***, with cloud subscription revenue posting 33% growth in the quarter." (*Id.* at ¶ 175).

- Capel's statement that: "***The Manhattan's business fundamentals are solid, and we remain confident and very optimistic about our business opportunity.*** While the global macro environment remains challenging, ***demand for our solutions is robust, customer satisfaction is high and [a]s evidenced by our recent release of the Manhattan Active Supply Chain Planning Solution, the investments we're making in R&D and our people are creating a clear differentiation.*** Delivering consistent market[-]leading innovation is creating more opportunities across supply chain, omnichannel retail and at the world's best – as the world's best brands look to unify and digitally transform." (*Id.* at ¶ 176).

- Capel's statement that: "RPO, remaining performance obligation, increased 27% to roughly $1.7 billion. And as we've often cautioned, large, complex deals can be lumpy on a quarter-over-quarter basis. And whilst we haven't seen much of that lumpiness over the past three or four years, this quarter and, to a lesser extent, last quarter, we have seen some. And our third quarter RPO growth was impacted by some

large digital transformational projects pushing out. ***That said, our fourth quarter is off to a great start, and demand is solid and attributes that give us confidence that we will actually achieve at the high end of our 2024 RPO bookings guidance of $1.8 billion.*** Across our industry leading product portfolio and global pipeline sits at record levels, our win rates remain strong at about 70%. And these factors, despite the uncertain macroenvironment, again, give us confidence that we'll achieve the high end of our 2024 RPO bookings goals, and equally important, are well positioned for continued success in 2025, 2026, and of course, beyond that. . . . In Q3, 14% of our new bookings were generated from net new logos, and we continue to have a very healthy mix of conversions, upsells and cross-sells. ***And we believe this demonstrates the many and varied opportunities we have for sustainable future growth. And as stated earlier, our solution pipeline is at record levels and new potential customers represent about 35% of that demand. This strong demand is driven by our best-of-breed cloud native solutions that provide continuous access to innovation and are helping our customers digitally transform their businesses to drive success. Our mission critical solutions help our clients improve customer satisfaction, drive more revenue, and improve efficiency***." (*Id.* at ¶ 177).

- Capel's statement that: "And ***this strong demand for our solutions is also fueling opportunities in growth for our internal services organization and our systems integration partners.*** In Q3, our global services team completed over 100 go-lives and ***continue to perform very well for our customers***." (*Id.* at ¶ 178).

- Story's statement that: "Importantly, Manhattan continues to benefit from ***a record pipeline that includes solid demand from both new and existing customers, and strong win rates are giving us confidence in achieving the high end of our 2024 RPO bookings outlook and the ability to provide strong 2025 outlook parameters.*** Our global services teams delivered record revenue totaling $137 million, up 7%, as cloud sales continue to fuel services revenue growth for Manhattan. Adjusted operating profit was $99 million, with adjusted operating margin of 37.1%. This is 670 basis points year-over-year up. Our performance was driven by strong cloud and services revenue growth combined with operating leverage, as our cloud business continues to scale. As Eddie [Capel] discussed, ***we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable, long-term growth***." (*Id.* at ¶ 180).

- Story's statement that: "Now moving to 2025, we're going to provide some preliminary parameters here. We are currently in the very early

stages of our 2025 budget cycle, and we'll firm up this outlook on our Q4 call as we get through the US election process and our final market analysis. With that, ***we are targeting total revenue of $1.13 billion to $1.14 billion, representing 9% to 10% growth,*** with license and maintenance attrition masking total growth by 5 percentage points. This includes our cloud revenue target of $415 million, representing 23% year-over-year growth. For RPO, we are targeting $2.15 billion, which represents 21% growth. ***In 2025, we are targeting services revenue of $565 million to $575 million.*** The $570 million midpoint represents 8% growth. In summary, our preliminary 2025 parameters include total revenue, excluding license and maintenance attrition, to increase 14%, cloud revenue to increase 23%, ***services revenue to increase 8%***, and RPO to increase 21%, and for an operating margin of 33.5%, while increasing our investment in Manhattan leading innovation. ***All-in solid execution by our global Manhattan team and looking forward to the – ending the year strong.***" (*Id.* at ¶ 182).

- When asked about the "upside that you saw in the quarter and in the guide" by an analyst, Story responded: "Absolutely. From a mix standpoint, ***it's a fantastic execution by the business, record cloud and services. Yeah, just great performance there***." (*Id.* at ¶ 184).

- Capel's statement that: "***[O]ur fourth quarter is off to a solid start, and we are providing responsible 2025 parameters.***" (*Id.* at ¶ 186).

Defendants argue that Plaintiffs have not demonstrated falsity or scienter in any of these alleged misrepresentations.[3]

1. <u>Falsity</u>

Defendants argue that their statements are not actionable because (1) ten of the challenged statements are protected by the PSLRA's statutory "safe harbor" for forward-looking statements, as provided by 15 U.S.C. § 78u-5, (2) the statements are

---

[3] Defendants initially argued that Plaintiffs failed to plead loss causation as to claims based on the February 10, 2025 disclosure of Capel's resignation as CEO, as required by 15 U.S.C. § 78u-4(b)(4). (Doc. 43 at 2). At oral argument, however, Defendants withdrew their loss causation argument. Thus, the Court considers that argument abandoned and does not address it here.

corporate "puffery," and (3) Plaintiffs fail to plead with particularity that any challenged statement was false or misleading when made as required by Rule 9(b) and 15 U.S.C. § 78u-4(b)(1). (Doc. 43 at 2; Doc. 43-19). The Court agrees that some statements are forward-looking and fall within the safe harbor, and some are corporate puffery. But not all. Some of the statements identified in the amended complaint rise to the level of an actionable misrepresentation of material fact.

*a. Forward-Looking Statements*

The PSLRA provides a "safe harbor" for forward-looking statements. *See* 15 U.S.C. § 78u-5. This "safe harbor" shields defendants from liability for forward-looking statements that are (1) "accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ meaningfully from those in the forward-looking statements," (2) "immaterial," or (3) not made with "actual knowledge" that "the statement was false or misleading." *Id.* at § 78u-5(c)(1). There is no duty to update a forward-looking statement. *Id.* at § 78u-5(d). To the extent a statement includes both present-tense and forward-looking components, "it makes sense to afford safe-harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1328 (11th Cir. 2019). Forward-looking statements include "projections of revenues, statements regarding management's future plans and objectives, and statements regarding future economic performance[.]" *FindWhat Inv. Grp.*, 658 F.3d at 1296 (citing 15 U.S.C. § 78u-5(c)(1)(A)(i), (i)(1)).

Certain statements identified by Plaintiffs are forward-looking and are

protected by the safe harbor. In particular, the portion of Story's statement on July 23, 2024 that "we are very optimistic on our business opportunity and continue to invest in innovation" reflects the Company's future objective in continued investment and economic performance. (Doc. 41 at ¶ 163). On that same call, Capel emphasized that the Company "plan[s] on continuing our hiring posture for the remainder of the year," specifically in the customer-facing and services roles, after explaining that the Company was remaining "appropriately cautious on the global economy" and stating that "lower attrition does mean, potentially, a little bit less hiring." (*Id.* at ¶¶ 167, 169 (emphasizing plans to continue to hire and expand the team)).

On October 22, 2024, Capel again emphasized that "we remain confident and very optimistic about our business opportunity," despite the challenging "global macro environment." (*Id.* at ¶ 176). Story agreed, explaining that "we are very optimistic on our business opportunity and continue to invest[.]" (*Id.* at ¶ 180). Such confidence and optimism for *future* performance are clearly forward-looking. Capel mentioned the Company's confidence that it would achieve the high end of its 2024 booking guidance and were "well positioned for continued success in 2025, 2026, and of course, beyond that." (Doc. 41 at ¶¶ 177 (also stating "we believe this demonstrates the many and varied opportunities we have for sustainable future growth"), 180). Story also emphasized the target revenue and percentage growth in the October call. (*Id.* at ¶ 182). Plaintiffs concede that these revenue forecasts are forward-looking. *See FindWhat Inv. Grp.*, 658 F.3d at 1296 (citation omitted); (Doc. 45 at 18 n.2).

Many statements, however, are not forward-looking and address the *current*

state of Manhattan and its services business. On the July 23, 2024 earnings call, Capel touted that "solid product demand is also fueling opportunities for growth of our internal services organization," and Story emphasized that "cloud sales continue to fuel revenue growth for Manhattan." (Doc. 41 at ¶¶ 161, 163). On that same call, Capel emphasized that the services team "continue[s] to perform very well for our customers." (*Id.* at ¶ 167). A few months later, on the October 22, 2024 earnings call, Capel stated that "Manhattan's business fundamentals are solid, . . . demand for our solutions is robust, customer satisfaction is high and is evidenced by . . . the investments we're making in R&D and our people are creating a clear differentiation." (*Id.* at ¶ 176). He boasted that the fourth quarter was "off to a great start, and demand [was] solid," and the "solution pipeline [was] at record levels." (*Id.* at ¶ 177). He stated that the global services team "continue[s] to perform very well for our customers," emphasizing, again, the "strong demand" for the Company's solutions. (*Id.* at ¶ 178). He claimed the fourth quarter was "off to a solid start, and we are providing responsible 2025 parameters." (*Id.* at ¶ 186). On that same call, Story emphasized these same sentiments, claiming that "Manhattan continues to benefit from a record pipeline that includes solid demand from both new and existing customers, and strong win rates," and "cloud sales continue to fuel services revenue growth" for the Company. (*Id.* at ¶ 180). These statements by Capel and Story are expressions of the present state of the Company, emphasizing growth right now, not just in the future. *See FindWhat Inv. Grp.*, 658 F.3d at 1298–99 (finding statements like "we employ" and "we enforce" to be affirmative statements of present facts and

thus not covered under the safe harbor protections).

But, to the extent these statements can be proven false and are of the nature where "truth or falsity is discernable only after it is made," they are still protected by the safe harbor. *Harris v. Ivax Corp*, 182 F.3d 799, 805 (11th Cir. 1999) (a chairman and CEO's "hopeful conclusion that conditions are better because of two anticipated improvements in business conditions is a prediction of economic performance, however couched" and was a statement "verifiable only after the chairman so declared"). Indeed, Defendants rightly argue that tense is not dispositive, and that even present tense statements that are statements "of the assumptions underlying or relating to the projections and predictions" are protected as forward-looking. (Doc. 43-1 at 18) (citing *Mogenson v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1216 (M.D. Fla. 2014); 15 U.S.C. § 78u-5(i)(1)(D)).

However, it is not an accurate statement of the law to argue that the Court cannot separate a present statement from a future one. Although the Eleventh Circuit in *Harris* found that a list with both present statements and future statements was covered by the safe harbor, the Eleventh Circuit emphasized later that "[k]ey to this holding . . . was the investors' allegation that the list *as a whole* was misleading." *Carvelli*, 934 F.3d at 1329 (citing *Harris*, 182 F.3d at 805–07). The holding in *Harris* did not "give companies carte blanche to shield present statements of fact in the safe harbor, explaining that 'a list or explanation will only qualify for this treatment' if any present-tense statements were limited to 'assumptions underlying a forward-looking statement.'" *Id.* The Court emphasized that where the

plaintiff "challenges multiple individual statements rather than an entire list," it makes sense to sever the present-tense statement and evaluate it on its own. *Id.* The Court held that "when a forward-looking statement is of the sort that, by its nature, rolls in present circumstances—that is, when a statement forecasts in a tentative way a future state of affairs in which a present commitment unfolds into action—the statement isn't barred from safe-harbor protection solely on that ground." *Id.*

Viewing Defendants' present statements under this framework, Capel's statements on the October 22, 2024 earnings call that "Manhattan's business fundamentals *are* solid . . . demand for our solutions *is* robust, customer satisfaction *is* high and *is* evidenced by . . . the investments we're making in R&D and our people *are* creating a clear differentiation" could be proven false at the time they were made. (Doc. 41 at ¶ 176). His boasting that the fourth quarter was "off to a great start, and demand [was] solid," and the "solution pipeline [was] at record levels" could also be proven false at the moment Capel spoke the words. (*Id.* at ¶ 177). The same is true for whether there was actually a "strong demand" for the Company's solutions and whether the fourth quarter was truly "off to a solid start." (*Id.* at ¶¶ 178, 186). These statements are not protected. But the statements that Manhattan would "continue" to perform very well for customers' benefit from a record pipeline, would "continue" its hiring posture, and would "continue" to have a very healthy mix of conversions, upsells, and cross-sells are properly sheltered under the safe harbor "because they convey management plans for yet-to-be-proven future operations and goals." *Carvelli*, 934 F.3d at 1329 (the promise that the company would "continue to provide strong

servicing results" implied "both that servicing results [were] currently strong and that [the company] commit[ed] to provid[ing] strong results in the future"); (Doc. 41 at ¶¶ 167, 177, 178, 180). So are the statements that cloud sales would "continue to fuel services revenue growth," and the cloud business "continues to scale." (Doc. 41 at ¶¶ 163, 180).

Even though portions of Defendants' statements are forward-looking, they are not protected by the statutory safe harbor unless they were also "(1) accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge of their falsity." *See Carvelli*, 934 F.3d at 1326. Defendants argue that meaningful cautionary language accompanied each of the forward-looking statements. (Doc. 43-1 at 18–19). For meaningful cautionary statements, it is sufficient for an issuer to "mention important factors that could cause actual results to differ materially from those in the forward-looking statement." *Carvelli*, 934 F.3d at 1326–27 (citation modified). "When an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* at 1327 (citation modified).

The Court agrees that meaningful cautionary language accompanied the forward-looking statements. On the July 23, 2024 and October 22, 2024 earnings calls, Manhattan emphasized that it "may make forward-looking statements regarding the future events or the future financial performance of Manhattan Associates," and that such statements "are not guarantees of future performance and

that actual results may differ materially from the projections[.]" (*See* Doc. 43-19 at 29, 32). Manhattan also pointed investors to its Form-10K 2023 SEC filing, in which it identified potential risks, such as future revenue decreasing from decreased cloud subscriptions, adverse impacts from the failure to offer high-quality services, and the volatility of stock pricing, (*Id.* at 15, 17, 29, 32). While the statements made in the earnings calls appear "boilerplate," the language outlined in the Form 10-K 2023 SEC filing warns of "risks of a significance similar to that actually realized." *Carvelli*, 934 F.3d at 1326–27 (citation modified) (cautionary language was more than boilerplate where it identified "uncertainty related to claims, litigation, and investigations brought by government agencies and private parties regarding our servicing"). Thus, while portions of the statements identified above are covered under the safe harbor provision (Doc. 41 at ¶¶ 163, 176–78, 180, 182), the other identified statements are not.

*b. Puffery*

"Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism." *Carvelli*, 934 F.3d at 1318 (citation omitted). In essence, "some statements are just too boosterish to justify reasonable reliance," and puffery is an "expression of an exaggerated opinion," not "a factual misrepresentation." *Id.* at 1318–19. "Excessively vague, generalized, and optimistic comments—the sorts of statements that constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle—that is, they're not material." *Id.* at 1320.

Importantly, however, "[a] conclusion that a statement constitutes puffery

doesn't absolve the reviewing court of the duty to consider the possibility—however remote—that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement." *Id.* (citation omitted). Thus, when considering a motion to dismiss, the motion should not be granted "unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Id.* at 1320–21 (citation omitted). And a statement of opinion, although sometimes puffery, is actionable if it is material and "falsely describes the speaker's own state of mind," making it an "untrue statement of fact." *Id.* at 1322.

Some of the statements identified in the amended complaint contain puffery. For example, statements focused on "confidence" and "optimism" about business opportunities are the kind of corporate puffery that is not actionable. (Doc. 41 at ¶ 163 ("we are very optimistic on our business opportunity"), ¶ 176 ("The Manhattan's business fundamentals are solid, and we remain confident and very optimistic about our business opportunity."), ¶ 180 ("we are very optimistic on our business opportunity"); *see Mogenson*, 15 F. Supp. 3d at 1213 (statement that "overall we feel optimistic" constituted puffery). Predictions about future performance, absent a false misstatement of fact, are also generally not actionable. (Doc. 41 at ¶ 182) (explaining target revenue and percentage growth), ¶ 177 (classifying the fourth quarter as "off to a great start" and expressing confidence that the Company would hit its future guidance goal)); *see Amalgamated Bank v. Coca-Cola Co.*, No. 1:05-cv-01226, 2006

WL 2818973, at *3 (N.D. Ga. Sep. 29, 2006) (statements that a company's growth is "strong" or that a company expects a "10% to 30% growth rate over the next several years" constitute puffery).

But some of the identified statements represent "more concrete affirmations of verifiable actions." *See Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020). For example, Capel's statement on the July earnings call that "our global services team completed over 100 go-lives in Q2" is a verifiable, tangible action statement. (Doc. 41 at ¶ 167); *see Tung*, 454 F. Supp. 3d at 1257 (finding statements like "working aggressively with our customers to help them gear up" and "increasingly providing integrated . . . services" were not puffery). Whether "solid product demand" actually "fuel[ed] opportunities for growth of [the Company's] internal services organization" and whether "performance" was actually "driven by strong cloud and services revenue growth" are verifiable. (*See* Doc. 41 at ¶¶ 161, 163, 178). It is also verifiable whether gross margins discussed in the July 2024 call were actually from "a positive mix between services and cloud in the gross margins." (*Id.* at ¶ 165). Thus, while portions of the statements identified above are puffery (*Id.* at ¶¶ 163, 176, 177, 180, 182), many are not.

*c. Particularity*

Plaintiffs have sufficiently pleaded particular facts to show that Manhattan's statements that are not covered by the safe harbor were false. "A complaint sufficiently pleads falsity by specifying the who, what, when, where, and how of statements made." *City of Southfield Gen. Emps.' Ret. Sys. v. Nat'l Vision Holdings,*

*Inc.*, No. 1:23-cv-00425-VMC, 2024 WL 1376016, at *6 (N.D. Ga. Mar. 30, 2024) (citation modified). "A defendant may not deal in half-truths," but only "material" misrepresentations give rise to a fraud claim. *Id.* at *7 (citation modified).

Importantly, for this analysis, the confidential witness statements may be considered by the Court in determining both falsity and scienter (as discussed below). Defendants argue that the Court may not consider the witness statements because they are "lower level employees in isolated roles who lacked visibility into Manhattan's business as a whole" and Defendants' knowledge. (Doc. 43-1 at 27). But the amended complaint provides enough detail for the Court to consider the witness statements. The complaint describes "the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1361–62 (N.D. Ga. Sep. 19, 2018) (citing *Mizzaro*, 544 F.3d at 1239); (*see* Doc. 41 at ¶¶ 33–38 (detailing the job positions of the employees), ¶¶ 86–101 (detailing FE-1's proximity to Defendants and the conduct), ¶¶ 103–29 (detailing FE-2's involvement with the clouds services and Manhattan's customers), ¶¶ 144–47 (FE-3's experience with lack of work), ¶¶ 130–32, 155 (same for FE-4), ¶¶ 152–54 (same for FE-5), ¶¶ 139–42 (same for FE-6)). Thus, the Court considers the witness statements here.

Plaintiffs allege that Defendants made materially false and misleading statements and omissions about the health of Manhattan's services business, particularly that the Company's cloud-based products were "fueling" growth in the services revenue. (Doc. 41 at ¶ 160). In reality, the opposite was true—Manhattan's

cloud-based products required less services and were often faulty, leading to reduced services demand, and Manhattan's services employees suffered from a lack of work because of it. (*Id.*) Accepting these allegations as true, the statements made during the 2024 earnings calls implied that there was strong demand for cloud-based services specifically. (Doc. 41 at ¶¶ 161, 163, 176, 178).

Defendants argue that Plaintiffs have not pleaded any facts showing that demand for cloud subscriptions did *not* fuel opportunities to generate services revenue. (Doc. 43-1 at 20–21). But Plaintiffs have alleged that there was reduced services demand while Defendants were promoting the opposite. And although Defendants cite to the increase in services revenue during 2024 as evidence that their statements were not false, Plaintiffs point to the $70 million downward revision to the 2025 total revenue that was driven by "a reduction in services revenue." (*See* Doc. 43-1 at 22 (citing Doc. 41 at ¶ 42); Doc. 45 at 28 (citing Doc. 41 at ¶ 204)). Such a reduction is consistent with Plaintiffs' allegations. Plaintiffs also point to "particularized, contemporaneous facts" through the confidential witness statements. (Doc. 41 at ¶ 87 (FE-1 reported that the switch to cloud-based software meant downgrading from millions of dollars in services to thousands)); *but see City of Southfield Gen. Emps.' Ret. Sys.*, 2024 WL 1376016, at *9 (the plaintiffs' fraud-by-hindsight argument failed, as they did not point to particularized facts demonstrating falsity).

Defendants also argue that Plaintiffs' allegations regarding delays and canceled contracts are not pleaded with particularity because long-term cloud contracts could not be canceled at-will, and Plaintiffs did not identify any services

contracts (which could be canceled at-will) that were canceled due to failed implementations. (Doc. 43-1 at 23–24). Although Plaintiffs have not identified a canceled contract by name, the confidential witness statements identify personal observations of clients that were unhappy and that some eventually canceled their contracts. FE-2 explained that "Manhattan's clients who had committed to working with Manhattan had decided to pull out because of the cloud-based software issues," and he had "witnessed and seen clients leave the Manhattan ecosystem completely due to the technical issues and go to a third-party competitor." (Doc. 41 at ¶¶ 126–27). He also reported that a specific Manhattan customer reached out to him directly after his termination to see if he would work as a consultant. (*Id.* at ¶ 128). He detailed his experience with a specific customer, termed H-E-B, who was "extremely disappointed and upset with the cloud-based service throughout his tenure." (*Id.* at ¶ 112). He also claimed his allegations were supported by other personnel whose "customers were experiencing similar problems." (*Id.* at ¶ 114).

Defendants also argue Plaintiffs have failed to plead that the allegations regarding staffing were false and are relying solely on fraud-by-hindsight. (Doc. 43-1 at 25). But Plaintiffs have alleged that the statements were false *when made*, as evidenced by the factual allegations regarding Defendants' knowledge at the time of the statements (and explained in more detail below in the analysis of the confidential witness statements). Plaintiffs are not simply pointing to after-the-fact statements as the sole basis for why an earlier statement was false. And the Court can rely on the confidential witness statements to reasonably infer that the statements were

false when made. *See City of Southfield Gen. Emps.' Ret. Sys.*, 2024 WL 1376016, at *12 (collecting cases where confidential witness testimony was sufficient to support falsity allegations); (Doc. 49 at 13–14). Thus, Plaintiffs have plausibly alleged falsity with particularity.

2. Scienter

Under the PSLRA, scienter must be stated with particularity and give rise to a "strong inference" of the required mental state. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1275 n.10 (11th Cir. 2016) (citation omitted). Scienter consists of "intent to defraud or 'severe recklessness' on the part of the defendant." *Id.* (citing *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 790 (11th Cir. 2010)). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve an extreme departure from the standards of ordinary care that are so likely to mislead that the defendant must have been aware of it." *Id.* (citation modified). "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute." *FindWhat Inv. Grp.*, 658 F.3d at 1296. "[I]f a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged," then the complaint should survive a motion to dismiss. *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1301 (11th Cir. 2015) (citation omitted).

"In order for statements from a confidential witness to raise a strong inference of scienter, the statements must be described with sufficient particularity to establish

the witness's reliability and personal knowledge and the statements must themselves be indicative of scienter." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 925 (11th Cir. 2020) (citation modified). The Court "should not eviscerate the weight given" to confidential witness statements "if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id.* at 924 (citing *Mizzaro*, 544 F.3d at 1240). Moreover, scienter is plausibly alleged where confidential witnesses report that executive defendants received "daily and weekly updates" of the issue but made public remarks that "there were no surprises," "they were right on track," and the "teams were executing at or ahead of expectations." *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d at 1361–62; *see also Hubbard v. BankAtlantic Bancorp., Inc.*, No. 07-61542-CIV, 2009 WL 3261941, at *1, *3 (S.D. Fla. May 12, 2009) (finding scienter was sufficiently pleaded where the defendants "were at meetings where such deficiencies were discussed and regularly received reports . . . detailing such deficiencies during the Class Period").

At the motion to dismiss stage, even with the heightened pleading requirements, Plaintiffs have plausibly alleged at least severe recklessness by Defendants. Plaintiffs summarize their scienter allegations as follows: (1) Defendants knew that the demand for services was declining and they would be unable to meet their services revenue forecasts, (2) Capel's abrupt resignation after the revealed decline raises a strong inference of scienter, (3) the Company's services employees lacked work and were eventually terminated, and (4) Manhattan described its

services business as the "secret weapon" of the Company. (Doc. 41 at ¶¶ 212–42).

According to Plaintiffs, FE-1 reported that the Company, Capel, and Story "knew internally by April 2024" that Manhattan was not going to make its full year 2024 services revenue forecasts "because the sales pipeline was not there, it was dry." (*Id.* at ¶¶ 6, 84, 91, 214). FE-1 explained that "high level executives" were aware of the likelihood of not meeting revenue forecasts because the executives received monthly update presentations. (*Id.* at ¶¶ 93, 216 n.10). The Company's documented rules required these presentations to be shown to Capel and Story. (*Id.* at ¶ 217). FE-1 stated that Capel met with the Company's Engagement Directors every other week for "key account reviews," and Story was in approximately 90% of the reviews, of which FE-1 presented and participated in approximately twice a year. (*Id.* at ¶¶ 100, 218, 220). These same high-level executives directed FE-1 and other directors to proactively ask customers for new or early orders, which had never been done before. (*Id.* at ¶ 95). Other former services employees reported lack of work and hiring issues during the Class Period. (Doc. 41 at ¶¶ 8, 138–55). Yet, in July 2024, Capel and Story told investors that "solid product demand" fueled opportunities for growth." (*Id.* at ¶ 161). In October 2024, Capel indicated that there was "strong demand for our services." (*Id.* at ¶ 178). The witness statements of the confidential former employees, combined with the statements that Story and Capel made during the Class Period, plausibly allege that the Company was severely reckless in misrepresenting the state of its services business.

And, although Defendants offer another "inference of non-fraudulent intent,"

"if a reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference," then the complaint should survive. *Brophy*, 781 F.3d at 1301 (citation omitted). The inference that Defendants knew about the declining demand for the services business and touted its growth anyway is at least as compelling as the argument that Defendants revised their guidance as necessary and acknowledged an "uncertain macroenvironment." (Doc. 41 at ¶ 177). At this stage, viewing the amended complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged scienter. *See In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d at 1362.

**B. Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a)**

To state a claim under Section 20(a) for control person liability, a plaintiff must allege "(1) that the company defendant committed a primary violation of the securities laws; (2) that the individual defendants had the power to control the general business affairs of the company defendant; and (3) that the individual defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *In re Floor & Decor Holdings, Inc. Sec. Litig.*, No. 1:19-cv-02270-SCJ, 2020 WL 13543880, at *5 (N.D. Ga. Sep. 21, 2020) (citation modified). Section 20(a) claims are derivative claims that only succeed if a plaintiff sufficiently pleads a Section 10(b) violation. *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890, 894 (11th Cir. 2012) ("Because a primary violation of the securities laws constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a § 20(a) claim only where the plaintiff adequately pleads

a primary violation."); *Buqueras*, 2025 WL 3183000, at *3 n.2.

The only argument Defendants advance for dismissal of Plaintiffs' Section 20(a) claim is that they failed to plead a viable primary violation of the Exchange Act. (Doc. 43 at 2–3). Essentially, this claim rises and falls with the first claim. But as discussed above, Plaintiffs have sufficiently demonstrated an underlying violation of the securities laws, and that the individual Defendants, as CEO and CFO, had the power to control Manhattan's business affairs and Manhattan's services business. Therefore, Plaintiffs' Section 20(a) claim may also proceed to discovery.

* * *

For clarity, the list below reflects the Court's determinations as to the 13 statements identified by Plaintiffs. The Court struck-through the non-actionable statements identified in this Order and finds that the remaining statements are actionable under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5.

- Capel's statement that: "Our best-of-breed cloud-native platform and solutions provide continuous access to innovation and are a key component of our customer success. These mission critical solutions help our clients strengthen their relationships with their end customers, drive more revenue and improve efficiency. These powerful benefits are translating into a record solutions pipeline for us with new potential customers representing about 35% of the demand. As solid product demand is also fueling opportunities for growth of our internal services organization, as well as the growing roster of Manhattan Value Partners." (Doc. 41 at ¶ 161).

- Story's statement that: The Company's "global services teams delivered record revenue totaling $137 million, up 10%" ~~and that "this was in line with our expectations as cloud sales continue to fuel services revenue growth for Manhattan."~~ Story then explained that Manhattan's "performance was driven by strong cloud and services revenue growth

combined with operating leverage as our cloud business continues to scale. ~~[I]mportantly, as Eddie [Capel] discussed, we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable long-term growth.~~" (*Id.* at ¶ 163).

- In response to a question about what specifically was driving the growth in basis points for gross margins for subscription, maintenance, and services, Story responded that "No, just a positive mix between services and cloud in the gross margins." The analyst questioned if this is "just more on the mix of revenue components," to which Story responded "Yeah." (*Id.* at ¶ 165).

- Capel's statement that: "Now, like the last few quarters, our global services team completed over 100 go-lives in Q2 . . . ~~and continue to perform very well for our customers. And while we remain appropriately cautious on the global economy, we continue to invest to drive growth from our numerous opportunities.~~ This includes monetizing strategic investments in industry-leading innovation, further enablement of our customer success, and the expansion of our addressable market. From a hiring perspective, we've hired just over 100 new team members year-to-date ~~and plan on continuing our hiring posture for the remainder of the year~~." (*Id.* at ¶ 167).

- Capel's statement that: "~~Yeah, we plan to continue to hire.~~ Now, the good news is that our attrition rate is – for this year is lower that we had forecasted. So that helps in all kinds of different ways, not at least – not least of which on efficiency, margin, customer satisfaction and so forth~~, but lower attrition does mean, potentially a little bit less hiring. But we do definitely plan to expand our team in the second half of the year, for sure. And those hires will be largely in customer-facing and services roles~~." (*Id.* at ¶ 169).

- Capel's statement that: "For the quarter, total revenue increased 12% to $267 million, and adjusted earnings per share increased 29% to $1.35. Both of these metrics were above our expectations. Driving the top-line outperformance and earnings leverage with solid cloud and services revenue growth across all geographies, with cloud subscription revenue posting 33% growth in the quarter." (*Id.* at ¶ 175).

- Capel's statement that: "~~The Manhattan's business fundamentals are solid, and we remain confident and very optimistic about our business opportunity.~~ While the global macro environment remains challenging, demand for our solutions is robust, customer satisfaction is high and [a]s evidenced by our recent release of the Manhattan Active Supply Chain

Planning Solution, the investments we're making in R&D and our people are creating a clear differentiation. Delivering consistent market[-]leading innovation is creating more opportunities across supply chain, omnichannel retail and at the world's best – as the world's best brands look to unify and digitally transform." (*Id.* at ¶ 176).

- Capel's statement that: "RPO, remaining performance obligation, increased 27% to roughly $1.7 billion. And as we've often cautioned, large, complex deals can be lumpy on a quarter-over-quarter basis. And whilst we haven't seen much of that lumpiness over the past three or four years, this quarter and, to a lesser extent, last quarter, we have seen some. And our third quarter RPO growth was impacted by some large digital transformational projects pushing out. ~~That said, our fourth quarter is off to a great start, and demand is solid and attributes that give us confidence that we will actually achieve at the high end of our 2024 RPO bookings guidance of $1.8 billion.~~ Across our industry leading product portfolio and global pipeline sits at record levels, our win rates remain strong at about 70%. ~~And these factors, despite the uncertain macroenvironment, again, give us confidence that we'll achieve the high end of our 2024 RPO bookings goals, and equally important, are well positioned for continued success in 2025, 2026, and of course, beyond that.~~ . . . In Q3, 14% of our new bookings were generated from net new logos~~, and we continue to have a very healthy mix of conversions, upsells and cross-sells. And we believe this demonstrates the many and varied opportunities we have for sustainable future growth.~~ And as stated earlier, our solution pipeline is at record levels and new potential customers represent about 35% of that demand. This strong demand is driven by our best-of-breed cloud native solutions that provide continuous access to innovation and are helping our customers digitally transform their businesses to drive success. Our mission critical solutions help our clients improve customer satisfaction, drive more revenue, and improve efficiency." (*Id.* at ¶ 177).

- Capel's statement that: "And this strong demand for our solutions is also fueling opportunities in growth for our internal services organization and our systems integration partners. In Q3, our global services team completed over 100 go-lives ~~and continue to perform very well for our customers.~~" (*Id.* at ¶ 178).

- Story's statement that: "~~Importantly, Manhattan continues to benefit from a record pipeline that includes solid demand from both new and existing customers, and strong win rates are giving us confidence in achieving the high end of our 2024 RPO bookings outlook and the ability to provide strong 2025 outlook parameters.~~ Our global services teams

delivered record revenue totaling $137 million, up 7%~~, as cloud sales continue to fuel services revenue growth for Manhattan~~. Adjusted operating profit was $99 million, with adjusted operating margin of 37.1%. This is 670 basis points year-over-year up. Our performance was driven by strong cloud and services revenue growth combined with operating leverage~~, as our cloud business continues to scale. As Eddie discussed, we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable, long-term growth.~~" (*Id.* at ¶ 180).

- ~~Story's statement that: "Now moving to 2025, we're going to provide some preliminary parameters here. We are currently in the very early stages of our 2025 budget cycle, and we'll firm up this outlook on our Q4 call as we get through the US election process and our final market analysis. With that, we are targeting total revenue of $1.13 billion to $1.14 billion, representing 9% to 10% growth, with license and maintenance attrition masking total growth by 5 percentage points. This includes our cloud revenue target of $415 million, representing 23% year-over-year growth. For RPO, we are targeting $2.15 billion, which represents 21% growth. In 2025, we are targeting services revenue of $565 million to $575 million. The $570 million midpoint represents 8% growth. In summary, our preliminary 2025 parameters include total revenue, excluding license and maintenance attrition, to increase 14%, cloud revenue to increase 23%, services revenue to increase 8%, and RPO to increase 21%, and for an operating margin of 33.5%, while increasing our investment in Manhattan leading innovation. All-in solid execution by our global Manhattan team and looking forward to the ending the year strong." (*Id.* at ¶ 182).~~

- When asked about the "upside that you saw in the quarter and in the guide" by an analyst, Story responded: "Absolutely. From a mix standpoint, it's a fantastic execution by the business, record cloud and services. Yeah, just great performance there." (*Id.* at ¶ 184).[4]

- Capel's statement that: "[O]ur fourth quarter is off to a solid start, and we are providing responsible 2025 parameters." (*Id.* at ¶ 186).

---

[4] While this statement was grouped broadly in Defendants' falsity-by-particularity section, it was otherwise not discussed by Defendants in their briefing. The same is true for statements included at ¶¶ 165, 175, 182 of the amended complaint (though they were included in the forward-looking statements chart). Similarly, Defendants do not discuss ¶ 186 of the amended complaint other than including it in their challenged forward-looking statements chart. (*See* Doc. 43-19).

## Conclusion

For these reasons, Defendants' Motion to Dismiss (Doc. 43) is **DENIED**. Pursuant to the Court's June 10, 2025 Order, Defendants' answer to Plaintiffs' amended complaint is due by **November 13, 2026**. By **October 29, 2026**, the parties shall confer as required by Local Rule 16.1 and file a Joint Preliminary Report and Discovery Plan.

SO ORDERED, this 29th day of September, 2026.

TIFFANY R. JOHNSON
United States District Judge